UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **ABEER ABOUYABIS** | |
| *Plaintiff,* | |
| v. | |
| **EMORY UNIVERSITY**, | |
| **EMORY HEALTHCARE, INC.**, | |
| **RAVI THADHANI**, | |
| **JOON LEE,** | |
| **CARLOS DEL RIO,** | |
| **JASON D. WEIDEN**, | |
| **CANARY MISSION**, | Case No. 1:25-cv-02438-ELR-CCB |
| **TUVIA MILSZTEIN, AKA ADAM MILSTEIN**, | |
| **ADAM AND GILA MILSTEIN FAMILY FOUNDATION** | JURY TRIAL DEMAND |
| **ANN AND ROBERT FROMER CHARITABLE FOUNDATION INC.**, | |
| **NATAN AND LIDIA PEISACH FAMILY FOUNDATION**, | |
| **STOPANTISEMITISM.ORG**, | |
| **LIORA REZNICHENKO**, | |
| **GILA MILSTEIN**, | |
| **MERONA LEADERSHIP FOUNDATION**, | |
| **KOUM FAMILY FOUNDATION**, | |
| *Defendants.* | |

## FIRST AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND

Plaintiff Abeer AbouYabis ("Dr. AbouYabis") files this Complaint against Defendants

Emory University ("Emory" or "University"), Emory Healthcare, Inc. ("Emory Health"),

Ravi Thadhani, Joon Lee, and Carlos del Rio, Jason D. Weiden, Canary Mission, Tuvia

Milsztein (aka Adam Milstein), Adam and Gila Milstein Family Foundation, Ann and Robert Fromer Charitable Foundation Inc., Natan and Lidia Peisach Family Foundation, StopAntiSemitism.org, Liora Reznichenko (aka Liora Rez), Gila Milstein, Merona Leadership Foundation, and Koum Family Foundation, and alleges as follows:

## I.    INTRODUCTION

1.    This case exposes a brazen campaign of institutionalized discrimination, retaliation, and censorship orchestrated by a major academic institution and its allies to punish a Palestinian Muslim physician for daring to advocate for her people. Dr. Abeer AbouYabis—a board-certified hematologist and medical oncologist, esteemed educator, and lifelong champion of equity—was terminated by Emory University in 2023 for privately condemning Israel's genocide in Gaza, while non-Palestinian faculty who endorsed, celebrated, and advocated for the genocide faced no consequences.

2.    Emory, colluding with the anti-Palestinian hate group that operates under the misleading name StopAntisemitism and Canary Mission, weaponized false accusations of "antisemitism" to silence Dr. AbouYabis's protected speech. This termination occurred during Dr. AbouYabis's federally protected medical leave for PTSD and depression stemming from the traumatic loss of 37 family members in Israel's genocidal campaign in Gaza in October 2023 and exacerbated by Emory's own discriminatory and retaliatory investigation. Meanwhile, Emory shielded faculty like Dr. Joshua H. Winer—who not only publicly endorsed the Israeli military's genocide in Gaza but opted to participate in the Zionist genocide by volunteering in the Israeli Defense Forces (IDF)—and Dr. Jason Weiden, who celebrated the indiscriminate killing and annihilation of Gaza and its indigenous Palestinian inhabitants and led a social media smear campaign against Dr. AbouYabis.

3.     This lawsuit challenges a systemic double standard: Emory enforces conduct policies with discriminatory fervor against Palestinians and Muslims while excusing identical or worse conduct by Zionist faculty. It reveals how well-funded networks like StopAntisemitism.org and its backers (including the Milstein Family Foundation) exploit antisemitism accusations as a political cudgel to erase Palestinian narratives, suppress dissent, and legitimize occupation, apartheid, and genocide.

4.     Dr. AbouYabis's termination is not an isolated incident. It reflects a national pattern of Israeli-aligned groups using defamation, doxing, and institutional capture to chill advocacy for Palestinian rights—a modern-day McCarthyism enabled by universities like Emory. The First Amendment, Title VII, core civil rights statutes, and state law exist to prevent such abuses. This Court must hold Defendants accountable for their unlawful conduct.

## II.    JURISDICTION AND VENUE

5.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Dr. AbouYabis's claims arise under federal statutes, including: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (national origin and religious discrimination and retaliation); 42 U.S.C. § 1981 (racial discrimination); 42 U.S.C. § 1983 (First Amendment retaliation and Due Process violations); 42 U.S.C. § 1985(3) (conspiracy to violate civil rights); Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (discrimination under federally funded programs); the Americans with Disabilities Act, 42 U.S.C. § 12112 et seq. (retaliation for disability accommodations); and the Family and Medical Leave Act, 29 U.S.C. § 2615 et seq. (interference with protected leave).

6.     This Court has supplemental jurisdiction over Dr. AbouYabis's state law claims for defamation and breach of contract under 28 U.S.C. § 1367, as these claims form part of the same case or controversy as the federal claims.

7.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this District, including Dr. AbouYabis's employment at Emory University, the discriminatory termination, and Defendants' retaliatory conduct. Defendant Emory University resides in this District, and its principal place of business is in Atlanta, Georgia.

8.     This Court has personal jurisdiction over all Defendants. Emory University and Emory Healthcare, Inc. are Georgia entities conducting business in this District. Defendants StopAntisemitism.org, its Executive Director Liora Reznichenko (aka Liora Rez), and its primary funders—the Adam and Gila Milstein Family Foundation, Ann and Robert Fromer Charitable Foundation Inc., Natan and Lidia Peisach Family Foundation, Merona Leadership Foundation, and Koum Family Foundation—purposefully directed harmful conduct into this District by funding and coordinating the cyberstalking, doxing, and defamation campaign against Dr. AbouYabis, pressuring and coordinating with Emory to secure Dr. AbouYabis's termination, and amplifying defamatory content, causing foreseeable harm in Georgia. Defendant Canary Mission, a Zionist cyberstalking project directly funded by these entities, further targeted Dr. AbouYabis with false accusations of terrorism support, which were disseminated in Georgia.

9.     Individual Defendants Ravi Thadhani, Joon Lee, Carlos del Rio, and Jason D. Weiden—Emory executives and faculty—reside and work in this District, where they executed retaliatory termination, enforced discriminatory policies, and defamed Dr.

AbouYabis. Defendants Tuvia Milsztein (aka Adam Milstein) and Gila Milstein, as a trustees of the Milstein Family Foundation and Merona Leadership Foundation, ratified and funded these actions. All Defendants' conduct was expressly aimed at silencing, penalizing, and intimidating conscientious voices in Georgia that humanize Palestinians and oppose Israel's occupation, apartheid, and genocide in Palestine, establishing specific jurisdiction under Georgia's long-arm statute (O.C.G.A. § 9-10-91).

10.    The amount in controversy exceeds $75,000, exclusive of interest and costs, satisfying diversity jurisdiction under 28 U.S.C. § 1332(a) as to non-federal claims involving diverse parties.

## III.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

11.    Dr. AbouYabis filed a timely charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on May 2, 2024—within 300 days of her November 8, 2023, termination—satisfying jurisdictional prerequisites.

12.    The EEOC issued a Right-to-Sue Letter on January 31, 2025, explicitly authorizing Dr. AbouYabis to pursue her claims in federal court. This action is filed within 90 days of receiving the Notice, as required under 42 U.S.C. § 2000e-5(f)(1).

## IV.    PARTIES

13.    **Plaintiff Abeer AbouYabis** is a Palestinian American Muslim board-certified hematologist and oncologist, recognized as one of *Atlanta's Best Doctors in Hematology (2023)*, with over 20 years of clinical and academic excellence. She is a distinguished educator and former Co-Vice Chair of Diversity, Equity, and Inclusion in the Department of Hematology and Medical Oncology at Emory University, and she pioneered transformative care models

for sickle cell disease and high-risk pregnancies in underserved communities in central Georgia while advocating nationally for health equity and interfaith dialogue.

14.     **Defendant Emory University** is a private research university in Atlanta, Georgia, and Dr. AbouYabis's former employer. Emory receives federal funding and operates under policies governing faculty conduct, academic freedom, and anti-discrimination.

15.     **Defendant Emory Healthcare, Inc.** is Emory University's affiliated healthcare system, which oversees clinical privileges and patient care at Emory facilities. Emory Healthcare jointly enforced the discriminatory termination and public defamation of Dr. AbouYabis.

**16.**     **Defendant Ravi I. Thadhani** is the Executive Vice President for Health Affairs of Emory University, Executive Director of the Woodruff Health Sciences Center, and Vice Chair of the Emory Healthcare Board of Directors. As the senior executive overseeing Emory's health sciences enterprise, Thadhani authorized and endorsed the public email of October 17, 2023, which defamed Dr. AbouYabis as promoting "comments rooted in bias and hate." His directive to place her on administrative leave—despite no evidence of workplace disruption—reflects institutional complicity in discriminating against Palestinian employees and suppressing Palestinian voices.

17.     **Defendant Joon Sup Lee** is the CEO of Emory Healthcare, overseeing 11 hospitals, 250 provider locations, and 24,000 employees. Defendant Lee co-signed the October 17 email, leveraging his operational authority to enforce Dr. AbouYabis's retaliatory suspension. By publicly labeling her posts as "antisemitic" without due process, he amplified Canary Mission and StopAntisemitism.org's defamation campaign, directly contributing to her termination.

18.    **Defendant Carlos del Rio** is the Interim Dean of Emory School of Medicine, Interim Chief Academic Officer of Emory Healthcare, and Executive Associate Dean for Emory at Grady. Del Rio initiated the October 17 conference call informing Dr. AbouYabis of her administrative leave. Despite admitting he had not reviewed her posts, he endorsed their characterization as "antisemitic," violating Emory's Respect for Open Expression Policy and enabling her wrongful termination.

19.    **Defendant Jason D. Weiden** is an Emory radiologist who publicly denounced Dr. AbouYabis as a "Hamas supporter" on social media and led a coordinated campaign for her termination within Emory, but faced no disciplinary action, exemplifying Emory's selective enforcement of conduct policies against Palestinian employees.

20.    **Defendant Canary Mission** is an anonymous U.S.-based criminal cyberstalking operation funded by U.S.-based entities and headquartered in Israel. It maintains a principal place of business c/o Megamot Shalom, 13 Hillel Street in Jerusalem, Occupied Palestine, and a U.S. address of c/o Central Fund of Israel, 461 Central Ave, Cedarhurst, NY 11516. While headquartered in occupied Palestine, Defendant Canary Mission's anonymous cyberstalking operation has substantial contacts in Georgia, where it targets Palestinian advocates at academic institutions and teaching hospitals. It is a deliberately opaque entity that maintains anonymity in its operations, funding, and organizational structure. It operates the cyberstalking website canarymission.org, which publishes cyberstalking dossiers targeting university students, faculty, and staff critical of the Zionist occupation, apartheid, and genocide in Palestine. Defendant Canary Mission is not a registered nonprofit in the United States, enabling its donors—including Defendant Ann and Robert Fromer Charitable Foundation Inc., Defendant Natan and Lidia Peisach Family

Foundation, and Defendant Adam and Gila Milstein Family Foundation—to evade public accountability for financing its criminal enterprise. Defendant Canary Mission is linked to Megamot Shalom, a Zionist nonprofit registered as a public benefit corporation in Beit Shemesh, in occupied Palestine, which is a legal structure that allows anonymity for donors and avoids U.S. nonprofit disclosure requirements. Donations to Defendant Canary Mission are funneled through the Central Fund of Israel, a New York-based 501(c)(3) organization that acts as a financial intermediary for groups supporting Zionist settlements in Palestine and the perpetual occupation, apartheid, and genocide of Palestine and Palestinians through far-right Zionist organizations. Canary Mission's lack of transparency, coupled with its coordination with undisclosed donors and foreign entities, renders it a nominal defendant whose true stakeholders require discovery to unmask.

21.    **Defendant Tuvia Milsztein, aka Adam Milstein,** is a California-based real estate investor, influential Zionist lobbyist, and founder of the Adam and Gila Milstein Family Foundation (MFF). Defendant Milsztein directed MFF funds to organizations like StopAntisemitism.org and Canary Mission, which systematically dox, harass, and cyberstalk conscientious advocates on Palestinian human rights. Defendant Milsztein publicly endorses strategic campaigns conflating anti-Zionism with "antisemitism." MFF's financial support enabled StopAntisemitism.org's doxing of Dr. AbouYabis, directly contributing to her termination and reputational harm.

22.    **Defendant Adam and Gila Milstein Family Foundation** (MFF) is a private foundation headquartered in Encino, California, that is the principal funder of anti-Palestinian advocacy networks in the United States. MFF funds StopAntisemitism.org's 2023 "Hamas Watchlist" campaign, which targeted Dr. AbouYabis. MFF also supports Canary

Mission's blacklist database, used to pressure institutions like Emory to punish Palestinian-affiliated students, faculty, and staff. MFF finances campus initiatives (e.g., UCLA's "Israel Fellowship") promoting policies that strategically equate Palestinian solidarity with "antisemitism."

23.     **Defendant Ann and Robert Fromer Charitable Foundation Inc.** is a Florida-based foundation (EIN 46-4350926) that funneled money to Canary Mission in 2023 through the Central Fund of Israel, while also funding Friends of the IDF and Birthright Israel. These contributions directly supported Canary Mission's blacklisting of Dr. AbouYabis.

24.     **Defendant Natan and Lidia Peisach Family Foundation** is a Florida-based foundation (EIN 20-3785948) that donated to Canary Mission in 2023, enabling its targeted cyberstalking, harassment, defamation, and termination of Dr. AbouYabis. Board members Alberto Peisach and Monica Sasson oversaw grants to organizations that amplified StopAntisemitism.org's smear campaign against Dr. AbouYabis.

25.     **Defendant StopAntisemitism.org** is a non-profit foundation that orchestrated a doxing campaign against Dr. AbouYabis by disseminating doctored screenshots of her private social media posts, falsely labeling her critiques of Israeli policy as "antisemitic."

26.     **Defendant Liora Reznichenko, aka Liora Rez** is the Executive Director of StopAntisemitism.org, who personally directed the targeted harassment of Dr. AbouYabis, amplifying the posts to over 2.3 million viewers and coordinating with Emory to secure her termination.

27.     **Defendant Gila Milstein** is a trustee of the Adam and Gila Milstein Family Foundation (MFF) and Principal Officer of the Merona Leadership Foundation. Defendant Gila Milstein directed funding to StopAntisemitism.org and Canary Mission—cyberstalking

operations that orchestrated the doxing and harassment campaign against Dr. AbouYabis. MFF provided funding annually to StopAntisemitism.org, enabling its targeting of conscientious people who empathize with and humanize Palestinian suffering. Defendant Gila Milstein oversaw MFF's "Active Philanthropy" strategy, which explicitly funds groups that "combat anti-Zionism" by silencing critics of Israel. Her leadership of the Merona Foundation further amplified this network, coordinating with Israeli government-linked initiatives to suppress voices humanizing Palestinians.

28.    **Defendant Merona Leadership Foundation** is a California-based nonprofit (EIN 47-1603664) operated by Gila and Adam Milstein (co-founders of the Milstein Family Foundation) that directly funds StopAntisemitism.org, providing annual funding for Liora Reznichenko's salary and operational costs. Defendant Merona Foundation supports "nonprofits that fight antisemitism," including campaigns targeting Palestinian students through Canary Mission and StopAntisemitism.org.

29.    **Defendant Koum Family Foundation** is founded by WhatsApp co-founder Jan Koum. This $2.3 billion foundation (EIN 47-5456562) donated to StopAntisemitism.org in 2023 via the Merona Leadership Foundation. Defendant Koum Foundation's funding enabled Reznichenko's doxing of Dr. AbouYabis.

## V.    FACTUAL ALLEGATIONS

### A. DR. ABEER ABOUYABIS, A MUSLIM WOMAN

30.    Dr. AbouYabis moved to the United States in 2001, experiencing a post-9/11 America where being a visibly Muslim woman meant navigating a landscape of pervasive discrimination, harassment, and fear. Like many Muslim women who wear the hijab, she

became a visible target in an era of heightened anti-Muslim bias and hate, where the simple act of covering her head marked her as "other."[1]

31.    The statistics paint a stark picture of the America Dr. AbouYabis inhabited: 76.7% of Muslim women report experiencing Islamophobia in their lifetimes, compared to 58.6% of Muslim men.[2] This gendered discrimination manifests in deeply personal ways—Muslim women regularly face having their hijabs forcibly removed, being spat upon, and enduring verbal assaults in public spaces.[3]

32.    Dr. AbouYabis witnessed the dramatic surge in anti-Muslim hatred after 9/11. FBI data showed anti-Muslim hate crimes skyrocketed from just 28 incidents in 2000 to 481 in 2001.[4] The trauma of this lived experience created what scholars call "social isolation," as many Muslim women and children were encouraged to stay home or alter their appearance out of fear for their safety.[5]

33.    Like countless other Muslim women, Dr. AbouYabis had to carefully navigate educational and professional spaces. Studies show that Muslim women face a "triple penalty" in employment—discriminated against based on gender, religion, and ethnicity.[6] The simple act of wearing a hijab reduces chances of receiving a job interview "close to zero."[7]

---

[1] Elsadig Elsheikh & Basima Sisemore, *Islamophobia Through the Eyes of Muslims*, OTHERING & BELONGING INST. (Sept. 29, 2021). Available at: https://belonging.berkeley.edu/sites/default/files/2021-10/Islamophobia%20Through%20the%20Eyes%20of%20Muslims.pdf.
[2] *Id.*
[3] Sakshi Venkatraman & Mirna Alsharif, *For Muslim Americans, a Spike in Hate Incidents Feels Reminiscent of Post 9/11 Islamophobia*, NBC News (Oct. 31, 2023), https://www.nbcnews.com/news/asian-america/muslim-americans-spike-hate-incidents-feels-reminiscent-post-911-islam-rcna122570.
[4] Aymen Ati, *The Post-9/11 Securitisation of the Hijab and International Human Rights Law: The Strasbourg Court, Article 9 and Hijab Restrictions*, 5 QUEEN MARY HUM. RTS. L. REV. 1 (2019). Available at: https://ssrn.com/abstract=3425845.
[5] Salih Tuzer, *The Impact of Islamophobia on the Education and Religious Identity of Muslims in the USA*, 17 TURKISH J. FOR RELIGIOUS EDUC. STUD. 131 (2024). Available at: https://doi.org/10.53112/tudear.1462175.
[6] Marjorie Moya, *Forgotten Women: The Impact of Islamophobia on Muslim Women in France*, European Network Against Racism (May 2016). Available at: https://www.enar-eu.org/wp-content/uploads/forgotten_women_report_france_-_final.pdf.
[7] *Id.*

34.    The psychological toll of this constant discrimination is profound: 93.7% of Muslims report that Islamophobia affects their emotional and mental wellbeing.[8] Even those who do not directly experience hate incidents feel constantly "monitored, judged, or excluded."[9] For visibly Muslim women like Dr. AbouYabis, this created what researchers call "stereotype threat," negatively impacting everything from healthcare access to professional achievement.[10]

35.    Yet Dr. AbouYabis persevered, like many Muslim women who refuse to compromise their faith despite facing what scholars describe as being "caught at the intersection of bias against Islam, the racialized Muslim, and women."[11] Her story exemplifies both the unique burden carried by Muslim women in post-9/11 America and their remarkable resilience in the face of persistent discrimination.

## B.  DR. ABEER ABOUYABIS, A PALESTINIAN REFUGEE

36.    Dr. AbouYabis is a Palestinian woman with deep roots in Palestine, a land where EuroAmerican Zionists have prohibited her from even visiting. Her family is scattered throughout occupied Palestine and the world, decreed by EuroAmerican settler-colonial Zionists to forever be refugees. She came into this world in Lebanon, among the family members who sought refuge there after being forcibly displaced from their ancestral homeland of Palestine in 1948.

---

[8] *Supra*, n.1.
[9] *Id.*
[10] Goleen Samari, *Islamophobia and Public Health in the United States*, 106 AM. J. PUB. HEALTH 1920 (2016). Available at: https://pmc_ncbi_nlm_nih.gov/articles/PMC5055770.
[11] Sahar F. Aziz, *From the Oppressed to the Terrorist: Muslim-American Women in the Crosshairs of Intersectionality*, 9 HASTINGS RACE & POVERTY L.J. 191 (2012). Available at: https://scholarship.law.tamu.edu/facscholar/100.

37.     Dr. AbouYabis's life reflects the systematic dispossession and institutionalized discrimination that Palestinians have endured under the Europe's Zionist apartheid regime in occupied Palestine. Her family's experience mirrors that of countless generations of Palestinians who have faced settler-sanctioned displacement through a complex web of violent, racist, and discriminatory laws, policies, and practices designed to privilege "Jewish" settlers from Europe at the expense of ancient indigenous Palestinians.

38.     The only life Dr. AbouYabis knows is one where the demolition of Palestinian homes and forced displacement represents a cornerstone of the Zionist apartheid system.[12] Dr. AbouYabis's family have been internally displaced or exiled refugees since the 1948 Nakba, when Europe's antisemitic fervor conceived of Zionism and established—through sheer terrorism and depraved indifference to human life—a colonial settlement in Palestine to rid itself from its European Jewish population.

39.     The initial immediate cost of the Nakba was the demolition of over 130,000 Palestinian homes and structures and the systematic erasure of entire villages and communities—forever wiping entire multi-generational families off the civil register.[13] For over 75 years, this catastrophe has continued. In 2023 alone, Israeli authorities demolished or seized 1,177 Palestinian structures—the highest number recorded since 2016.[14]

---

[12] Amnesty Int'l, *Israel's Apartheid Against Palestinians: Cruel System of Domination and Crime Against Humanity* (Feb. 1, 2022), https://www.amnesty.org/en/documents/mde15/5141/2022/en/.

[13] Israeli Comm. Against House Demolitions, *The Demolition of Palestinian Homes by Israel: A Fact Sheet* (Apr. 20, 2021), https://icahd.org/2021/04/20/the-demolition-of-palestinian-homes-by-israel-a-fact-sheet/.

[14] Office of the European Union Representative (West Bank and Gaza Strip, UNRWA), *One Year Report on Demolitions and Seizures in the West Bank, Including East Jerusalem* (Nov. 19, 2024), Reporting Period: Jan. 1 – Dec. 31, 2023. Available at: https://www.eeas.europa.eu/sites/default/files/documents/2024/One%20Year%20Report%20on%20Demolitions%20and%20Seizures%20in%20the%20West%20Bank%20including%20East%20Jerusalem%20-%201%20January%20%2031%20December%202023.pdf.

40.     Israel's 2018 Nation-State Law codified what Palestinians like Dr. AbouYabis's family had long experienced—an explicit constitutional mandate declaring "Jewish settlement" as a national value requiring state promotion.[15] This law formalized a system where Palestinians are separate and unequal, treated as an "inferior racial group and systematically deprived of their rights."[16]

41.     Dr. AbouYabis's family is impacted by the Zionist occupation's maintenance of "Jewish" domination over Palestinians through sweeping restrictions on movement, confiscation of Palestinian land, forced displacement of communities, denial of residency rights, suspension of basic civil rights, among others.[17]

42.     While conscientious people around the world read and research the plight of Palestinians, Dr. AbouYabis's family know how the Zionist occupation imposes territorial fragmentation to separate Palestinian families and communities, discriminatory land and property seizures, systematic denial of building permits, forced evictions and home demolitions, and denial of the right to return.[18]

43.     The Palestinian experience of being denied a home stands at the heart of the Zionist occupation's apartheid system.[19] For Dr. AbouYabis's family, like millions of Palestinians, this meant watching her ancestral home seized through "a cruel system" of "Jewish" domination and "crimes against humanity."[20]

---

[15] Hum. Rts. Watch, *A Threshold Crossed: Israeli Authorities and the Crimes of Apartheid and Persecution* (Apr. 27, 2021), https://www.hrw.org/report/2021/04/27/threshold-crossed/israeli-authorities-and-crimes-apartheid-and-persecution.
[16] *Supra*, n.22.
[17] Lama Fakih & Omar Shakir, *Does Israel's Treatment of Palestinians Rise to the Level of Apartheid?*, Hum. Rts. Watch (Dec. 5, 2023), https://www.hrw.org/news/2023/12/05/does-israels-treatment-palestinians-rise-level-apartheid.
[18] *Supra*, n.22.
[19] *Id.*
[20] *Id.*

44.     This system of oppression continues today, with Palestinians facing ongoing dispossession through home demolitions, land confiscation, and forced displacement—all carried out under the explicit mandate of maintaining Jewish dominance.[21] The trauma of this systematic erasure echoes through generations of Palestinian families like Dr. AbouYabis's, who have witnessed their families and communities fragmented, their rights systematically denied, their properties seized or destroyed, and their humanity unrecognized under a settler-colonial regime that explicitly positions indigenous Palestinians as *Untermenschen* ("subhuman") while privileging European Jews as the *Herrenvolk* ("master race")—the dominant ethnoreligious group.

## C. ZIONISM'S ANTISEMITIC AIM TO FRAME THE VIOLENT COLONIZATION AND SETTLEMENT OF PALESTINE AS "JEWISH" IN CHARACTER.

45.     For Palestinians, the psychological trauma of occupation and apartheid is inextricably linked to symbols and declarations of "Jewishness"—not by their choice, but by the explicit and repeated framing of their oppression as specifically "Jewish" by the Zionist occupation itself.[22]

46.     The Zionist occupation has constructed a comprehensive system of domination that explicitly privileges European Jewish settlers while systematically oppressing indigenous Palestinians. This system manifests through laws that enshrine "Jewish settlement" as a national value, military orders conducted under what the Zionist occupation antisemitically declares as a "Jewish army," forced violent displacement of Palestinians conducted in the name of maintaining "Jewish demographic dominance," and an apartheid regime that

---

[21] *Supra*, n.25.
[22] Amal Jamal, *Jewish Sovereignty and the Inclusive Exclusion of Palestinians: Shifting the Conceptual Understanding of Politics in Israel/Palestine*, 4 FRONTIERS POL. SCI. 995371 (2022). Available at: https://www.frontiersin.org/journals/political-science/articles/10.3389/fpos.2022.995371/full.

explicitly prioritizes Ashkenazi Jewish settlers.[23] This dehumanizing system has confronted Dr. AbouYabis her whole life.

47.    For Palestinians like Dr. AbouYabis's family, every aspect of daily violence and oppression is deliberately branded as "Jewish" by their Zionist oppressors.[24] For example, home demolitions carried out under the Star of David, checkpoints emblazoned with symbols of ethno-supremacist Jewish sovereignty, settlements explicitly established for "Jewish-only" residence, and brutal military operations conducted routinely under what the Zionist occupation calls the "Jewish flag."[25]

48.    Whether surviving the inhumanity of the Zionist occupation, apartheid, and genocide directly or secondarily as a displaced refugee living in exile, the psychological burden is particularly acute because Palestinians are told to separate their trauma from its explicitly antisemitic "Jewish" branding—all while suffering under laws that redefine the occupied Palestinian territories as exclusively "the nation-state of the Jewish people,"[26] suffering discrimination justified through "Jewish demographic needs,"[27] watching their homes demolished to make way for what the Zionist occupation calls "Jewish settlement,"

---

[23] *Supra*, n.22 & n.25.

[24] Lydia Wilson, *The Psychology of the Intractable Israel-Palestine Conflict*, New Lines Mag. (Oct. 24, 2023), https://newlinesmag.com/argument/the-psychology-of-the-intractable-israel-palestine-conflict/.

[25] *Supra*, n.22 & n.25.

[26] In the early 20th century, Ze'ev Jabotinsky, founder of Revisionist Zionism, articulated a vision of Zionist Jewish sovereignty spanning both banks of the Jordan River. His movement's anthem, "*The East Bank of the Jordan*" (1929), declared: "*The Jordan has two banks-this one is ours, and the other one too*," reflecting a claim to all of Mandatory Palestine (modern occupied Palestine, Lebanon, and Jordan). *See* Uri Avnery, *Foam on the Water*, GUSH-SHALOM (Sept. 22, 2007), http://zope.gush-shalom.org/home/en/channels/avnery/1190495504/. This ideology was institutionalized in 1977 when the Likud Party—Benjamin Netanyahu's political home—adopted a platform stating: "*Between the sea and the Jordan there will only be Israeli sovereignty*," explicitly rejecting Palestinian self-determination. *See* Rashid Khalidi, *It's Time to Confront Israel's Version of "From the River to the Sea*," THE NATION (Nov. 22, 2023), https://www.thenation.com/article/world/its-time-to-confront-israels-version-of-from-the-river-to-the-sea/. Likud's stance, rooted in Jabotinsky's revisionism, sought a Jewish state encompassing the entirety of historic Palestine, a vision later reinforced by Israel's 2018 Nation-State Law enshrining Jewish supremacy. Thus, the earliest iterations of the phrase "from the river to the sea" were tools of Zionist settler-colonial expansion, not Palestinian liberation.

[27] Gershon Shafir, *(Re)framing Jewish Privilege and Rebuffing Arab Rights*, Project on Middle E. Pol. Sci. (2023), https://pomeps.org/reframing-jewish-privilege-and-rebuffing-arab-rights.

and being subject to brutal military rule by what the Zionist occupation proclaims as its "Jewish army."[28]

49.    For Palestinians like Dr. AbouYabis, the documented severity of the mental health impact is too familiar. It manifests in high rates of anxiety disorders and PTSD to transgenerational trauma from decades of occupation and deep psychological wounds from daily humiliation.

50.    For Palestinians like Dr. AbouYabis, the psychological trauma of occupation and apartheid is not merely linked to violence and displacement, but to the explicit branding of that oppression as specifically "Jewish" by the Zionist occupation itself. This creates a complex psychological burden where victims must process their trauma through symbols their antisemitic oppressors have deliberately transformed from religious markers into symbols of unimaginable terrorism, emblems of depraved indifference to human life, and White Supremacy.

51.    Despite this incredible trauma, Dr. AbouYabis is not one to conflate Judaism with oppression, racism, and hate. She understands the reality that European Zionists are desperate to legitimize their extermination project in Palestine by deliberately framing their occupation, apartheid system, and terrorism as "Jewish."

## D. DR. ABEER ABOUYABIS, AN EXAMPLE OF PALESTINIAN RESILIENCE

52.    For Dr. AbouYabis, like countless other Palestinians, this reality means carrying cultural trauma—not just the direct experience of discrimination, but the collective memory of Zionist oppression that shapes identity formation and daily life. Yet her story also exemplifies the extraordinary resilience of the indomitable Palestinian spirit—never deterred,

---

[28] *Supra*, n.22 & n.25.

defeated, or dejected by the Zionist occupation, apartheid, displacement, systemic oppression, and decades-long ethnic cleansing campaign—which has persisted and achieved in the face of ethnoreligious supremacy, dehumanization, and systemic barriers designed to ensure its failure

53.    Born into a Palestinian refugee family in Lebanon during its civil war, Dr. AbouYabis earned her BS in Biology (1996) and MD (2000) from the American University of Beirut. Despite systemic barriers for Palestinian refugees in Lebanon—denied property rights, restricted professions, and exclusion from public-sector jobs—she graduated at the top of her class, demonstrating early resilience against institutionalized discrimination.

54.    In 2001, she relocated to the U.S., navigating post-9/11 Islamophobia as a visibly Muslim woman. She completed her Internal Medicine Residency at Emory University (2004), followed by Hematology/Medical Oncology Fellowship (2007) and Blood Bank and Transfusion Medicine Fellowship (2008), also at Emory University. Her admission to these competitive programs marked a rare achievement for a Palestinian refugee and a visibly Muslim woman in post-9/11 America.

55.    From 2009–2018, Dr. AbouYabis served as Medical Director of Hematology at Central Georgia Health System, addressing critical gaps in care for sickle cell and classical hematology patients, especially among underserved communities in central Georgia. She established the first Adult Sickle Cell Continuity Clinic in central Georgia, reducing ER visits through comprehensive care. As the sole hematologist on the blood utilization committee at Navicent Health, she helped establish the institution's first Massive Transfusion Protocol, now a national model for trauma response. She also co-founded central Georgia's first

Transitional Clinic for adolescents with inherited blood disorders, ensuring seamless continuity of care from pediatric to adult services.

56.     Dr. AbouYabis continued her dedication to underserved populations upon joining Emory in 2018. As one of only three non-pediatric hematologists on the Sickle Cell Transitional Care Team at Grady Health System, she advanced care for sickle cell patients—a population predominantly of African ancestry. Her expertise led to recurrent invitations as a guest speaker at professional forums, including the Southern Hospital Medicine Conference, where she shared best practices for equitable hematologic care.

57.     Dr. AbouYabis rejoined Emory in 2018 as an Assistant Professor, as a leading hematologist specializing in coagulation disorders, high-risk pregnancies, and sickle cell disease. Until the 2023 establishment of Winship Cancer Institute (Midtown), she was the sole hematologist at Emory Hospital (Midtown) providing outpatient care for patients with hematologic malignancies. She occupied many important roles at Emory. Among them, she served on Emory Healthcare's Blood Utilization Committee and Blood Conservation Team, where she implemented evidence-based guidelines to reduce unnecessary transfusions. During the COVID-19 pandemic, she contributed to the COVID-19 Atlanta Therapy Group at Emory Midtown, optimizing treatment protocols for critically ill patients.

58.     Dr. AbouYabis also served as Co-Vice Chair of Diversity, Equity & Inclusion (DEI) in the Department of Hematology/Oncology at Emory from 2021 to 2023. Her tenure was defined by her unflinching commitment to dismantling systemic inequities while fostering spaces for radical empathy. Her initiatives, grounded in verifiable institutional records and public reporting, bridged divides through experiential learning.

59.    In September 2023, Dr. AbouYabis launched the "Our Diversity Shared in Food" program in the Department of Hematology/Oncology during Emory's SOM Diversity & Inclusion Week. This initiative transformed cultural exchange into actionable solidarity. Faculty, staff, and students in the Department brought dishes representing their heritage, paired with narratives about the historical and political struggles embedded in their cuisines (e.g., Palestinian *maqluba* as resistance to displacement). Dr. AbouYabis participated with her own *manaqeesh*—a traditional Palestinian flatbread topped with *za'atar* (a thyme-based herb blend) and olive oil—a culinary emblem of Palestinian heritage that embodies the enduring connection to ancestral lands and centuries-old olive groves in Palestine.

60.    Dr. AbouYabis co-founded the Women's Interfaith Alliance of Middle Georgia, a pioneering initiative uniting Jewish, Christian, and Muslim women through open dialogue, shared religious practices, and collaborative community service. Under her leadership, the Alliance launched programs like the *School Food Packages Initiative*, where interfaith teams assembled meals for food-insecure children in Warner Robins public schools—directly addressing systemic inequities while modeling pluralism in action. After relocating to Atlanta, she continued this work as a member of Sisters of Salaam Shalom (SOSS), a national organization combating Islamophobia and antisemitism through grassroots solidarity—later becoming a co-leader (2022–2023). Her interfaith advocacy reflects her unwavering commitment to building bridges among different faith groups.

61.    Dr. AbouYabis's DEI work transcended performative allyship. Her department-wide communications contextualized religious and cultural observances within frameworks of historical struggle and solidarity. For instance, her 2023 Passover message emphasized the holiday's themes of liberation from oppression, concluded with a call for

solidarity with all marginalized groups, stating: "*Passover's message transcends the Jewish faith—it's a call for humanity to stand with the oppressed against oppression.*" A Jewish colleague affirmed her inclusive approach, messaging her "*This is the Abeer I know*" and sharing her communication widely. This pedagogical approach, which treated DEI as a critical praxis rather than performative checklist, fostered rare cross-cultural dialogue.

### E.  DR. ABEER ABOUYABIS, AN ADVOCATE FOR JUSTICE

62.    Dr. AbouYabis's commitment to justice extends far beyond her clinical practice, deeply rooted in her lived experience as a Palestinian refugee and her profound solidarity with Atlanta's African American community. Over more than two decades in Georgia, she has actively engaged with the African American struggle against systemic racism, generational trauma, and the enduring legacy of slavery (1619–1865), recognizing parallels with the Palestinian experience under 77 years of military occupation, institutionalized apartheid, and Zionist terrorism. While distinct in historical context, both narratives converge in their resistance to dehumanization: Palestinians confronting displacement, apartheid, and genocide under the Zionist *Herrenvolk* occupation, and African Americans battling the legacy of slavery through mass incarceration, voter suppression, economic exclusion, and police violence.[29] Dr. AbouYabis's advocacy, rooted in shared resilience, seeks to amplify these interconnected fights for dignity and justice.

63.    Defying the confines of the "model minority" myth—a racist stereotype weaponizing perceived success of some marginalized groups to dismiss systemic inequities faced by others—Dr. AbouYabis's identity and heritage ignite a profound awareness of

---

[29] Paula A. Braveman *et al.*, *Systemic and Structural Racism: Definitions, Examples, Health Damages, and Approaches to Dismantling*, 41 HEALTH AFF. 171 (2022). Available at: https://doi.org/10.1377/hlthaff.2021.01394.

injustice, heighten her vigilance against oppression, and compel her to dismantle structures of harm through her work as a physician and advocate.

64.     The legacy of systemic oppression transcends borders. In the United States, Jim Crow laws enforced a *de jure* apartheid regime for nearly a century after emancipation, denying African Americans voting rights, equitable education, and freedom from terror—including 3,446 documented lynchings between 1882 and 1968.[30] Similarly, since 1948, Palestinians have endured *de jure* apartheid under Israel's Nation-State Law, which codifies European Jews as the *Herrenvolk* ("master race") and indigenous Palestinians as *Untermenschen* ("subhuman"), denying Palestinian refugees' right of return and enabling mass displacement. From 2000 to 2025, Zionist forces and settlers killed over 48,570 Palestinians in Gaza and the West Bank,[31] with 1,768 Palestinian homes demolished in 2024 alone to entrench territorial fragmentation.[32] Both histories reveal how state-sanctioned violence and discriminatory legal regimes weaponize racial hierarchy to suppress liberation movements.

65.     During the COVID-19 pandemic, Dr. AbouYabis joined the George Floyd protests during her lunch breaks in Midtown Atlanta, standing against systemic racism and health inequities firsthand. As Co-Vice Chair of DEI at Emory, she became a trusted confidant for employees reporting discrimination.

66.     Dr. AbouYabis's advocacy addresses systemic discrimination across marginalized communities, including her clinical work with African American sickle cell

---

[30] Equal Justice Initiative, *Lynching in America: Confronting the Legacy of Racial Terror* 5 (3d ed. 2017), https://lynchinginamerica.eji.org/.
[31] Francesca Albanese, *Report of the Special Rapporteur on the Situation of Human Rights in the Palestinian Territory Occupied Since 1967*, U.N. Doc. A/HRC/55/73 (Mar. 18, 2025), https://www.ohchr.org/en/documents/country-reports/ahrc5573.
[32] Norwegian Refugee Council, *Area C is Palestine: Accelerated Annexation and Forcible Transfer* 6 (Oct. 7, 2024), https://www.nrc.no/globalassets/pdf/reports/area-c-is-everything/area-c-is-palestine---october-2024.pdf.

patients-a population disproportionately affected by healthcare disparities-and her public condemnation of Israel's genocidal siege of Gaza, which has decimated Palestinian access to medical care. Her dual focus on racial justice in U.S. healthcare and Palestinian liberation reflects a consistent commitment to equity and humanizing marginalized lives.

67.    In 2022, Dr. AbouYabis lobbied Congress alongside the American Society of Hematology (ASH) to pass the Sickle Cell Disease Comprehensive Care Act (S.721), which Senator Warnock co-sponsored and Senator Ossoff supported after testimony highlighting care barriers for Black patients. Her work reflects the Black-Palestinian solidarity movement, recognizing how slavery (1619–1865) and Zionist apartheid (1948–present) both weaponize legal systems to enforce racial health disparities.

68.    Just as 79% of African Americans report enduring systemic racism that shortens life expectancy by 4.7 years compared to white Americans,[33] Palestinians under Israeli occupation face institutionalized apartheid that has slashed Gaza's life expectancy from 75.7 years (2022) to 65.2 years (2023)—"[t]hat is almost 60 million years lost for the remaining 5.2 million Palestinians who have remained in Palestine and survived the genocide."[34] Infant mortality mirrors this oppression: Black infants die at 2.3 times the rate of white infants in the U.S., while 3,100 Palestinian children under five were killed in Gaza between October 2023 and August 2024 alone, with 83% of Gaza's population now facing famine-induced malnutrition.

---

[33] Sara N. Bleich *et al.*, *Discrimination in the United States: Experiences of Black Americans*, 54 HEALTH SERV. RES. 1399 (2019). Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC6864380.
[34] Vijay Prashad, *The Life Expectancy of Palestinians Fell by 11.5 Years in the First Three Months of the Genocide: The Fifth Newsletter*, Tricontinental Inst. for Soc. Res. (Jan. 30, 2025), https://thetricontinental.org/newsletterissue/life-expectancy-falls-in-gaza/.

69.     Dr. AbouYabis' advocacy—at the intersection of Palestinian displacement and African American resilience—exposes how structural violence perpetuates cultural trauma across generations. Her work underscores that systemic oppression weaponizes legal systems to enforce racial hierarchy, inflicting psychological harm while erasing historical agency. Yet her story transcends victimhood by refusing to accept dehumanization as inevitable. This duality of trauma and resistance, rooted in shared struggles for bodily autonomy and self-determination, reframes liberation not as a distant ideal but as a daily act of defying the legacies of White Supremacy and Zionism.

70.     For Dr. AbouYabis, cultural trauma is not an abstraction but a lived reality—not just the direct experience of discrimination, but the collective memory of centuries of oppression that shapes identity formation and daily life.[35] Yet her legacy defies erasure and exemplifies the extraordinary resilience of Palestinian refugees who, generation after generation, have persisted and achieved in the face of persecution, dehumanization, and systemic barriers designed to ensure their failure.[36] Like the African American elders who turned spirituals into freedom songs, she channels ancestral pain into exceptional medical service and unyielding advocacy, proving that resilience lies not in forgetting oppression but in dismantling its architecture by exposing it through education and raising awareness. In a world intent on silencing marginalized voices, her persistence is itself a resistance to Zionist White Supremacists framing Palestinians as *Untermenschen*.

---

[35] Maeed Almarhabi, *Cultural Trauma and the Formation of Palestinian National Identity in Palestinian-American Writing* (Ph.D. dissertation, Kent State Univ. 2020), http://rave.ohiolink.edu/etdc/view?acc_num=kent1605614421967042.

[36] Said Shukri et al., *The Silent Epidemic; The Toll of Mental Health in Occupied Palestine*, 8 PALEST. MED. & PHARM. J. 1, Art. 5 (2023), https://doi.org/10.59049/2790-0231.1141.

F. ISRAEL'S RELENTLESS GENOCIDE AGAINST THE PEOPLE OF PALESTINE

71. Since October 7, 2023, Israel has carried out a relentless genocide against the people of Palestine. Dr. AbouYabis does not use the term "genocide" as a rhetorical device, but as a concrete legal prohibition that exists in federal and international law. *See* 18 U.S.C § 1091 (implementing the Genocide Convention).[37] Israel's genocidal conduct in Palestine has been recognized by international courts,[38] United Nations experts,[39] genocide scholars,[40] leading medical professionals,[41] and even U.S. courts,[42] among others. Demanding an end to this genocide and justice for the people being annihilated is not only lawful and

---

[37] The crime of genocide occurs when someone "whether in time of peace or in time of war and with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group as such—(1) kills members of that group; (2) causes serious bodily injury to members of that group; (3) causes the permanent impairment of the mental faculties of members of the group through drugs, torture, or similar techniques; (4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part; (5) imposes measures intended to prevent births within the group; or (6) transfers by force children of the group to another group." 18 U.S.C. § 1091; *see also* Convention on the Prevention and Punishment of the Crime of Genocide, December 9, 1948, General Assembly Resolution 260, entered into force on January 12, 1951, ("The Genocide Convention"), Article II.

[38] *See* International Court of Justice, Dkt. No. 87, ICJ opinion dated January 26, 2024, at ¶ 30.

[39] *See, e.g.,* United Nations, "Anatomy of a Genocide, Report of the Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967, Francesca Albanese," A/HRC/55/73 (March 25, 2024), https://perma.cc/9GRF-XR7K; United Nations, "Gaza: UN Human Rights Experts Call on International Community to Prevent Genocide Against the Palestinian People—OHCHR Press Release" (November 16, 2023), https://perma.cc/XDS8-PJF2.

[40] *See, e.g.,* "Declaration of William A. Schabas in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-5 (November 16, 2023), https://perma.cc/4MH2-ENU5; *see also* "Declaration of Dr. John Cox, Dr. Victoria Sanford and Dr. Barry Trachtenberg in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-6 (November 16, 2023), https://perma.cc/3RPE-F6AN.

[41] *See, e.g.,* "[Proposed] Brief of Amici Curiae Medical Doctors in Support of Plaintiffs' Motion for Preliminary Injunction and Opposition to Defendants' Motion to Dismiss," 4:23-cv-05829-JSW, Document 52-1 (December 30, 2023), https://perma.cc/A68V-DU4C.

[42] In his decision in *Defense for Children International-Palestine v. Biden*, Judge Jeffrey S. White noted that "the undisputed evidence before this Court comports with the finding of the ICJ and indicates that the current treatment of the Palestinians in the Gaza Strip by the Israeli military may plausibly constitute a genocide in violation of international law. Both the uncontroverted testimony made by the Plaintiffs and the expert opinion proffered at the hearing on these motions as well as statements made by various officers of the Israeli government indicate that the ongoing military siege in Gaza is intended to eradicate a whole people and therefore plausibly falls within the international prohibition against genocide." 714 F.Supp.3d 1160, 1163 (N.D. Cal. 2024). (Because the Judge granted Defendants' Motion to Dismiss based on the political question doctrine, this section of the opinion does not have legal force as a factual finding).

constitutionally protected, but also a legal imperative upon all nations under the Genocide Convention.[43]

72.    After October 7, Israel launched its genocidal assault. That same day, Israel began immediate, indiscriminate aerial bombing of civilian infrastructure and population centers across Gaza.[44] Israel's Prime Minister immediately declared that "the enemy will pay an unprecedented price," signaling the acts of genocide that would follow.[45] Within the first twenty-four hours of Israel's genocide, it had already killed 313 Palestinians and injured more than 2,000, while 20,000 had been forcibly displaced.[46]

73.    By October 9, 2023, Israeli political and military leaders had openly proclaimed their genocidal intentions to the world, the Minister of Defense declared that "no electricity, no food, no water, no fuel" would be allowed to the "human animals" in Gaza.[47] The Energy Minister declared that "[w]hat *was* will not *be*."[48] Israeli Major General Ghassan Alian declared "there will only be destruction."[49]

---

[43] The Genocide Convention, supra note 1, Article I; *see also* Application of Convention on Prevention and Punishment of Crime of Genocide (Bosn. & Herz. v. Serb. & Montenegro), Judgment, 2007 I.C.J. 43, 221, ¶ 430.
[44] "Damning Evidence of War Crimes as Israeli Attacks Wipe Out Entire Families in Gaza," Amnesty International (October 20, 2023), https://perma.cc/AY8W-38K5.
[45] "Active Genocide Alert – Israel-Palestine: There is No Justification for Genocide," Lemkin Institute for Genocide Prevention and Human Security (October 13, 2023), https://perma.cc/B9BZ-E62R.
[46] United Nations, "Identical Letters Dated 8 October 2024 from the Permanent Observer of the State of Palestine to the United Nations Addressed to the Secretary-General, the President of the General Assembly and the President of the Security Council" A/ES-10/1012-S/2024/719 ("Letter from Permanent Observer of the State of Palestine") (October 8, 2024), https://perma.cc/B957-TDL.
[47] Sanjana Karanth, "Israeli Defense Minister Announces Siege on Gaza to Fight 'Human Animals,'" Huffington Post (October 9, 2023), https://perma.cc/HXN5-DQRJ.
[48] Israel Katz, @Israel_Katz, Tweet (12:48 pm, 9 October 2023) ("I ordered to immediately cut off the water supply from Israel to Gaza. Electricity and fuel were cut off yesterday. What was will not be."), https://perma.cc/33TM-5Z2F.
[49] Gianluca Pacchiani, "COGAT Chief Addresses Gazans: 'You Wanted Hell, You Will Get Hell,'" Times of Israel (October 10, 2023), https://perma.cc/6J5E-SYKH.

74. By the end of the first week of Israel's genocide, the Israeli military had already begun using chemical weapons such as white phosphorous,[50] and had murdered 2,800 Palestinians, the majority women and children.[51] Israel also began its campaign of targeting life-sustaining civilian infrastructure, which now includes hospitals, pharmacies, refugee camps, sanitation facilities, electricity networks, apartment complexes, mosques, and churches.[52] Within less than a month, Israel had dropped the equivalent of two nuclear bombs on Gaza.[53]

75. It was with this sense of urgency that people of conscience—Jews, Christians, Muslims, agnostics, and atheists—organically and swiftly rose into action to demand an end to these horrifying atrocities. They posted on social media to raise awareness and attended emergency protests, seeking to mobilize local, national, and global condemnation that boycotts, divests, and sanctions Israel's ongoing annihilation of Palestinians.

### G. DR. ABOUYABIS'S SOCIAL MEDIA POSTS

76. Dr. AbouYabis's social media posts during October 2023—the supposed justification for Defendants' cyberstalking, harassment, defamation, and termination of Dr. AbouYabis—emerged from a profound personal and humanitarian crisis, rooted in her lived experience as a Palestinian refugee and the traumatic loss of 37 family members in the ongoing Zionist genocide. Her posts, shared on private accounts with no affiliation to Emory University, sought to contextualize the genocide in Gaza through historical parallels to

---

[50] White phosphorous is a chemical weapon that causes burns that penetrate through skin and flesh straight to the bone, and reignite whenever exposed to oxygen. *See* "Questions and Answers on Israel's Use of White Phosphorus in Gaza and Lebanon," Human Rights Watch (October 12, 2023), https://perma.cc/5TNA-PY8J.
[51] Chris McGreal, "The Language Being Used to Describe Palestinians is Genocidal," The Guardian (October 16, 2023), https://perma.cc/XT6C-7FSC.
[52] Letter from Permanent Observer of the State of Palestine, *supra* n.11, at 1.
[53] Euro-Med Human Rights Monitor, "Israel Hits Gaza Strip With the Equivalent of Two Nuclear Bombs," November 2, 2023, https://perma.cc/U45J-PET7.

systemic oppression, while advocating for Palestinian humanity amid escalating dehumanization.

77.      After completing an extra week of 24/7 inpatient duty at Emory Midtown on October 7, Dr. AbouYabis received messages on WhatsApp from family and friends describing Palestinians breaching Israel's siege wall using paragliders. She had no other information.

78.      Following a 24-hour inpatient shift ending at 5:30 a.m. on October 8, 2023, Dr. AbouYabis posted a photo of a paraglider paired with lyrics from *"Wahdon"* (The Lonely Ones), a song by Lebanese icon Fairuz, which explores themes of isolation and collective grief. The lyrics—"They wander the forest, hands stretched like rainfall, knocking on my door, but no one answers"—reflects the profound solitude of Palestinians under siege, a sentiment amplified by what UN Special Rapporteur Francesca Albanese describes as "the world's indifference" to Israel's apartheid and genocide of Palestinians.



وحدن ببقوا مثل زهر البيلسان وحدهن بيقطفوا وراق الزمان بيسكروا الغابة بيضبلهن مثل الشتي يدقوا على بوابي،
🇵🇸🇵🇸على بوابي الله معك ياغزّة العزّة❤️ تصبحون على وطن

وحدن ببقوا مثل زهر البيلسان
وحدهن بيقطفوا وراق الزمان
بيسكروا الغابة بيضبلهن مثل الشتي
يدقوا على بوابي، على بوابي

الله معك ياغزّة العزّة❤️

تصبحون على وطن🇵🇸🇵🇸🇵🇸

79.     This post was a personal expression of how the Palestinian struggle remains isolated, and not because it lacks legal or moral legitimacy—the International Court of Justice (ICJ) has repeatedly ruled Israel's actions illegal. This abandonment echoes historical betrayals, from the 1948 Nakba to the 1993 Oslo Accords to the ongoing genocide, leaving Palestinians to resist occupation, apartheid, and genocide on their own. Finally, Dr. AbouYabis ended her post wishing for Palestine to wake up in a liberated homeland.

80.     On October 9, 2023, Dr. AbouYabis posted a series of images accompanying the following text:

COLONIAL SETTLERS fleeing from a music festival they were enjoying on an
ETHNICALLY CLEANSED STOLEN LAND where its indigenous PALESTINIANS
have been besieged for more than 15 years, steps away, behind an ILLEGAL
SEPARATION WALL, broke the hearts of the self proclaimed 'human' western
world!
BUT NOT that of INDIGENOUS PALESTINIANS, fleeing their camps that were
raided by israeli apartheid regime 4 months ago,
or the pictures of Palestinians expelled from their HOMELAND PALESTINE by
zionist terror groups in 1948,
Tells all you need to know about Justice, relative morality & humanity.

To those who do not see Palestinians as equal humans, we see you.
To those who support out killers, #wewillnotforget
To the freedom fighters: we're praying for you 🙏

#gaza #relativemorality #Palestine #unequallyhuman #humanitychallenge
#StopApartheid #wearealsohumans

81.    The images accompanying the above post depict two contrasting scenes of
displacement and violence, contextualizing her critique of "relative morality" in response to
Palestinian suffering under Zionist occupation, apartheid, and genocide on one hand and
European settlers suffering Palestinian reactions to unspeakable tyranny on the other.










BUT not this >

Indigenous Palestinians fleeing Jenin in June 2023 after israeli colonizers raided the refugee camp








OR this >



Indigenous Palestinians expelled from THEIR HOMELAND by the zionist terrorists in 1948





82.     On October 8, Dr. AbouYabis attended a protest advocating for Palestinian rights and an end to U.S. funding of the Zionist occupation, apartheid, and genocide in Palestine and called for an end to the blockade of Gaza.

83.     On October 9, Dr. AbouYabis posted about her experience at the student-organized protest near the Israeli consulate in Atlanta, joining Emory Students for Justice in Palestine and other Atlanta college groups and community members.



I needed to say it LOUD,
So I joined those brave, well organized, passionate students from different Atlanta
colleges near the israeli embassy. Thanks to Emory students for Justice in
Palestine and all the other student bodies who helped me hang onto the last
thread of my faith in humanity and hope for justice… one day
One day!

They got walls we got gliders
Glory to all resistance fighters

Palestine is our demand
No peace on stolen land

Not another nickel not another dollar
We will pay For israel slaughter

Not another nickel not another dime
We will pay for israel crimes

#wearealsohumans #Gaza #palestine #nojusticenopeace #freedomfighter
#endisraelapartheid #istandwithpalestine #istandwithpalestine🇵🇸

84.     Dr. AbouYabis's posts condemned Israeli military occupation, apartheid policies, and genocide in Palestine, alongside U.S. military and financial support for these crimes. As a Palestinian refugee whose family has endured over 76 years of displacement—from the 1948 Nakba to the 2023 carpet bombing—her advocacy reflects an unbroken commitment to challenging state-sanctioned oppression. Her critiques align with decades of anti-colonial scholarship and mirror her clinical work combating systemic racism in U.S. healthcare. Her speech embodies the universal principle that no people should be subjugated, dispossessed, or erased—whether Palestinians under occupation, African Americans under Jim Crow, or South Africans under settler-colonial Apartheid.

85.     On October 10, 2023, Dr. AbouYabis received a message via Facebook Messenger from a close friend in Gaza. The message included a photograph of a residential building reduced to rubble by an Israeli airstrike and stated: *"This is my best friend's house. No one can approach the rubble to search for survivors because the Israelis always strike the same location minutes later."* Dr. AbouYabis's friend, a parent of two toddlers, expressed terror that the

family might be trapped or killed under the debris. This communication exacerbated Dr. AbouYabis's existing trauma, particularly given her inability to contact her own family in Gaza, and contributed to her subsequent social media posts condemning the targeting of civilians.

86.    That same day, during a DEI committee meeting at Emory University, a participant opened discussions about the escalating violence in Israel and Gaza by centering the Israeli perspective that dehumanizes Palestinians, citing personal connections to relatives in Israel. Dr. AbouYabis intervened, urging the committee to adopt equitable institutional responses. She noted that Emory's leadership had sent two emails expressing solidarity with Israel (including President Fenves's personal reflections on his "attachment to Israel") but had remained silent on the massive destruction, displacement, and killings of Palestinians, despite over 1,000 Palestinians killed in May 2023 during Israel's prior assault on Gaza. Dr. AbouYabis emphasized that Emory had never issued statements about conflicts in Sudan, Congo, or other regions in that world that are not Israeli or European, creating a pattern of selective empathy that alienated students and staff of color, including those of Palestinian heritage.

87.    As she spoke, Dr. AbouYabis disclosed that she had just learned of an Israeli airstrike destroying her close friend's home in Gaza, with survivors trapped under rubble amid fears of a "double tap" strike.[54] Overwhelmed by grief and the weight of institutional indifference, she broke down in tears. Multiple committee members later expressed support

---

[54] A **double-tap strike** is an Israeli military tactic involving an initial attack followed by a second strike shortly afterward, often targeting emergency responders, civilians, or rescuers who rush to the scene. The term originates from firearms training (firing two rounds rapidly) but has been adapted to describe a brutal warfare strategy condemned under international law and classified as a war crime under the Geneva Conventions, which prohibit targeting civilians, medical personnel, or humanitarian workers.

via private messages, acknowledging the validity of her critique and the university's failure to uphold its DEI mandate.

88.     On October 11, 2023, Dr. Sheryl Heron, Vice Chair of DEI at Emory School of Medicine, contacted Dr. AbouYabis to discuss her participation in the October 10 DEI meeting. During their conversation, Dr. Heron acknowledged that Dr. AbouYabis's remarks about Palestinian suffering had prompted attendees to educate themselves on the genocide— a rare instance of institutional recognition of Palestinian humanity. Dr. Heron then inquired whether Dr. AbouYabis wished to take leave, given her family's precarious situation in Gaza. Dr. AbouYabis declined, explaining that her clinical duties provided a necessary distraction from the trauma of constant updates about airstrikes and that her hematology/oncology team was already understaffed (she was covering 24/7 inpatient service for three weeks). Dr. Heron suggested Emory's faculty support program, but Dr. AbouYabis noted she was already under the care of a psychiatrist and therapist, with appointments scheduled the following week.

89.     Dr. Heron concluded the call by cautioning Dr. AbouYabis about social media activity, advising her to avoid posts that might "upset others." Dr. AbouYabis clarified that she only shared underreported news from Gaza on private accounts with strict privacy settings and asked if Dr. Heron had specific concerns. Dr. Heron, who admitted to having no social media presence, reiterated a general warning to "be careful" and consider using a pseudonym—a suggestion Dr. AbouYabis interpreted as institutional pressure to self-censor.

90.     By October 15, 2023, Israel's military campaign in Gaza had led to catastrophic loss of Palestinian life and widespread devastation. The mounting civilian death toll, the destruction of neighborhoods and infrastructure, the ongoing siege, and the apparent indifference or paralysis of the international community—including the silence of U.S. and

European governments and institutions—deeply affected Dr. AbouYabis. Witnessing these events, and feeling the weight of institutional complicity and the lack of meaningful response at her own workplace, compelled her to share another post on October 15, 2023, expressing her grief, outrage, and urgent call for justice.

If you've ever wondered what you'd have done
in times of American slavery,
The Tulsa Race Massacre?!!

Or how outspoken and how much personal risk and protection you'd have offered during the Holocaust,
Or what you'd have thought of Nazi's security justifications for Concentration Camps,

Or how you'd have reacted to internment camps in America?
Or what you'd have called those who tried to break through the Auschwitz barriers?

And how deeply and how often you'd have protested for civil rights?

Or what you'd have thought of Nelson Mandela?
Or South Africa Apartheid?

Take a look at what you are doing now for GAZA …
And know,
That's EXACTLY what you'd have done in times before.

HUMANITY is failing an open book history test

The children of Gaza #willnotforgive
The Palestinians who remain #willnotforget

#neveragain only for some!

#IStandWithJustice #IStandWithGaza

#GazaUnderAttack #IStandWithPalestine #GazaGenocide #EthnicCleansing
#StopIsraeliApartheid#stopisraelwarcrimes

91.    The images accompanying the post served as a visual outcry—Dr. AbouYabis's urgent call for all people of conscience to bear witness, to feel outrage, and to be moved to speak out and act against injustice.

If you've ever wondered what you'd have done in times of American slavery,
The Tulsa Race Massacre?!!



 AL·MONITOR

## Israeli settlers burn Palestinian crops in Hebron: PA

Tensions are soaring in the West Bank despite efforts by Israeli, Palestinian and US officials to calm the situation.    June 2023



JAAFAR ASHTIYEH/AFP via Getty Images





## News | Occupation

# US condemns Israeli settler rampage through West Bank

Washington calls for 'accountability and justice' following settler riots that left one dead, at least 34 Palestinians wounded and more than 140 vehicles set ablaze



A picture shows burnt cars, reportedly set ablaze by Israeli settlers, in the area of Lubban al-Gharbi in the occupied West Bank on 21 June 2023 (AFP)

**Or how you'd have reacted to internment camps in America?**

**Or what you'd have thought of Nazi's security justifications for Concentration Camps,**





**Or how outspoken and how much personal risk and protection you'd have offered during the Holocaust,**

**Or what you'd have called those who tried to break through the Auschwitz barriers?**



Gaza 2023



1945- Nazi Germany







# And how deeply and how often you'd have protested for civil rights?



Gaza BoarderProtest against Siege 2018:
Israel killed 214 Palestinians,
including 46 children, and injured over 36,100,
including 8,800 children



**Or what you'd have thought of Nelson Mandela?
Or South Africa Apartheid?**





























92.     Dr. AbouYabis ends her post with a powerful piece of graffiti art depicting two

children sitting across from each other, separated by a wired fence. The child on the left wears

a kippah (traditional Jewish head covering) with a Star of David pattern, while the child on

the right in a prison uniform wears a kefiyyeh (traditional Palestinian scarf with its distinctive

checkered pattern).

93.     To Dr. AbouYabis, this image is a profound statement on the shared injustice

and the possibility—and necessity—of human connection and empathy across lines of

division and conflict. The children, unburdened by the histories and politics that separate

adults, embody innocence and the innate human capacity for friendship. Their presence on

the wall—a structure built to divide—transforms it into a canvas for hope, dialogue, and the

longing for a future where coexistence prevails over enmity. The artwork is a visual plea for

reconciliation, reminding us that peace is not just a political arrangement but a lived reality

that begins with recognizing the shared humanity in the "other." It is a call to imagine a world where barriers are replaced by understanding, and where the next generation can sit together not in defiance of a wall, but in the absence of one. Dr. AbouYabis chose that image to conclude her post to visualize her aspirations for peace, mutual recognition, and a future beyond separation.

94.    Through her post, Dr. AbouYabis sought to provoke a moral reckoning by drawing explicit parallels between past atrocities—such as slavery, the Holocaust, and apartheid—and the ongoing occupation, apartheid, and genocide in Palestine. She called on her friends and the broader public to reflect on their own moral consistency, both domestically and internationally, arguing that one's response to the human suffering in Palestine is a direct indicator of how they might have responded to historical injustices. Her statement that "HUMANITY is failing an open book history test" captured her conviction that the lessons of history demand action and empathy in the present, yet too often go unheeded. This perspective was shaped in part by her distress at seeing widespread calls to "flatten Gaza" and declarations that there were "no innocents in Gaza," deepening her sense of urgency to speak out.

95.    On the morning of October 16, 2023, before her first shift back on inpatient hospital duty, Dr. AbouYabis reviewed her social media and discovered that Facebook had selectively removed a historical image of Adolf Hitler from her October 15 post—which juxtaposed Hitler's dehumanization of Jews with Israeli Defense Minister Yoav Gallant's dehumanization of Palestinians as "human animals." Facebook cited violations of its "dangerous individuals and organizations" policy for Hitler's image but allowed Gallant's

White supremacist rhetoric to remain. Dr. AbouYabis documented this inconsistency by screenshotting Facebook's notification and the unchanged post.

96.     On October 16, 2023, after returning home from her clinical duties, Dr. AbouYabis encountered a devastating news report: a 6-year-old Palestinian boy, Wadea al-Fayoume, had been fatally stabbed in his home in Illinois in a targeted hate crime. The attack, which authorities later attributed to anti-Palestinian racism, occurred amid a surge in xenophobic rhetoric across the U.S., including calls to "flatten Gaza" and dehumanizing statements by public figures. This horrific incident amplified Dr. AbouYabis's trauma, particularly given her own family's vulnerability in Gaza and the normalization of anti-Palestinian bigotry in American discourse. The boy's murder underscored her fears that the systemic dehumanization of Palestinians—on mainstream media, social media, in political rhetoric, and within institutions like Emory—was escalating into tangible violence.

97.     On October 17, Dr. AbouYabis decided to share a post on her private account, highlighting the inconsistency in Facebook's moderation practices—removing historical dehumanizing rhetoric against Jews while permitting the same dehumanizing rhetoric against Palestinians to remain visible. She captioned the image with: "*Selective enforcement enables oppression. When platforms erase history but amplify modern genocide, they become complicit.*"

> What's wrong with this world?
> Selective morality is immoral
> Selective humanity is inhumane
>
> Stop dehumanizing #Palestinians
> That's why #WeFightOn
> #FreePalestine #GazaGenocide #IStandWithGaza #IStandWithPalestine





98.     Dr. AbouYabis's social media posts emerged from a crucible of personal and collective trauma—made as she lost contact with her family in Gaza, learned of the destruction of her best friend's home, and eventually discovered the death of 37 family members in Israeli airstrikes. These posts on her private accounts—devoid of any connection to Emory—represented her desperate attempts to humanize Palestinians amid deadly dehumanizing rhetoric calling to "flatten Gaza" and claiming, "no innocents in Gaza."

99.     Her comparison of historical injustices to contemporary suffering sought to create a moral mirror, challenging viewers to examine their own consistency in responding to human tragedy. Dr. AbouYabis's words are criticisms of Zionism, as a White supremacist and antisemitic ideology of hate and violence, and criticisms of Israeli governmental actions, which seeks to legitimize its terroristic existence and war crimes by proclaiming "Jewish" authority. Dr. AbouYabis always believed that violence and injustice come from hatred and that hatred comes from ignorance. That is why she spent her adult life seeking understanding, building bridges, and speaking up against all forms of injustice.

## H. Canary Mission's Antisemitic and Racist Web of Hate and Persecution

100.     Canary Mission operates as an anonymous blacklisting website that systematically targets Palestinian rights advocates, particularly students and academics, through coordinated harassment campaigns designed to damage their professional and educational opportunities.

101.     The organization maintains a database of detailed profiles containing personal information, photos, and social media history of targeted individuals, overwhelmingly focusing on African American, Arab, Muslim, Palestinian, and Jewish students and faculty, as well as their supporters.

102.    Canary Mission's public database profiles over 10,000 students, professors, and organizations critical of Israel, which immigration authorities have weaponized to target non-citizen activists. For example, Columbia University graduate student Mahmoud Khalil was arrested by ICE after Canary Mission highlighted his pro-Palestinian leadership, while the group's 2025 "Uncovering Foreign Nationals" campaign explicitly urged deportation of activists based on visa status and political views.

103.    An investigation by The Nation revealed that Canary Mission receives funding through a complex network including the Jewish Community Federation of San Francisco and the Helen Diller Family Foundation, deliberately obscuring its operational structure through various pass-through entities.[55]

104.    Canary Mission's domain registration was initially linked to Howard David Sterling, a pro-Israel attorney who has described investment in Israeli companies as a means to "protect Israel" through economic ties. Though Sterling's attorney denied ownership, bank records showed donations to Canary Mission accompanied by a phone number registered in Sterling's name through 2015.[56]

105.    The censored Al Jazeera documentary *The Lobby – USA* identified Adam Milstein—a convicted tax felon and founder of the Israeli-American Council—as a key Canary Mission funder. Milstein's foundation partners with the Israel on Campus Coalition

---

[55] James Bamford, *Who Is Funding Canary Mission? Inside the Doxxing Operation Targeting Anti-Zionist Students and Professors*, The Nation (Dec. 27, 2023), https://www.thenation.com/article/world/canary-mission-israel-covert-operations/.
[56] Hamzah Raza & Max Blumenthal, *Who Is Behind Canary Mission's Anonymous Anti-Palestinian Blacklisting Website?*, The Grayzone (Aug. 22, 2018), https://thegrayzone.com/2018/08/22/meet-the-owner-of-canary-missions-anonymous-anti-palestinian-blacklisting-website/.

(ICC), which endorsed Canary Mission in its 2016-2017 annual report as a "strong deterrent against antisemitism and BDS activism."[57]

106.    The organization's tactics include publishing misleading dossiers designed to appear in Google searches, making false accusations of terrorism and antisemitism, contacting employers and academic institutions about targets, and coordinating with Israeli authorities to facilitate border detentions.

107.    The Israeli Ministry of Strategic Affairs' coordination with Canary Mission to use student data to suppress voices, including in Georgia, reflects intentional targeting of U.S. institutions, including Georgia institutions, as the Ministry's 2023 internal strategy memo prioritized neutralizing anti-Zionist influence through covert operations.

108.    As a result of their Canary Mission profiles, individuals affirming the humanity of Palestinians have experienced denial of entry to the occupied Palestinian territories, arbitrary detentions,[58] interrogations by U.S. federal agents, loss of employment and educational opportunities, and severe emotional distress and self-censorship.

109.    Canary Mission collaborates with U.S. police to punish Palestinian advocacy. For example, Seton Hall Law School contacted the FBI to interrogate Palestinian-American student Ahmad Aburas after Canary Mission falsely accused him of supporting terrorism for stating "We are all Resistance" during Israel's 2014 Gaza bombing campaign.

---

[57] Siniver, A. (Ed.), *Routledge Companion to the Israeli-Palestinian Conflict*, Routledge (2022), https://doi.org/10.4324/9780429027376.

[58] J Street, *J Street U Leaders to Israel's Minister Erdan: Detention of Lara Alqasem Is Dangerous and Wrong*, J Street (Oct. 10, 2018), https://jstreet.org/press-releases/j-street-u-leaders-to-israels-minister-erdan-detention-of-lara-alqasem-is-dangerous-and-wrong/.

110.    Internal documents obtained by the American-Jewish newspaper The Forward demonstrate that Canary Mission coordinates with Israeli government agencies.[59]

111.    The Jewish Federation of San Francisco has acknowledged funding Canary Mission through Megamot Shalom, a Zionist organization that serves as a U.S. front for the Israeli Ministry of Strategic Affairs.[60]

112.    Major Jewish organizations have condemned Canary Mission's hatemongering. The Jewish Telegraphic Agency described Canary Mission's methods as "antithetical to . . . democratic and Jewish values" and "morally reprehensible" for using "hateful," "Islamophobic," and "racist" rhetoric "to villainize individuals" involved "with pro-Palestinian causes" "under the guise of combating anti-Semitism."[61] J Street called it a "right-wing organization" that "aims to promote a toxic atmosphere of harassment and fear on US college campuses and beyond."[62] T'ruah, the Rabbinic Call for Human Rights labeled it "Jewish McCarthyism."[63]

## I.    STOPANTISEMITISM.ORG'S MALEVOLENT CAMPAIGN AGAINST PALESTINIAN ADVOCACY

113.    StopAntisemitism.org, masquerading as a watchdog against antisemitism, operates as a coordinated instrument of racist harassment and ideological suppression, systematically targeting Palestinian, Arab, Muslim, and Jewish advocates of Palestinian

---

[59] Josh Nathan-Kazis, *Israel Uses Canary Mission Blacklist Info To Bar Activists*, The Forward (Oct. 4, 2018), https://forward.com/news/411453/israel-uses-canary-mission-blacklist-info-to-bar-activists/.
[60] *Id.*
[61] Gabrielle Roth and Joseph Goldberg, *Jewish Students: Blacklist of BDS Supporters Hurting Efforts to Defend Israel on Campus*, Jewish Telegraphic Agency (Apr. 23, 2018), https://www.jta.org/2018/04/23/ideas/jewish-students-blacklist-bds-supporters-hurting-efforts-defend-israel-campus.
[62] *Supra*, n.42.
[63] T'ruah, *Young Jewish Activists Furious Over SF Federation's Support of Canary Mission*, T'ruah, https://truah.org/coverage/young-jewish-activists-furious-over-sf-federations-support-of-canary-mission. *See also* Andrew Rehfeld, *What the Taboo on Criticizing Israel Can Teach Us About Cancel Culture*, The Forward (Jul. 20, 2020), https://forward.com/opinion/451118/free-speech-warriors-and-the-jewish-community-have-a-double-standard-on/.

human rights along with other anti-Zionist voices under the guise of combating hate. Its tactics—doxing, defamation, misinformation campaigns, institutional intimidation, and collaboration with extremist far-right groups—reflect a deliberate strategy to chill free speech and perpetuate anti-Palestinian racism.[64]

114.    StopAntisemitism.org is not merely an organization but a pseudonym for Liora Reznichenko (also known as Liora Rez), its founder, executive director, and sole public face. Reznichenko, a Ukrainian-born aspiring social media influencer, created the group in 2018 to amplify her personal crusade against perceived antisemitism, weaponizing the platform to silence Palestinians, anti-Zionists, and critics of Israel. Her dominance over the organization is absolute: she controls its messaging, funding, and operations, leveraging her media presence to transform a grassroots project into a coordinated harassment machine. Reznichenko is the group's sole spokesperson, appearing on Fox News, testifying before Congress, and penning articles for outlets like *The Jerusalem Post*.

115.    StopAntisemitism.org functions as a digital lynch mob, soliciting followers to report criticism of Israel or solidarity with Palestinians as "antisemitic incidents." These reports are framed with inflammatory language, conflating anti-Zionism with antisemitism and equating protected speech with terrorism. The group then publishes targets' personal information, urging followers to bombard employers, schools, and licensing boards with demands for investigations, suspensions, terminations, and expulsions—denying due process and factual scrutiny.[65]

---

[64] Viki Auslender, *Doxing: A Legitimate Tool in the Fight Against Anti-Semitism?*, CALCALISTECH (Nov. 23, 2023), https://www.calcalistech.com/ctechnews/article/y4r9y3tyc.
[65] Pranshu Verma, *They Criticized Israel. This Twitter Account Upended Their Lives*, WASH. POST (Apr. 16, 2024), https://www.washingtonpost.com/technology/2024/04/16/stop-antisemitism-twitter-zionism-israel/.

116.    StopAntisemitism.org's campaigns disproportionately target Muslims, Palestinians, and people of color, weaponizing antisemitism accusations to suppress advocacy for Palestinian rights. The group perpetuates anti-Muslim tropes, falsely labeling figures like Congresswoman Rashida Tlaib and journalist Mehdi Hasan as "terrorist sympathizers" for condemning Israeli policies.[66]

117.    For example, StopAntisemitism.org associated a Delta Airlines employee with "violence against Jews" for wearing a kefiyyeh,[67] joined a smear campaign against United Airlines flight attendants wearing Palestinian flag pins, maligning them as "Hamas badges,"[68] and disavowed the Jewish identity of J Street staffers opposing Israeli settlements, declaring one a "Christian" for criticizing illegal occupation and settlement of Palestine's West Bank.[69]

118.    This pattern extends to non-political figures. In April 2025, StopAntisemitism.org targeted Rachel Griffin Accurso ("Ms. Rachel"), a children's YouTube educator with 14 million subscribers, after she shared posts amplifying the suffering of Palestinian children. The cyberstalking group declared Ms. Rachel's expression of empathy towards Palestine's children as spreading "Hamas propaganda." Not only that, but Reznichenko through StopAntisemitism.org urged Florida's Attorney General to investigate

---

[66] Islamophobia.org, *StopAntisemitism.org*, ISLAMOPHOBIA.ORG (Mar. 21, 2022), https://islamophobia.org/islamophobic-organizations/stopantisemitism-org/.

[67] StopAntisemitism (@StopAntisemites), "*A Delta passenger at JFK Airport was horrified to see a grounds crew member wearing a kefiyyeh-a symbol that has been appropriated and associated with violence against Jews. How unsettling to witness this moments before boarding a plane. This poses a safety concern for all passengers, @JFKairport!*" [Photo Post], X (Jan. 14, 2025), https://x.com/StopAntisemites/status/1879273164410093902.

[68] Carl Campanile, *United Airlines Staffer's Palestinian-Flag Pin Sparks Furor - But Company Stands by Policy Allowing Displays of "Pride"*, N.Y. POST (Aug. 27, 2024), https://nypost.com/2024/08/27/us-news/united-airlines-staffers-palestinian-flag-pin-sparks-furor-but-company-stands-by-policy-allowing-displays-of-pride/; *see also* StopAntisemitism (@StopAntisemites), *"Pride" Really @united ?? [Photo Post]*, X (Aug. 27, 2024), https://x.com/StopAntisemites/status/1828568180639547584.

[69] Joel S. Swanson (@jh_swanson), "*@StopAntisemites is just openly erasing the Jewishness of American Jews they dislike, telling an American Jew who works for J Street that he's now a Christian because of his opposition to West Bank settlements. "Stop Antisemitism" by defining people out of Jewishness, I guess.*" [Photo Post], X (June 25, 2023), https://x.com/jh_swanson/status/1673135767504445440.

Ms. Rachel under the Foreign Agents Registration Act (FARA), despite her apolitical humanitarian messaging.[70]

119.    Meanwhile, StopAntisemitism.org ignores blatant antisemitism from far-right figures. Donald Trump repeatedly invoked antisemitic tropes, claiming Jewish Democrats exhibit "disloyalty" and warning that Israel faces "annihilation" if he loses the 2024 election.[71] Elon Musk endorsed a post accusing Jewish communities of "hatred against whites," prompting a surge in antisemitic harassment on X.[72]

120.    By silencing Palestinian solidarity while excusing far-right hate, StopAntisemitism.org exposes its true objective: enforcing ideological Zionist conformity under the guise of combating antisemitism.

121.    StopAntisemitism.org also has ties to a broader Israeli influence apparatus aimed at shaping U.S. discourse. Leaked documents reveal coordination with Israel's Ministry of Strategic Affairs and the "Voices for Israel" initiative, which funnels millions into silencing Palestinian advocacy through lawfare and disinformation.[73] This network includes Canary Mission, a blacklist database targeting students and professors; Zachor Legal Institute, which files SLAPP suits against individuals who seek to boycott, divest, and sanction the occupation, apartheid, and genocide of Palestine by the Zionist

---

[70] Ct Jones, *Ms. Rachel Defends Gaza Fundraiser Posts: 'Our Compassion Doesn't Have Boundaries or Borders'*, ROLLING STONE (May 12, 2025), https://www.rollingstone.com/culture/culture-news/ms-rachel-gaza-fundraising-philanthropy-defense-1235337465/; *see also Hearing on the Weaponization of the Federal Government Before the H. Select Subcomm. on Weaponization of the Fed. Gov't*, 118TH CONG. (Feb. 6, 2024), https://www.congress.gov/event/118th-congress/house-event/116793/text.
[71] Associated Press, *US Jews Upset with Trump's Latest Rhetoric Say He Doesn't Get to Tell Them How to Be Jewish*, AP NEWS (Mar. 25, 2024), https://apnews.com/article/trump-jewish-voters-democrats-antisemitism-a43bf6f6266d9c6a4b761b82281aa512; *see also*
[72] Ryan Mac, *X Races to Contain Damage After Elon Musk Endorses Antisemitic Post*, N.Y. TIMES (Nov. 16, 2023), https://www.nytimes.com/2023/11/16/technology/elon-musk-endorses-antisemitic-post-ibm.html.
[73] Lee Fang, *Inside the Pro-Israel Information War*, SUBSTACK (Dec. 8, 2023), https://www.leefang.com/p/inside-the-pro-israel-information.

regime; and the Milstein Family Foundation, which funds StopAntisemitism.org, Canary Mission, and other groups promoting White Supremacy, dehumanizing Palestinians, and narratives that erase Palestinians.[74]

122.    Lara Friedman of the Foundation for Middle East Peace notes that StopAntisemitism.org's goal is to "punish and deter" anti-Zionists and critics of Israel, creating a climate where advocacy for Palestinian rights risks "life-changing consequences."[75] StopAntisemitism.org's targets face death threats, PTSD, and career destruction—a tactic Reznichenko openly celebrates, stating, "If I was working with somebody who wanted my demise . . . I wouldn't want to be working with them."[76]

123.    The group employs coded language that invokes historic antisemitic conspiracies while accusing others of bigotry. Terms like "globalists" and "foreign nationals" are deployed to frame critiques of Israeli policies as existential threats to Jewish safety, echoing Nazi-era tropes about Jewish dual loyalty and global domination. This rhetorical strategy deliberately conflates anti-Zionism with antisemitism, erasing distinctions between state criticism and religious hatred. By labeling phrases like "Free Palestine" as inherently antisemitic, StopAntisemitism stifles protected political speech while amplifying the very stereotypes it claims to oppose.

124.    StopAntisemitism coordinates with government agents, university administrators, and employers to punish targeted individuals. Internal emails and public

---

[74] Lee Fang & Jack Poulson, *Israel Feared Legal Trouble Over US Advocacy Efforts, Leaked Files Suggest*, THE GUARDIAN (Aug. 17, 2024), https://www.theguardian.com/world/article/2024/aug/17/israel-foreign-agent-law-leaked-documents.
[75] Pranshu Verma, *They Criticized Israel. This Twitter Account Upended Their Lives*, WASH. POST (Apr. 16, 2024), https://www.washingtonpost.com/technology/2024/04/16/stop-antisemitism-twitter-zionism-israel/.
[76] Nikolas Lanum, *Antisemitism Watchdog Accuses Washington Post of 'Smear' Piece, Sympathizing with Anti-Israel Figures*, FOX NEWS (Apr. 18, 2024), https://www.foxnews.com/media/antisemitism-watchdog-accuses-washington-post-smear-piece-sympathizing-anti-israel-figures.

records reveal campaigns to revoke visas, terminate employment, and blacklist activists. For instance, the group pressured New York University to investigate Professor Amin Husain for organizing pro-Palestinian teach-ins, citing fabricated "security concerns." Such actions institutionalize discrimination by treating Palestinian advocacy as a disciplinary offense, violating Title VI protections against national origin discrimination and academic freedom principles.

125.    Prominent Jewish voices, including Rabbi David Mivasair and Jewish Voice for Peace, condemn StopAntisemitism's tactics as counterproductive. They argue that equating Jewish safety with unwavering support for Israel fuels actual antisemitism by reinforcing harmful stereotypes. As Mivasair stated, "This group doesn't protect Jews—it weaponizes Jewish trauma to legitimize apartheid." These critiques underscore how StopAntisemitism's actions alienate allies, fracture coalitions, and ultimately endanger marginalized communities under the pretense of safeguarding them.

126.    StopAntisemitism.org epitomizes the weaponization of antisemitism to advance a racist campaign of dehumanizing Palestinians. Its collaboration with state and non-state actors to silence dissent exposes a systemic effort to erase Palestinian narratives and legitimize occupation, apartheid, and genocide.

**J.  STRATEGIC USE OF ANTISEMITISM ACCUSATIONS AS POLITICAL DOG WHISTLES IN ZIONIST AND ISRAELI INFLUENCE CAMPAIGNS**

127.    Canary Mission and StopAntiSemitism.org are just two of a vast network of sinister organizations and individuals who have systematically weaponized accusations of antisemitism to suppress advocacy for Palestinian rights in the United States. Groups like the Merona Leadership Foundation and the Adam and Gila Milstein Family Foundation (MFF) employ tactics ranging from doxing and blacklisting to funding campus initiatives that

conflate criticism of Zionist with antisemitism. These efforts align with broader Israeli government objectives to erase Palestinian narratives and punish dissent, often under the guise of combating hate.

128.    The Adam and Gila Milstein Family Foundation (MFF) funds campus groups that conflate anti-Zionism with antisemitism while marginalizing Palestinian perspectives. MFF grants support "cultural events" hosting speakers who equate criticism of Israel with hate speech and collaborate with the American-Israeli Political Action Committee (AIPAC) to lobby for legislation focused on supporting the Zionist occupation, apartheid, and genocide of Palestine and Palestinians. In 2023, MFF directed funds to influence UCLA's student government against Palestinian solidarity resolutions, undermining campus democracy. The foundation also promotes anti-BDS laws that penalize advocacy for Palestinian rights, framing boycott efforts as antisemitic.

129.    The MFF also funded Canary Mission through Megamot Shalom, an Israeli front organization, as documented in *The Nation*'s investigative report (Dec. 22, 2023). Internal footage from Al Jazeera's *The Lobby – USA* captured Eric Gallagher, a Jewish Zionist operative, stating: "Adam Milstein's the guy who funds" while discussing coordination with Milstein about launching "name-and-shame" campaigns.[77] Though Milstein publicly denied funding Canary Mission,[78] the Al Jazeera footage and financial records from the Jewish Community Federation of San Francisco confirm his foundation's role in channeling donations through Megamot Shalom to sustain Canary Mission's criminal enterprise.[79]

---

[77] James Bamford, *Who Is Funding Canary Mission? Inside the Doxxing Operation Targeting Anti-Zionist Students and Professors*, The Nation (Dec. 22, 2023).

[78] Josh Nathan-Kazis, *Pro-Israel Donor Adam Milstein Denies Report That He Funds Canary Mission*, Times of Israel (Jan. 4, 2019).

[79] Nora Barrows-Friedman, *Jewish Community Federation Admits It Secretly Funded Canary Mission*, Electronic Intifada (Apr. 9, 2019).

130.    Milstein's foundation collaborated with the Israeli Ministry of Strategic Affairs—a government body tasked with suppressing Palestinian advocacy globally—to weaponize Canary Mission and StopAntiSemitism.org's cyberstalking operations. As reported by *The Forward* (Oct. 3, 2018), the Ministry used Canary Mission profiles to detain and deport Palestinian Americans like Lara Alqasem at Ben Gurion Airport, demonstrating institutional coordination.[80] This partnership aligns with the Ministry's admitted strategy of "countering delegitimization" through covert operations targeting U.S. campuses, as detailed in James Bamford's *Democracy Now!* interview (Dec. 27, 2023).[81]

131.    The MFF deliberately targeted its efforts at the Northern District of Georgia by funding Canary Mission and StopAntiSemitism's cyberstalking operations targeting Emory University students, faculty, and staff—including members of Emory's Robert W. Woodruff Health Sciences Center.

### K.  COORDINATED ZIONIST CAMPAIGN OF HATE AGAINST DR. ABOUYABIS

132.    StopAntisemitism.org, under the guise of combating antisemitism, orchestrated a coordinated, vitriolic campaign to destroy Dr. Abeer AbouYabis's career and safety. At 10 P.M. on October 16, 2023, the group weaponized its platform of 332.1 thousand followers to publicly dox her, sharing doctored, decontextualized, and distorted screenshots of her private social media posts alongside her Emory University affiliation, photo, and workplace details. This juxtaposition was designed to connect her professional identity with her private political speech. StopAntisemitism.org labeled Dr. AbouYabis's posts humanizing Palestinians, calling for an end to the occupation and genocide as "antisemitic," dangerously

---

[80] Josh Nathan-Kazis, *Israel Uses Canary Mission Blacklist Info To Bar Activists*, The Forward (Oct. 4, 2018).
[81] *Who Funds Canary Mission? James Bamford on Group That Doxxes Students & Profs for Palestine Activism*, Democracy Now! (Dec. 27, 2023).

equating opposition and resistance to occupation, apartheid, and genocide with hatred of Jewish people. This malicious act triggered a flood of death threats, harassment, and demands for her termination, with the post amassing over 3 million views, 8,300 likes, and 3,400 reposts within days.



133.    The posts were laden with incendiary lies, accusing Dr. AbouYabis of "cheer[ing] the slaughter of innocent Jewish civilians" and "endorsing Hamas"—claims directly contradicted by her decades of interfaith work and explicit condemnations of violence.[82] StopAntisemitism.org's framing exploited fearmongering tropes, stating, "Would you want YOUR Jewish family member to be treated by this woman?" This rhetoric reduced

---

[82] The National Desk, Emory professor who allegedly cheered Hamas as 'resistance fighters' no longer employed by school (Nov. 15, 2023), https://thenationaldesk.com/news/americas-news-now/emory-professor-who-allegedly-cheered-hamas-as-resistance-fighters-no-longer-employed-by-school-georgia-atlanta-antisemitism-university-campus-jews-israel-palestine-muslim-conflict-middle-east-gaza-emass.

her identity to a racist caricature, erasing her humanity as a physician, scholar, and Palestinian refugee.

134.    Dr. AbouYabis had no idea that one of her contacts surreptitiously leaked her social media posts on her private profile to Zionist cyberstalkers who doctored, decontextualized, and distorted the posts to dox her.

135.    On October 17, 2023, at approximately 8:30 a.m., Dr. Sagar Lonial, Chair of Emory's Hematology/Oncology Department, attempted to contact Dr. AbouYabis by phone while she was attending to patients. Unable to answer immediately, Dr. AbouYabis returned his call at 9:00 a.m. after completing her clinical duties. Dr. Lonial initiated a conference call with Dr. Carlos Del Rio, Acting Dean of Emory Medical School, who informed Dr. AbouYabis that the university was placing her on administrative leave. When she inquired about the basis for this action, Dr. Del Rio cited concerns about a Facebook post "related to Hitler," but admitted he had not viewed the post personally and could not provide specifics, stating only that an investigation would follow.

136.    This abrupt decision, made without due process or written notice, directly stemmed from StopAntisemitism.org's defamatory campaign, which had falsely characterized Dr. AbouYabis's protected humanitarian plea on her private social media profile as antisemitic. Dr. Del Rio's reliance on unverified claims—despite Emory's Social Media Policy 4.62 permitting private political expression—demonstrates institutional complicity in suppressing Palestinian advocacy.

137.    Dr. AbouYabis returned home to find a television news van stationed at her subdivision's gate, attempting to contact her for comment. Simultaneously, she received unsolicited calls from multiple media outlets, including Fox 5 Atlanta and The Washington Post, seeking responses to StopAntisemitism.org's doxing campaign. Overwhelmed by shock, she checked Twitter (now X) for the first time in weeks and discovered defamatory posts by StopAntisemitism.org and Canary Mission, which falsely accused her of "supporting Hamas" and "endorsing terrorism."



138.    Followers of StopAntisemitism.org circulated Dr. AbouYabis's address, phone numbers, and family members urging supporters to "get in touch" with Dr. AbouYabis and contact Emory *en masse*. Online trolls and cyberstalkers kept calling her a "murderous" and "hateful" antisemite who deserves to lose her job and her medical license, while others called for physical harm, including a text message on her personal phone that read: "Find her and make her pay." This mob mentality, fueled by the group's platform, transformed protected political speech into a life-threatening liability.

139.    The reach and velocity of the attack were staggering. StopAntisemitism.org's posts went viral across far-right networks, with coordinated amplification by accounts tied to the Milstein Family Foundation—a major funder of Zionists dehumanizing Palestinians. The group's followers inundated Emory with emails and calls demanding



Dr. AbouYabis's firing, while simultaneously terrorizing her with messages like, "Terrorists will never work again in this country. You're a shit stain on the toilet bowl of society."

140.    Zionist mobs inundated Emory with demands for her termination, commenting, "@EmoryUniversity this woman has no place in medical care" and "Your students and patients should not have to fear that their doctors call for their murder."





141.    Recognizing the imminent danger to her safety and career, Dr. AbouYabis deactivated all social media accounts within hours to curb her exposure from the harassment. She urgently sought to clarify that her posts—focused on Gaza's humanitarian crisis—had been deliberately misrepresented, but faced institutional barriers as Emory had already placed her on leave without providing access to legal or public relations support. The posts, extracted from her private accounts and disseminated to millions, exemplified a coordinated effort to weaponize social media against Palestinian voices.

142.    On October 17, 2023, the barrage of online vitriol and institutional betrayal, including a direct message threatening her and her family by a Zionist terrorist by the name of Yaniv Golan, pushed Dr. AbouYabis to the brink of psychological collapse. She urgently contacted her psychiatrist, moving her appointment from October 19 to that same day, and requested an emergency session with her trauma/PTSD specialist. Recognizing her deteriorating mental state, she formally sought



**Yaniv Golan**

OCT 17 AT 5:29 AM


Your family's life is in danger. I'm not just saying that. you should be very careful the next few months

a voluntary medical leave to protect her well-being.

143.    Emory responded not with compassion, but with retaliation. At 3:00 p.m. that day, Dr. AbouYabis received an email placing her on administrative leave. However, within 12 hours of Reznichenko's doxing via StopAntisemitism.org, Emory had already publicly shamed and defamed Dr. AbouYabis hours earlier: internal emails circulated across Emory University, Emory Healthcare, and Winship Cancer Institute that labeled Dr. AbouYabis's opposition to occupation, apartheid, and genocide as "hatred" that "incites violence" and "is counter to the values that unite us as health care professionals and educators." Meanwhile, Emory's official social media accounts declared Dr. AbouYabis's private posts "antisemitic" and announced her suspension. Within 20 minutes of the administrative notice, *The New York Post* published a defamatory article titled "Emory Professor Suspended Over Antisemitic Posts," using conveniently "leaked" details from Emory's internal communications.



144. On the same day, Canary Mission and Reznichenko through StopAntisemitism.org quickly announced the news of their successful campaign, with Zionist cyberstalkers celebrating.



145. The next day, October 18, 2023, Dr. AbouYabis existed in a haze of trauma, unable to process events or confide in her parents, who were consumed by fears for family in Palestine. Emory's actions—transparently coordinated with anti-Muslim and anti-Palestinian tabloids—had transformed protected speech into a public lynching, weaponizing Dr. AbouYabis's identity as a Palestinian American Muslim physician to appease Zionist interests. This calculated cruelty violated Title VII's prohibitions on national origin discrimination and created a hostile work environment rooted in anti-Palestinian racism.

L. **EMORY'S DISCRIMINATION AND UNLAWFUL TERMINATION OF DR. ABOUYABIS**

146.    On October 19, 2023, Dr. AbouYabis received less than 24 hours' notice for a Zoom interview with Emory's investigatory committee, during which she was denied legal representation.

147.    During the October 20, 2023 investigatory interview, Dr. AbouYabis exhibited severe psychological distress, repeatedly pausing the proceedings due to overwhelming grief over her inability to contact family in Gaza amid Israel's ongoing genocide, compounded by the coordinated doxing campaign and death threats orchestrated by Canary Mission and Reznichenko using her cyberstalking platform, StopAntisemitism.org. The committee, comprised of Cliff Teague (HR), attorney Zainab Wurie Harvey (Dean's Office), and Dr. Carla Hack (Surgery), conducted the interrogation less than 24 hours after notifying Dr. AbouYabis, while she was on FMLA leave for PTSD and major depression.

148.    Emory's investigators dismissed Dr. AbouYabis's explanations, minimizing her critique of Israel's occupation, apartheid, and genocide in Palestine as "rooted in bias and hate" and falsely equating her humanizing Palestinians with incitement to violence. This prejudgment mirrored Reznichenko's language on StopAntisemitism.org, as well as that of Canary Mission, whose defamatory claims Emory internalized without independent verification.

149.    On November 8, 2023, Defendant Carlos del Rio notified Dr. AbouYabis that she was being terminated from her position. The university's refusal to allow legal representation, combined with its failure to provide evidence of workplace disruption, rendered the process a procedural sham designed to legitimize a predetermined outcome:

termination for humanizing Palestinians and opposing Israel's occupation, apartheid, and genocide.

150.    By adopting external actors' framing of her posts as "antisemitic," Emory violated its Respect for Open Expression Policy 4.62 and federal anti-discrimination laws, which shield critiques of state violence under Title VII and the First Amendment. The rushed, adversarial nature of the interview—conducted amid Dr. AbouYabis's medical leave—exposed institutional malice, not impartial fact-finding.

### M. Disparate Treatment and Comparator Evidence Demonstrating Pattern of Discriminatory Animus

151.    Emory University has demonstrated a pattern of disparate treatment in its handling of controversial speech and conduct by employees, favoring non-Muslim and pro-Israel voices while discriminating against Palestinian and Muslim perspectives.

152.    **Comparator 1: Jason D. Weiden**. Jason Weiden, a white male Jewish Zionist Assistant Professor of Radiology and Imaging Sciences at Emory University School of Medicine, serves as a critical comparator demonstrating Emory's discriminatory double standards.



153.    On October 7, 2023, Defendant Jason Weiden publicly endorsed the Israeli genocide of Palestinian civilians. In this exchange: Mehdi Hasan (@mehdirhasan) argued against killing civilians in Gaza, stating: "Strategically, killing civilians in Gaza who aren't Hamas won't hurt Hamas, it'll help them, in the long-run." "Morally, killing civilians in Gaza as part of an 'overwhelming' show of force isn't moral. It's immoral." Hasan was responding to David French (@DavidAFrench), who had posted that "Israel should not permit Hamas

to exist in Gaza any longer" and justifying an "overwhelming response." Defendant Weiden (@WeidenJason) responded to this exchange with the chilling comment: "They will be freed from their bodies."



154.    Defendant Weiden's statement unambiguously endorses the indiscriminate killing of Palestinian civilians in Gaza, dehumanizing them and celebrating their ethnic cleansing as "freedom from their bodies." The post garnered significant visibility given the prominence of the original posters. Unlike Dr. AbouYabis's private posts expressing concern for Palestinian civilian casualties, Defendant Weiden's public comment explicitly cheered on genocide against civilians. Yet while Dr. AbouYabis was terminated for alleged "antisemitism," Defendant Weiden faced no professional consequences for this clear endorsement of killing civilians. This represents compelling evidence of Emory's discriminatory enforcement of Policy 4.62 (Standards of Conduct), which prohibits "behavior harmful to the reputation and mission of Emory University" and "inappropriate and disruptive behavior adversely affecting students, employees and patients."

155.    On October 16, 2023, in response to a doxing post by Reznichenko's cyberstalking and doxing operation via StopAntisemitism.org and Canary Mission, combining Dr. AbouYabis's professional Cancer Institute profile with her personal social media content expressing solidarity with Palestine, Defendant Weiden vowed to lead a public and Emory-wide campaign to "get [Dr. AbouYabis] fired."

156.    The exchange begins with Jonathan Donenfeld (verified account) tagging @EmoryUniversity and asking, "Are there any Jewish doctors and professors that work at @EmoryUniversity? They should [know] about their antisemitic colleague." This post received 15,000 views, deliberately drawing attention to Dr. AbouYabis.



157.    Defendant Weiden responds: "We will start working on the campaign to get her fired." This statement unequivocally demonstrates three things. First, Defendant Weiden's intent to organize collective action against her employment. Second, Defendant Weiden's use of the plural "we," clearly signals coordination with others anti-Palestinian and anti-Muslim actors. Finally, Defendant Weiden's explicit vitriolic goal of terminating Dr. AbouYabis because of her solidarity with Palestine against the Israeli occupation, apartheid, and genocide. The

original post featuring Dr. AbouYabis garnered 3.1 million views, 8,300 likes, and 3,400 reposts-evidence of the massive exposure generated by this targeted campaign.

158.    This evidence directly contradicts Emory's claim that Dr. AbouYabis was terminated solely for policy violations. Rather, it demonstrates that a fellow Emory physician, with explicit anti-Palestinian and anti-Muslim animus, actively orchestrated her firing based on her Palestinian identity and protected humanitarian expression—a campaign that violated multiple Emory policies, including: Emory's prohibition of harassment based on national origin and political viewpoint (Policy 1.3), Emory forbidding "disruptive behavior adversely affecting . . . employees" (Policy 4.62), and Emory's protection of community members' right to expression (Policy 8.14).



159.    While Dr. AbouYabis was terminated for private posts about Palestinian rights, Defendant Weiden faced no consequences for publicly coordinating her termination—a stark evidence of Emory's discriminatory enforcement patterns.

160.    On February 20, 2025, Defendant Jason Weiden (@WeidenJason) responded to the extreme humanitarian suffering of

Palestinian civilians, including women, children, and the elderly, with explicit celebration. The original post features a video showing Palestinian refugees' tents flooding due to heavy rainfall in Gaza, with the caption: "Meanwhile the Palestinians tents are flooding due to heavy rains." The video shows displaced Palestinians, including a child, attempting to salvage their makeshift shelters as water inundates their already blighted living spaces.

161.  Defendant Weiden's response below the video reads: "Couldn't happen to nicer people. I guess there is some justice in the world." This statement explicitly celebrates the suffering of Palestinian civilians, including children, elderly, and other vulnerable displaced persons who were forced to live in makeshift tents after Israel carpet-bombed their homes in the ongoing Zionist-led genocide.

162.  This post provides compelling evidence of disparate treatment at Emory University. While Dr. AbouYabis was terminated for private expressions of concern





 

Couldn't happen to nicer people. I guess there is some justice in the world.

for Palestinian civilians, Defendant Weiden faced no professional consequences for cheerleading war criminals and publicly celebrating Palestinian suffering. His comment constitutes a clear violation of Emory's Policy 1.3 (Equal Opportunity and Discriminatory Harassment) and Policy 4.62 (Standards of Conduct), which prohibit behavior that is "harmful to the reputation and mission of Emory University" and "inappropriate and disruptive behavior adversely affecting students, employees and patients."

163.    The post received substantial visibility, with 495,000 views, 7,900 likes, and 901 reposts—comparable to the reach of Dr. AbouYabis's private posts that Emory deemed "harmful" to its reputation. Despite this public endorsement of genocide from a physician responsible for patient care, Emory took no disciplinary action, demonstrating a pattern of anti-Palestinian bias in policy enforcement.

164.    In a fourth Twitter/X post from Defendant Jason Weiden (@WeidenJason), he mockingly celebrates the destruction of Palestinian homes and civilian suffering. The post shows Dr. Weiden responding to a viral image (2.2 million views) of a Palestinian teenager wearing a kefiyyeh sitting in a white armchair amidst the complete destruction of what appears to be her home in Gaza—surrounded by rubble, damaged walls, and debris. The original post had garnered substantial engagement with 146,000 likes and 18,000 reposts.

165.    Defendant Weiden's response to this image of civilian suffering reads: "If that's what winning looks like keep it up. You're doing great. 🤡" Defendant Weiden's statement celebrates destruction of Palestinian civilian homes, mocks Palestinian suffering by sarcastically referring to it as "winning," uses the clown emoji to further ridicule the teenager

sitting amid the ruins of her home, and
endorses continuing such genocidal
destruction with his "keep it up"
encouragement.

166.    This post by Defendant
Weiden, an Emory physician responsible
for patient care, explicitly violates
Emory's Policy 4.62 (Standards of
Conduct) by demonstrating "behavior
harmful to the reputation and mission of
Emory University" and "inappropriate
and disruptive behavior adversely
affecting students, employees and
patients." It also violates Policy 1.3





**Jason**
@WeidenJason
Follow

If that's what winning looks like keep it up.
You're doing great. 🤡

prohibiting discriminatory harassment based on national origin.

167.    The stark contrast with Dr. AbouYabis's treatment is unmistakable: while she
was terminated for expressing concern for Palestinian civilians on her private account,
Defendant Weiden faced no professional consequences for publicly dehumanizing, cheering
genocide, and mocking Palestinian suffering. This represents compelling evidence of Emory's
discriminatory enforcement patterns and anti-Palestinian bias, directly relevant to Dr.
AbouYabis's claims under Title VII and 42 U.S.C. § 1985(3).

168.    In a fifth Twitter/X post from Defendant Jason Weiden (@WeidenJason), he
leans into his Zionism and uses racist, Islamophobic rhetoric against Palestinians. In this

interaction, verified journalist Abubaker Abed (@Abubaker) posts a message condemning the moral hypocrisy regarding violence against children, stating: "You can't talk about moral inversion when you turn a blind eye to the massacres of innocent children." His post, which received substantial engagement (10,000 views, 1,100 likes), makes a general ethical argument about violence against civilians.

169.    Defendant Weiden (@WeidenJason) responds with the comment: "Says the sheep lover." This derogatory slur represents a well-known racist and Islamophobic trope that has historically been directed at people of Arab and Muslim backgrounds, implying bestiality and uncivilized behavior. Such language violates Emory Policy 4.62 (Standards of Conduct), which prohibits "behavior harmful to the reputation and mission of Emory University," violates Policy 1.3 (Equal Opportunity and Discriminatory Harassment) by targeting someone based on their perceived ethnicity and religion, and demonstrates unprofessional conduct unbecoming of a physician responsible for treating diverse patient populations.

> **Abubaker Abed** ✓ @Abubaker... · 19h
> You can't talk about moral inversion when you turn a blind eye to the massacres of innocent children. And you can't put yourself in conversation with such noble people because one cent can buy you and your soul if you ever had one.
>
> You don't know the meaning of moral to talk about it. Mind your own business.
>
> 💬 19    🔁 127    ♡ 1.1K    📊 10K    🔖    ⬆️
>
> **Jason**    [Follow]
> @WeidenJason
>
> Says the sheep lover.

170.    The stark contrast with Dr. AbouYabis's treatment is unmistakable: while Dr. AbouYabis was terminated for expressing concern for Palestinian civilians on her private account, Defendant Weiden faced no professional consequences for publicly directing racist language at a journalist discussing the toll of Israel's genocide on children. This exchange provides compelling evidence of Emory's discriminatory enforcement patterns, as Defendant

Weiden was permitted to engage in explicitly racist conduct while maintaining his position and clinical privileges.

171.    In a sixth Twitter/X post from Defendant Jason Weiden (@WeidenJason), he leans deeper into Zionist sadism demonstrating his callous attitude towards Palestinian suffering and indifference to Muslim and Palestinian life. In this post, verified journalist Imtiaz Mahmood shares devastating before-and-after aerial photos of Rafah, a city in Gaza. The top image shows a densely populated urban area with developed neighborhoods and infrastructure, while the bottom image reveals the same location reduced to complete rubble and destruction as Israel's genocidal campaign continues. The Arabic text on the images reads "before" (قبل) and "after" (بعد).



172.    Defendant Weiden (@WeidenJason) responds to this evidence of mass destruction and ethnic cleansing with a single acronym: "FAFO"—standing for "Fuck Around and Find

Out," a phrase implying that Palestinians deserve genocide and ethnic cleansing. This sadistic and callous abbreviation dismisses the humanity of Palestinians and furthers the Zionist White supremacist ideology of hate that feeds off the humanitarian catastrophe depicted in the images, where an entire civilian population "deserves" to have their homes, schools, hospitals, and infrastructure destroyed through what environmental experts have termed "scorched earth" tactics, and international legal authorities deemed war crimes.

173.    It is inconceivable that an avowed Zionist like Defendant Weiden—cheerleading, praising, and glorifying Israel's terrorism, genocide, war crimes, and ethnic cleansing—remains employed by Emory. And this is a post that received significant engagement, with Mahmood's original post garnering 137,000 views, 5,400 likes, and 647 reposts, ensuring that Defendant Weiden's inhumane response reached a wide audience.

174.    This exchange demonstrates another stark example of Emory's discriminatory enforcement of its professional conduct policies. While Dr. AbouYabis was terminated for expressing concern for Palestinian civilians on private social media accounts, Defendant Weiden faced no consequences for publicly celebrating the complete destruction of a Palestinian city and depraved indifference for Palestinian human life—clear violations of Emory's Policy 4.62 (Standards of Conduct) and Policy 1.3 (Equal Opportunity and Discriminatory Harassment).

175.    This post, combined with Defendant Weiden's other documented statements dehumanizing Palestinians and celebrating their physical destruction and ethnic cleansing presented here—which is just a sampling of his hate speech—establishes an unequivocal, undeniable, and unconscionable pattern of anti-Muslim and anti-Palestinian animus that directly contextualizes Dr. AbouYabis's wrongful termination.

| Factor | Defendant Jason D. Weiden | Dr. AbouYabis |
|---|---|---|
| **Protected Class** | White, Jewish, Male, Zionist | Muslim, Palestinian, Female |
| **Position** | Radiologist, Emory School of Medicine (retained). | Hematologist/Oncologist, Winship Cancer Institute and Emory School of Medicine (suspended within 12 hours and eventually terminated in less than a month). |
| **Misconduct** | Racist and dehumanizing tweets celebrating the flooding of Gaza refugee camps, called a Palestinian journalist a racist trope, and endorsed war crimes and genocide. | Private social media posts condemning civilian deaths in Gaza, humanizing Palestinians, and opposing occupation, apartheid, and genocide. |
| **Investigation** | No investigation conducted despite public petitions and documented harassment. | None; suspended within 12 hours and terminated in less than a month without due process. |
| **Disciplinary Action** | None. Retains clinical and academic roles. | Terminated within 3 weeks. |
| **Implicated Emory Policies** | – Policy 1.3: Discriminatory harassment (anti-Palestinian racism). <br> – Policy 4.62: "Behavior harmful to Emory's reputation." <br> – Policy 8.14: Suppression of protected speech. | Same policies cited for termination; enforced disparately. |
| **Emory's Justification** | No public justification provided for inaction. | Terminated for "harmful" posts and "disruptive behavior" despite private, non-threatening content. |

176.    This preferential treatment—afforded to an employee who targeted a protected class—stands in stark contrast to Emory's summary termination of Dr. AbouYabis for conduct that cannot even be compared to the hatemongering and racist violence

communicated in Defendant Weiden's post, exposing the Emory's systemic bias against Palestinian and Muslim voices.

177.    **Comparator 2: Joshua H. Winer**. Joshua Winer, a white male Jewish Zionist Associate Professor of Surgery in the division of surgical oncology at Emory's Winship Cancer Institute, serves as another comparator demonstrating Emory's discriminatory double standards.

178.    Joshua Winer proudly served in the Israeli Defense Forces (IDF) as a lone soldier in the early to mid-2000s. An IDF lone soldier refers to a member of the IDF who serves without immediate family support in Israel. For example, when, as is the case with Winer, a U.S. citizen who immigrates to Israel alone and joins the IDF. This is typically done through programs like *Nefesh B'Nefesh* or *Garin Tzabar*.

179.    Following Israel's declaration of its genocidal intent in Gaza,[83] Josh Winer described his decision to enlist as inevitable: "The question wasn't *if* I would volunteer," he wrote, "but *when* and *how*." According to his public account, this resolve led to his deployment as a "surgeon in an elite reconnaissance unit" operating inside Gaza.[84]

180.    While Israel enforces mandatory military conscription, Winer was under no such obligation—he made the conscious decision to emigrate and voluntarily enlist in the IDF, fully aware that the IDF is "committing a 'live-streamed genocide' against Palestinians in Gaza by targeting critical infrastructure, displacing most of the enclave's inhabitants and

---

[83] Raz Segal, *A Textbook Case of Genocide*, JEWISH CURRENTS (Oct. 13, 2023), https://jewishcurrents.org/a-textbook-case-of-genocide.

[84] Josh Winer, *An Ongoing Quest to Serve*, The Blogs, TIMES OF ISRAEL (Mar. 7, 2024), https://blogs.timesofisrael.com/an-ongoing-quest-to-serve/.

depriving them of life-saving aid."[85] This is not hyperbole, but a conclusion reached after declarations of systematic targeting of Gaza's critical infrastructure—hospitals, schools, water facilities—deliberately displacing nearly the entire population and depriving them of life-saving aid in what Human Rights Watch and Amnesty International have both concluded are acts of genocide, extermination, and crimes against humanity.[86]

181.    Winer's decision was not born of coercion or circumstance, but of long-standing aspiration. For decades, he dreamed of moving to and supporting a Zionist project that, according to the findings of Human Rights Watch and the UN, has "committed numerous war crimes and created an apartheid state in the West Bank"—systematically dispossessing Palestinians, enforcing a permit regime, and stripping millions of their most basic human rights.[87] The evidence is overwhelming and the intent unmistakable: Israel's policies and actions in the occupied territories constitute not only war crimes, but the crime of crimes—genocide—while individuals like Winer willingly choose to participate in this machinery of oppression.

182.    Not only does Winer express a brazen lack of remorse and a disturbing self-satisfaction on display in his article in the Times of Israel. After participating in what the international community and leading human rights organizations have repeatedly described as a campaign of genocide against Palestinians in Gaza, Winer had the audacity to fondly recall his "memorable experiences" during nearly four months with the IDF. He does not

---

[85] FRANCE 24, *Israel Perpetrating 'Live-Streamed Genocide' Against Palestinians in Gaza, Says Amnesty International*, FRANCE 24 (Apr. 29, 2025), https://www.france24.com/en/middle-east/20250429-israel-perpetrating-live-streamed-genocide-against-palestinians-in-gaza.
[86] Amnesty Int'l, *The State of the World's Human Rights: April 2025* POL 10/8515/2025 (Apr. 28, 2025), https://www.amnesty.org/en/documents/pol10/8515/2025/en/.
[87] FRANCE 24, *Israel Perpetrating 'Live-Streamed Genocide' Against Palestinians in Gaza, Says Amnesty International*, FRANCE 24 (Apr. 29, 2025), https://www.france24.com/en/middle-east/20250429-israel-perpetrating-live-streamed-genocide-against-palestinians-in-gaza.

express regret or even sober reflection about the suffering inflicted on civilians—on the contrary, he boasts about being "*in* Beit Hanoun," a site devastated in Israel's genocidal campaign.

183.    Even more appalling, Winer attempts to cloak these atrocities in religious justification, referencing a "Dvar Torah" to rationalize and excuse the ongoing genocide. He describes using scripture to "explain why all of us were in Gaza and why we must continue," as if sacred texts could possibly legitimize the mass displacement, destruction, and killing of a besieged civilian population. This is not only a gross perversion of faith, but a chilling example of how perpetrators of grave human rights violations seek to normalize and sanctify the machinery of genocide.

184.    For context, from October 2023 to April 2024, Beit Hanoun, a northern Gaza town once home to 50,000 Palestinians, became a focal point of Israel's genocidal campaign in Gaza. The IDF reduced the town to rubble, systematically erasing its civilian infrastructure, slaughtering families, and weaponizing starvation in blatant violation of international law.

185.    In a video posted online on 21 December 2023, Commander in the 2908th Battalion of the genocidal Zionist army Yair Ben David said that the Israeli army had "entered Beit Hanoun and did there as Shimon and Levi did in Nablus," and that "[t]he entire Gaza should resemble Beit Hanoun," referring to the city in northern Gaza which has been entirely devastated by the Israeli army.[88] The biblical passage in issue reads: "On the third day, when

---

[88] Yair Ben David, Commander in the 2908th Battalion, statement, 20 December 2023. https://www.youtube.com/watch?v=NK8ZnGKspel. Translation in "*War on Gaza: Israeli commander vows to flatten 'entire' Gaza Strip*", MIDDLE EAST EYE (Dec. 21, 2023), https://www.middleeasteye.net/news/war-gaza-israeli-commander-vows-flatten-entire-gaza-strip.

they were in pain, Simeon and Levi, two of Jacob's sons, brothers of Dinah, took each his sword, came upon the city unmolested, and *slew all the males.*"[89]

186.    The IDF's invasion of Beit Hanoun on October 27, 2023, marked the beginning of a calculated annihilation of Palestinian life. For example, the IDF dropped unguided "dumb bombs" on densely populated neighborhoods, killing over 7,000 Palestinians, including 4,900 women and children; targeted the Shabat family home on December 29, 2023, killing seven civilians—three of them children—in a strike with no discernible military objective; and shelled a UN school sheltering displaced families to terrorize displaced survivors. By April 2024, 90% of Beit Hanoun's structures lay destroyed, rendering the town "no longer existing." Satellite imagery confirmed the IDF's deliberate razing of residential blocks to create a "buffer zone," a war crime under Article 53 of the Fourth Geneva Convention.[90]

187.    Israel imposed a sadistic siege on Beit Hanoun, blocking food, water, and medicine for 66 consecutive days by December 2023. This policy forced families to drink contaminated water and eat animal feed, leading to widespread malnutrition and infant deaths, and paralyzed medical infrastructure, leaving 26,000 Palestinians with life-altering injuries untreated.

188.    Beit Hanoun stands as a testament to Israel's genocidal machinery: a town reduced to ashes, its people starved, bombed, and dispossessed. This is not "self-defense" but a calculated campaign to extinguish Palestinians.

---

[89] Genesis 34:25 (New Jewish Publication Society, 1985), https://www.sefaria.org/Genesis.34 .25?lang-=bi&with-all&lang2=en (emphasis added).
[90] *Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip* (South Africa v. Israel), Application Instituting Proceedings and Request for the Indication of Provisional Measures, 2023 I.C.J. (Dec. 29, 2023).

189.    How easily personal turmoil and communal loyalty are invoked by Winer to justify participation in atrocity. Cloaked in the language of duty, belonging, and hope, these narratives sinisterly erase the lived reality of Palestinian suffering and the catastrophic human toll of Israel's genocidal campaign. The refrain of "Am Yisrael Chai" is wielded by Winer not as a call for coexistence or justice, but as a shield against accountability—a rallying cry that sanctifies war crimes and normalizes the machinery of occupation, apartheid, and genocide.

190.    What is presented as ordinary heroism is, in truth, the ordinary face of complicity: a willingness to set aside conscience, to "drop everything" for a cause that, in practice, means the destruction and ethnic cleansing of another people's lives and homeland. No invocation of religion, heritage, or professional service can cleanse the damning stain of collective punishment, mass displacement, and the systematic denial of basic human rights. Until these stories reckon honestly with the suffering inflicted and the laws violated, they remain not tales of hope, but of willful blindness and moral abdication.

191.    Emory University's retention of Winer—despite his public endorsement and participation in Israel's genocidal campaign in Gaza demonstrates institutional complicity in anti-Palestinian discrimination. Winer's March 7, 2024, article in *The Times of Israel*, where he identifies himself as an "Emory Surgical Oncologist," violates Emory Policy 127, which permits affiliation references only when "consistent with Emory's mission." By allowing Winer to leverage his Emory title to justify Israel's war crimes—including the systematic destruction of Gaza's healthcare infrastructure and the killing of 412 Palestinian medical workers—Emory ratified conduct antithetical to its purported humanitarian values.

192.    Meanwhile, Emory terminated Dr. AbouYabis for private social media posts condemning the ethnic cleansing of Palestinians by Israel, despite her adherence to

Policy 8.14's protections for "open expression." Winer's article, which frames Israel's crimes against humanity as "a determination that nothing like Oct. 7 would ever happen again,"[91] directly contradicts Emory's Policy 1.3, prohibiting "behavior inconsistent with Emory's commitment to humanitarian principles." Emory's refusal to investigate Winer exposes discriminatory enforcement of its policies.

193.    Emory also ignored Winer's role in Gaza's humanitarian collapse. Winer operated in Beit Hanoun, where the IDF razed 90% of buildings and blocked food/medicine, starving 2.3 million Palestinians—acts constituting starvation as a war crime under the Rome Statute Art. 8(2)(b)(xxv). Emory took no disciplinary action, despite HRW documenting Israel's "deliberate deprivation of life-sustaining resources."[92]

194.    Winer's joining the IDF and public endorsement of Israel's genocidal campaign in Gaza created a hostile environment for Muslim, Arab, Palestinian, and anti-Zionist patience, colleagues, students, and faculty at Emory. By framing Israel's siege as a "determination that nothing like Oct. 7 would ever happen again," Winer legitimized the systematic destruction of Gaza's healthcare infrastructure, including the killing of over 400 Palestinian medical workers. This rhetoric, coupled with his IDF service in Beit Hanoun (where 90% of buildings were razed), constitutes harassment based on national origin under Policy 1.3, which prohibits conduct that "denigrates or shows hostility" toward protected groups. Emory's failure to investigate Winer's role in perpetuating anti-Palestinian violence—

---

[91] Haley Cohen, *Jewish Surgeon Sues Anti-Israel Groups for Defamation After Volunteering in IDF*, Jewish Insider (May 6, 2025), https://jewishinsider.com/2025/05/jewish-surgeon-dr-josh-winer-idf-lawsuit-emory-anti-israel-groups/.
[92] Human Rights Watch, *Israel's Crime of Extermination, Acts of Genocide in Gaza* (Dec. 19, 2024), https://www.hrw.org/news/2024/12/19/israels-crime-extermination-acts-genocide-gaza.

while punishing Dr. AbouYabis for advocating Palestinian rights on her private social media account—exposes discriminatory enforcement of this policy.

195.    Winer's participation in the IDF, documented by the UN as involving indiscriminate bombing and starvation tactics,[93] directly contravenes Policy 4.62's prohibition on "behavior harmful to the reputation and mission of Emory University." His public glorification of Israel's military actions—including operating in Beit Hanoun, a site of mass civilian casualties—damaged Emory's institutional integrity by aligning it with war crimes. Meanwhile, Emory applied Policy 4.62 punitively to terminate Dr. AbouYabis for private social media posts, highlighting a double standard that privileges Zionist advocacy over humanizing Palestinians and opposing occupation, apartheid, and genocide.

196.    Emory's celebration of Winer's IDF service while silencing Palestinian voices violates Policy 8.14's mandate to protect "courageous inquiry" and "dissent." This selective enforcement transforms Policy 8.14 into a tool of ideological repression, privileging pro-Israel and Zionist speech and chilling protected dissent.

197.    Emory's retention of Winer—despite his complicity in genocide—alongside its termination of Dr. AbouYabis for advocating Palestinian rights, constitutes systemic discrimination under Title VII. The university's refusal to discipline Winer for endorsing and committing violence against Arabs, Muslims, and Palestinians (all of whom are protected classes) while punishing speech humanizing Palestinians reflects a hostile work environment rooted in anti-Palestinian, anti-Muslim, and anti-Arab animus. This disparate treatment violates federal anti-discrimination laws and emboldens institutional racism.

---

[93] *General Assembly Committee on the Exercise of the Inalienable Rights of the Palestinian People, 420th Meeting*, U.N. Doc. A/AC.183/PV.420 (Nov. 26, 2024), https://www.un.org/unispal/wp-content/uploads/2024/12/n2436923.pdf.

| Factor | Joshua H. Winer | Dr. AbouYabis |
|---|---|---|
| **Protected Class** | White, Jewish, Male, Zionist | Muslim, Palestinian, Female |
| **Position** | Surgical Oncologist, Emory School of Medicine; Affiliated with Winship Cancer Institute (retained). | Hematologist/Oncologist, Winship Cancer Institute and Emory School of Medicine (suspended within 12 hours and eventually terminated in less than a month). |
| **Misconduct** | – Volunteered with IDF in Gaza during Israel's genocidal campaign, operating in Beit Hanoun, where 90% of structures were destroyed.<br>– Publicly justified Israel's genocidal campaign as "a determination that nothing like Oct. 7 would ever happen again." | Private social media posts condemning civilian deaths in Gaza, humanizing Palestinians, and opposing occupation, apartheid, and genocide. |
| **Investigation** | No investigation conducted despite public petitions and documented harassment. | None; suspended within 12 hours and terminated in less than a month without due process. |
| **Disciplinary Action** | None. Retains clinical and academic roles. | Terminated within 3 weeks. |
| **Implicated Emory Policies** | – Policy 1.3: Discriminatory harassment (anti-Palestinian racism).<br>– Policy 4.62: "Behavior harmful to Emory's reputation."<br>– Policy 8.14: Suppression of protected speech. | Same policies cited for termination; enforced disparately. |
| **Emory's Justification** | No public justification provided for inaction. | Terminated for "harmful" posts and "disruptive behavior" despite private, non-threatening content. |

198.    Joshua Winer's actions—and Emory's complicity—violate core ethical and legal standards. By glorifying genocide, suppressing Palestinian voices, and enforcing policies with blatant bias, Emory has become an accomplice to Israeli hasbara and Zionist persecution.

199.    **Comparator 3: Rebecca Seidel**. Rebecca Seidel, a white female Jewish Zionist Associate Professor of Radiology and Imaging Sciences at Emory University School of Medicine, serves as another comparator demonstrating Emory's discriminatory double standards.



200.    Seidel publicly endorsed the IDF's genocidal campaign in Gaza by liking and amplifying posts glorifying Israeli military actions. For instance, she engaged with a post by Lior Raz (@lioraz) on October 9, 2023, which praised "brothers in arms" volunteers assisting Sderot—a city complicit in Israel's blockade and bombardment of Gaza. By validating narratives that frame Palestinian resistance as "terrorism," Seidel contributed to the dehumanization of Palestinians, which is central to Israel's



genocidal campaign. Emory's failure to discipline her-while terminating Dr. AbouYabis for amplifying Palestinian human rights—exposes systemic anti-Palestinian animus under Title VII.

201.    Seidel liked a post by war criminal and former Israeli Ambassador Gilad Erdan (@giladerdan1) on October 29, 2023, which called to "defund the UN" over its criticism of Israel's genocidal campaign. This aligns with Israel's decades-long campaign to discredit international bodies documenting its war crimes. By endorsing Erdan's smear—made while Gaza's healthcare system collapsed under IDF strikes—Seidel legitimized Israel's isolation from accountability. Emory's tolerance of this conduct violates Policy 4.62, which prohibits "behavior harmful to the university's reputation," yet was weaponized exclusively against Palestinian voices.



202.    Seidel shared an article by Bari Weiss titled *Is Campus Rage Fueled by Middle Eastern Money?* (November 12, 2023), which desperately seeks to attribute U.S. campus protests for a ceasefire and in opposition to occupation, apartheid, and genocide to foreign funding rather than grassroots outrage over Israel's



genocide. The article, rooted in the racist trope of "foreign influence," mirrors Israel's strategy

to conflate Palestinian solidarity and opposition to occupation, apartheid, and genocide with antisemitism. By platforming this disinformation, Seidel violated Policy 8.14 (Respect for Open Expression), which Emory enforces selectively to suppress Palestinian narratives.

203.    Seidel engaged with posts by Stephen Miller (@StephenM), architect of Trump's Muslim ban, who accused pro-Palestine students of being "pro-jihad foreigners." This rhetoric, which frames Palestinian advocacy as a national security threat, aligns with Israel's systemic erasure of Palestinian identity. Emory's



inaction—despite Miller's well-documented hatemongering and Islamophobia—contrasts starkly with its punitive response to Dr. AbouYabis's protected speech, violating Policy 1.3 (Equal Opportunity).

204.    Seidel also endorsed a post by Marc Zell in November 2023 declaring that Palestinian "have no reason to exist" represents a chilling legitimization of Zionism's eliminationist ideology from a medical professional at Emory University. By publicly liking rhetoric that calls for dismantling UNRWA—the primary lifeline for 5.9 million Palestinian refugees—Seidel demonstrates profound contempt for international humanitarian law and Palestinian existence itself. Particularly revealing is her comfort with Zell's dehumanizing language amid Israel's genocidal campaign that had already killed



thousands of Palestinian civilians. The post's highlighted statement—that Palestinians "have no reason to exist"—reflects classic genocidal discourse that challenges a group's very right to exist, language that preceded mass atrocities throughout history. That Seidel faced no professional consequences for endorsing such rhetoric while Dr. AbouYabis was terminated for expressing grief over civilian casualties exposes Emory's complicity in normalizing anti-Palestinian hate. This represents a flagrant double standard in Policy 4.62 enforcement and violates fundamental principles of medical ethics that demand respect for human dignity regardless of national origin or ethnicity.

205.    Seidel's conduct exemplifies how Emory privileges Zionist anti-Muslim and anti-Palestinian advocacy while criminalizing humanizing Palestinians and opposing occupation, apartheid, and genocide. Seidel's endorsement of genocide-denial narratives, coupled with Emory's refusal to investigate, underscores the university's role in normalizing anti-Palestinian racism. As the ICJ affirmed, Israel's actions in Gaza meet the legal threshold for genocide—a reality Seidel's posts tacitly endorse.

| Factor | Rebecca Seidel | Dr. AbouYabis |
|---|---|---|
| Protected Class | White, Jewish, Female, Zionist | Muslim, Palestinian, Female |
| Position | Associate Professor of Diagnostic Radiology; Associate Director of the Division of Breast Imaging at Emory School of Medicine (retained). | Hematologist/Oncologist, Winship Cancer Institute and Emory School of Medicine (suspended within 12 hours and eventually terminated in less than a month). |
| Misconduct | – Endorsed posts by Gilad Erdan (Israeli ambassador and war criminal) calling to defund the UN to end critical aid to Gaza.<br>– Promoted Islamophobic conspiracies by sharing Bari Weiss's article falsely claiming Middle Eastern funding drives pro-Palestine protests.<br>– Endorsed anti-Muslim rhetoric: Engaged with content framing Palestinian advocacy as threat to national security. | Private social media posts condemning civilian deaths in Gaza, humanizing Palestinians, and opposing occupation, apartheid, and genocide. |
| Investigation | None. | None; suspended within 12 hours and terminated in less than a month without due process. |
| Disciplinary Action | None. Retains clinical and academic roles. | Terminated within 3 weeks. |
| Implicated Emory Policies | – Policy 1.3: Discriminatory harassment (anti-Palestinian racism).<br>– Policy 4.62: "Behavior harmful to Emory's reputation."<br>– Policy 8.14: Suppression of protected speech. | Same policies cited for termination; enforced disparately. |
| Emory's Justification | No public justification provided for inaction. | Terminated for "harmful" posts and "disruptive behavior" despite private, non-threatening content. |

206.    **Comparator 4: Paul Zwier**. Paul Zwier, a tenured White professor at Emory Law School, repeatedly used the dehumanizing and violent n-word in class—first during a discussion of a civil rights case, then again in a confrontation with an African American student, where he defended his use of the violent slur by recounting that he himself had previously been called a "n*****-lover" by other white people because of his views on race. Despite admitting to using the slur, Emory's administration initially shielded Zwier under the guise of "academic freedom," arguing his language was a "pedagogical choice."[94] This framing ignores the violent trauma inflicted on African American students who are forced to endure racial epithets in an educational setting—a clear violation of Title VII and Emory's own Policy 1.3, which prohibits discriminatory harassment.

207.    Despite student protests and documented harm to African American students—including reluctance to recruit minority peers and transfer requests—Emory reinstated Zwier in 2020, restricting him from teaching mandatory courses until 2021. This token discipline contrasts sharply with Dr. AbouYabis's termination for advocating human rights. By allowing Zwier to retain tenure while punishing speech humanizing Palestinians, Emory signals that anti-Black and anti-Palestinian violence is permissible if cloaked in "academic" rhetoric.

208.    Zwier's conduct created a hostile educational environment under Title VI, which mandates institutions address racial harassment. Emory's failure to uphold this—while weaponizing Policy 4.62 against Dr. AbouYabis—exposes systemic racism. The American Association of University Professors rightly noted that Zwier's speech, while offensive, was

[94] American Ass'n of Univ. Professors, *Letter to Dr. Claire E. Sterk, President, Emory Univ.* (May 15, 2019), https://www.thefire.org/sites/default/files/2019/09/03144331/AAUP-Letter-to-Emory-University-May-15-2019.pdf.

pedagogically relevant, but this leniency was denied to a Palestinian professor critiquing occupation, apartheid, and genocide.

| Factor | Paul Zwier | Dr. AbouYabis |
|---|---|---|
| Protected Class | White, Male | Muslim, Palestinian, Female |
| Position | Tenured Professor of Law at Emory (retained). | Hematologist/Oncologist, Winship Cancer Institute and Emory School of Medicine (suspended within 12 hours and eventually terminated in less than a month). |
| Misconduct | – Used the racial slur "n-word" in class during a discussion of civil rights law. – Repeatedly employed the slur in a confrontation with an African American student. | Private social media posts condemning civilian deaths in Gaza, humanizing Palestinians, and opposing occupation, apartheid, and genocide. |
| Investigation | Emory initiated disciplinary proceedings but faced condemnation from AAUP and FIRE, which argued Zwier's speech was protected under academic freedom. | None; suspended within 12 hours and terminated in less than a month without due process. |
| Disciplinary Action | Placed on paid-leave for 9 months; reinstated with tenure in 2020; barred from teaching first-year courses until 2021. | Terminated within 3 weeks. |
| Implicated Emory Policies | – Policy 1.3 (Equal Opportunity): Ignored Zwier's racial harm to Black students. – Policy 4.62 (Standards of Conduct): Applied leniently despite "moral delinquency" claims. – Policy 8.14 (Open Expression): Shielded Zwier's speech as "pedagogical." | Same policies cited for termination; enforced disparately. |
| Emory's Justification | Dean Mary Anne Bobinski claimed the n-word "carries potential for harm" but reinstated Zwier, citing "academic freedom." | Terminated for "harmful" posts and "disruptive behavior" despite private, non-threatening content. |

209.    **Comparator 4: Shun Yan Cheung**. Shun Yan Cheung, a long-term professor in Emory's Computer Science Department, used his Emory-hosted webpage (http://www.cs.emory.edu/~cheung/) to disseminate virulently anti-Muslim propaganda, including a document titled "Mark of the Beast 666: RFID Chip vs Islam." This racist manifesto, accessible via Emory's servers, falsely equates Islam with the biblical "Mark of the Beast," alleging that Muslims are compelled to receive physical marks on their foreheads and arms—a conspiracy theory rooted in white supremacist and Christian nationalist ideology. The document fabricates Quranic verses to portray Islam as "vile" and "depraved," while likening Muslim religious practices to Hitler's Holocaust-era persecution of Jews.

210.    Cheung preached this hate for 32 years at Emory before retiring. And despite retiring in 2023, Emory rehired Cheung as an adjunct professor in 2024, allowing him to continue teaching while maintaining his hate-filled website on Emory's domain. Muslim students reported feeling "terrified" and "dehumanized" by this state-sanctioned bigotry, yet Emory took no meaningful disciplinary action.

| Factor | Shun Yan Cheung | Dr. AbouYabis |
|---|---|---|
| **Protected Class** | Asian, Male | Muslim, Palestinian, Female |
| **Position** | Tenured Computer Science Professor who retired and invited to return in an adjunct capacity at Emory (retained). | Hematologist/Oncologist, Winship Cancer Institute and Emory School of Medicine (suspended within 12 hours and eventually terminated in less than a month). |
| **Misconduct** | – Hosted Islamophobic content on Emory's website, including a posts falsely equating Islam with the "Mark of the Beast" and Nazi ideology.<br>– Spread fabricated Quranic verses to demonize Muslims. | Private social media posts condemning civilian deaths in Gaza, humanizing Palestinians, and opposing occupation, apartheid, and genocide. |
| **Investigation** | None. Emory removed links only after student outcry but took no disciplinary action. | None; suspended within 12 hours and terminated in less than a month without due process. |
| **Disciplinary Action** | None. Retained adjunct role; rehired in 2024 despite 32-year history of bigotry. | Terminated within 3 weeks. |
| **Implicated Emory Policies** | – Policy 1.3: Discriminatory harassment (anti-Muslim rhetoric).<br>– Policy 4.62: "Behavior harmful to Emory's reputation." | Same policies cited for termination; enforced disparately. |
| **Emory's Justification** | Claimed "non-CS related links have all been taken down" (Cora MacBeth, Feb. 29, 2024). | Terminated for "harmful" posts and "disruptive behavior" despite private, non-threatening content. |

211.    Cheung's case, along with the other comparators, epitomizes how institutions privilege White supremacy—specifically Zionism—while punishing marginalized voices. Emory's refusal to discipline Weiden for hate and violent speech, Winer for supporting

and partaking in a genocidal campaign, Seidel for endorsing dehumanizing and racist rhetoric, Zwier for racial violence, and Cheung for disseminating anti-Muslim hate speech on university platforms—while terminating Dr. AbouYabis for naming genocide—reflects a broader apartheid logic that devalues African American and Palestinian lives.

## VI.    CAUSES OF ACTION

<u>COUNT I</u>
**42 U.S.C. § 2000e et seq.**
**(Discrimination Based on Race, Religion, and National Origin)**
Against Defendants Emory University, Emory Healthcare, Inc.,
Ravi Thadhani (official capacity), Joon Lee (official capacity),
and Carlos del Rio (official capacity)

212.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

213.    Dr. AbouYabis, a Palestinian Muslim, was subjected to disparate treatment by Emory, which selectively enforced conduct policies against her for private political speech while shielding non-Palestinian/non-Muslim/non-Arab Zionist faculty and staff (e.g., Jason Weiden, Joshua Winer, Rebecca Seidel) who engaged in actual misconduct.

214.    Emory's termination of Dr. AbouYabis, as facilitated by Defendants Thadhani, Lee, and del Rio, while retaining faculty and staff who endorsed anti-Muslim rhetoric, calls to genocide Palestinians, or war crimes by the IDF, constitutes intentional discrimination based on race (Arab), national origin (Palestine), and religion (Islam).

215.    Emory's proffered reasons for these adverse actions are pretextual, as evidenced by its disparate treatment of non-Muslim Zionist employees who used dehumanizing rhetoric, endorsed racist statements, or partook in Israel's genocidal campaign.

216.    Title VII shields employees who oppose discriminatory state practices, even if politically contentious. Emory's termination of Dr. AbouYabis for denouncing the Zionist

occupation, apartheid, and genocide in Palestine—while retaining faculty who denigrated Muslims, dehumanized Palestinians, endorse genocide, and provided material support to Zionist war crimes—exposes unlawful viewpoint discrimination masquerading as neutral policy enforcement. This double standard violates Title VII's core prohibition against punishing advocacy that challenges systemic oppression.

## COUNT II
### 42 U.S.C. § 2000e-3(a)
### (Retaliation)
Against Defendants Emory University, Emory Healthcare, Inc.,
Ravi Thadhani (official capacity), Joon Lee (official capacity),
and Carlos del Rio (official capacity)

217.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

218.    Dr. AbouYabis's engaged in protected opposition to discrimination by condemning Israel's genocide in Gaza on her private social media—a textbook example of protected speech under Title VII's opposition clause and Emory's own Respect for Open Expression Policy 8.14—constitutes a lawful critique of state-sanctioned human rights abuses inextricably tied to anti-Palestinian, anti-Arab, anti-Christian, and anti-Muslim racism. Emory retaliated with punitive measures that flagrantly violate 42 U.S.C. § 2000e-3(a), which shields employees from adverse actions for opposing practices "reasonably perceived" as discriminatory. This egregious overreach—censoring dissent against ethnic cleansing while weaponizing institutional power to silence marginalized voices—exposes a chilling pattern of complicity in Zionist occupation, apartheid, and genocide, and a grotesque betrayal of higher education's professed values.

219.    Emory University's retaliatory actions against Dr. AbouYabis, as facilitated by Defendants Thadhani, Lee, and del Rio, constitute a blatant violation of Title VII, academic

freedom, and basic due process. By placing her on administrative leave within less than *24 hours* of Reznichenko cyberstalking and defamatory social media attacks via StopAntisemitism.org and Canary Mission—two far-right Zionist groups funded by donors linked to Israeli occupation, apartheid, and genocide—Emory weaponized its "reputation" policies to punish protected speech critiquing genocide, despite Dr. AbouYabis's humanization of Palestinians and poetic expressions of solidarity with the indigenous population.

220.    Emory then compounded this retaliation by terminating Dr. AbouYabis's employment on November 8, 2023, after a sham investigation that ignored exculpatory evidence of her decade-long interfaith work and departmental DEI leadership, while amplifying Zionist cyberstalkers and their criminal operation like Reznichenko's StopAntisemitism and Canary Mission. Emory chose to use in bad faith the racist and Islamophobic narrative of Zionist hatemongers and racists in its internal emails and press releases falsely labeling Dr. AbouYabis's posts as "rooted in bias and hate." This flagrant disregard for procedural fairness, coupled with public defamation designed to appease donors and shield Israel's war crimes, exposes Emory's complicity in silencing conscientious voices on Palestine under the guise of "community values"—a dangerous precedent that erodes academic freedom and emboldens anti-Arab, anti-Muslim, and anti-Palestinian racism in higher education.

221.    Emory University's retaliatory conduct against Dr. AbouYabis constitutes egregious violations of Title VII and academic freedom, brazenly weaponizing temporal proximity and external pressure to mask unlawful intent. The University's disciplinary

proceedings—launched *within hours* of defamatory, racist smear campaign by Reznichenko's StopAntisemitism.org and Canary Mission—expose Emory's retaliatory motive.

222.    Emory executives then compounded this malfeasance by admitting in internal communications that termination was driven not by merit but to address community and donor concerns and "protect the university's reputation" amid backlash from Zionist individuals and groups—a shocking admission of capitulation to external actors that perverts institutional integrity into a tool of censorship. Zionist faculty member Jason Weiden's campaign to "get her fired" publicly and within Emory further amplified this corrupt nexus, which Emory recklessly indulged, substituting a sham investigation for due process and abandoning even the pretense of neutrality. Such conduct—prioritizing Zionist appeasement and political agendas over academic freedom and anti-discrimination law—exposes a flagrant breach of Title VII's protections and academia's ethical obligations, rendering Emory complicit in the suppression of Palestinian voices and the normalization of anti-Arab racism.

## COUNT III
### 42 U.S.C. § 12203
### (Retaliation under the Americans with Disabilities Act)
Against Defendants Emory University, Emory Healthcare, Inc.,
Ravi Thadhani (official capacity), Joon Lee (official capacity),
and Carlos del Rio (official capacity)

223.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

224.    Dr. AbouYabis, a Palestinian physician and faculty member at Emory, developed Post-Traumatic Stress Disorder (PTSD) due to the relentless harassment, doxing, and death threats she endured following the racist smear campaign by Reznichenko's StopAntisemitism.org and Canary Mission, which Emory adopted in its public vilification of Dr. AbouYabis's humanizing speech. Her PTSD, a recognized disability under the ADA,

substantially limited her ability to sleep, concentrate, and engage in daily activities. On October 19, 2023, Dr. AbouYabis formally requested a voluntary medical leave of absence and accommodations under Emory's disability policies to address her deteriorating mental health.

225.    Instead of granting her legally mandated accommodations, Emory retaliated by accelerating her termination. On November 8, 2023, just weeks after her accommodation request, Emory executives Thadhani, Lee, and del Rio terminated her employment, citing pretextual allegations about her private social media activity. This adverse action followed a sham investigation that ignored Dr. AbouYabis's disability-related needs and focused exclusively on silencing and penalizing her voice. The temporal proximity between her accommodation request and termination, coupled with Emory's failure to engage in the interactive process required by the ADA, establishes a causal link sufficient to infer retaliatory intent.

226.    Emory's actions violate 42 U.S.C. § 12203(a), which prohibits retaliation against individuals for seeking accommodations for disabilities. Dr. AbouYabis's PTSD diagnosis and accommodation request constitute protected activity under the ADA, and her termination—a materially adverse action—was directly motivated by her assertion of rights under the statute.

**COUNT IV**
**42 U.S.C. § 1981**
**(Racial Discrimination)**
Against Defendants Emory University, Emory Healthcare, Inc.,
Ravi Thadhani (official capacity), Joon Lee (official capacity),
and Carlos del Rio (official capacity)

227.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

228.    Dr. AbouYabis, a Palestinian Muslim physician, entered into an employment contract with Emory University and Emory Healthcare as a hematologist/oncologist. Under § 1981, which guarantees all persons the same rights as "white citizens" to "make and enforce contracts," Emory's termination of Dr. AbouYabis's employment constituted unlawful racial discrimination. The facts establish that Emory, through its executives Thadhani, Lee, and del Rio, intentionally interfered with her contractual rights based on her, Muslim faith, Arab race, and Palestinian ancestry, which are protected classes under § 1981.

229.    Emory's discriminatory intent is evidenced by its disparate treatment of Dr. AbouYabis compared to non-Palestinian faculty. While Jason Weiden, a White Zionist Jewish radiologist, retained his position despite publicly advocating genocide against Palestinians (e.g., stating "They will be freed from their bodies"), Dr. AbouYabis was terminated for private social media posts condemning Israel's genocide in Gaza. This double standard reflects racial animus, as § 1981 prohibits discrimination based on "ancestry or ethnic characteristics," even if the targeted group is classified as "Caucasian" under modern taxonomy. Emory further violated § 1981 by capitulating to external pressure from Reznichenko's StopAntisemitism.org, Canary Mission, Jason Weiden, and other Zionist bad actors which falsely labeled her opposition to Israel's occupation, apartheid, and genocide as

"antisemitic," thereby impairing her ability to enforce her contractual right to academic freedom.

230.    The temporal proximity between the defamatory Zionist campaign by Reznichenko's StopAntisemitism.org and Canary Mission (October 16, 2023) and Dr. AbouYabis's immediate suspension (October 17, 2023) and termination (November 8, 2023) underscores pretext. Emory's sham investigation ignored exculpatory evidence, including her PTSD diagnosis and requests for medical leave, while adopting internal and external Zionist actors' racist framing of her private posts. Such conduct violates § 1981's guarantee of equal contractual rights, as Emory applied policies punitively to suppress Palestinian speech while excusing anti-Palestinian incitement from white Zionist faculty.

**COUNT V**
**42 U.S.C. § 1983**
**(First Amendment Retaliation)**
Against Defendants Emory University, Emory Healthcare, Inc.,
Ravi Thadhani (official capacity), Joon Lee (official capacity),
and Carlos del Rio (official capacity)

231.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

232.    Dr. AbouYabis's termination constitutes state action under § 1983 because Emory University, despite its private status, functions as an arm of the state through its deep and pervasive entwinement with government. Emory receives hundreds of millions of dollars annually in federal grants and operates a state-chartered police department with arrest authority under GA Code § 20-3-72, rendering it a state actor under the public function and entwinement doctrines.

233.    Emory executives Thadhani, Lee, and del Rio, acting under color of state law, terminated Dr. AbouYabis in retaliation for her protected speech condemning Israel's

genocide in Gaza. Emory's termination letter cited "reputational harm to the university's mission," a pretextual justification that masks viewpoint-based discrimination. Jason Weiden, leveraging his role as faculty and state-funded researcher, amplified defamatory campaigns by Reznichenko's StopAntisemitism.org and Canary Mission to label Dr. AbouYabis's posts as antisemitic.

**COUNT VI**
**14TH AMENDMENT VIA § 1983**
**(Due Process Violations)**
Against Defendants Emory University, Emory Healthcare, Inc.,
Ravi Thadhani (official capacity), Joon Lee (official capacity),
and Carlos del Rio (official capacity)

234.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

235.    Dr. AbouYabis's termination violated the Fourteenth Amendment's Due Process Clause because Emory, as a state actor, deprived her of a protected property interest (employment) through a sham adjudicative process devoid of fundamental fairness. Emory's own policies mandate that administrative leave (Policy 4.72) be used to investigate allegations neutrally, with notice and an opportunity to respond. Yet Dr. AbouYabis was placed on leave on October 17, 2023, less than 24 hours after the racist doctored and defamatory posts by Reznichenko's StopAntisemitism.org and Canary Mission, without prior notice or a hearing. The investigatory committee, led by Cliff Teague and Zainab Harvey, denied her legal representation, provided less than 24 hours' notice for a critical interview, and refused to consider exculpatory evidence, including her PTSD diagnosis and medical leave request.

236.    Emory's termination letter, issued on November 8, 2023, relied on conclusory allegations of "behavior harmful to Emory's reputation" without specifying how her private

social media posts disrupted university operations. This pretextual rationale ignored Policy 8.14, which protects "open expression" on matters of public concern. The rushed sham investigation—concluded in three weeks—violated Emory's duty to provide a meaningful pre-termination hearing.

237.    Emory executives Thadhani, Lee, and del Rio implied that the termination aimed to address community and donor concerns and appease external pressure from Zionist individuals and groups, including Reznichenko's StopAntisemitism.org and Canary Mission. Jason Weiden amplified this campaign of hate by working publicly and within Emory to "get her fired," leveraging his faculty role to preempt and corrupt any investigative process contemplated by Emory. This collusion between Emory deprived Dr. AbouYabis of procedural safeguards, including impartial fact-finding and the right to confront witnesses.

### COUNT VII
### 14TH AMENDMENT VIA § 1983
### (Equal Protection Violations)
Against Defendants Emory University, Emory Healthcare, Inc.,
Ravi Thadhani (official capacity), Joon Lee (official capacity),
and Carlos del Rio (official capacity)

238.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

239.    Emory University, a state actor under the entwinement doctrine, violated the Equal Protection Clause by systematically discriminating against Dr. AbouYabis based on her Palestinian national origin and Muslim religion. Emory's termination of Dr. AbouYabis-while retaining faculty like the Zionist Jason Weiden, who publicly endorsed genocidal rhetoric against Palestinians—reflects invidious discrimination rooted in racial and ethnic animus. The University adopted the racist doctored and defamatory posts by Reznichenko's StopAntisemitism.org and Canary Mission to suppress Dr. AbouYabis's humanization of

Palestinians on her private social media posts, thereby enforcing a dual system of discipline that privileged Zionist narratives over Palestinian human rights.

240.    Emory's executives Thadhani, Lee, and del Rio implied in internal communications that Dr. AbouYabis's termination aimed to appease community members, donors, and other Zionist groups, which sought to get Dr. AbouYabis fired and revoke her medical license. This discriminatory intent is further evidenced by Emory's selective enforcement of Policy 4.62: while Dr. AbouYabis was terminated for private social media posts condemning the Zionist occupation, apartheid, and genocide in occupied Palestine, Jason Weiden faced no discipline for public statements celebrating Palestinian suffering (e.g., "Couldn't happen to nicer people"). Such disparate treatment is where facially neutral policies are applied to target marginalized groups.

241.    Emory's reliance on external racist, doctored, and defamatory campaign by Reznichenko's StopAntisemitism.org and Canary Mission transformed its policies into tools of viewpoint-based suppression. Emory's refusal to investigate comparable misconduct by non-Palestinian faculty (e.g., Joshua Winer's IDF service in Gaza) demonstrates a deliberate pattern of discrimination, violating the Fourteenth Amendment's mandate that laws be applied equally to all persons.

## COUNT VIII
### 42 U.S.C. § 2000d
### (Title VI Discrimination)
Against Defendants Emory University, Emory Healthcare, Inc.,
Ravi Thadhani (official capacity), Joon Lee (official capacity),
and Carlos del Rio (official capacity)

242.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

243.    Emory University and Emory Healthcare, Inc., recipients of over hundreds of millions of dollars annually in federal grants, violated Title VI by subjecting Dr. AbouYabis to severe discrimination based on her Palestinian national origin. Emory's executives, Thadhani, Lee, and del Rio, enforced a dual disciplinary system that punished humanizing Palestinians and opposition to Israel's occupation, apartheid, and genocide while excusing anti-Palestinian, anti-Muslim, and anti-Arab conduct from White Zionist Jewish faculty. For instance, Dr. AbouYabis was terminated for private social media posts condemning Israel's genocide in Gaza, while Jason Weiden retained his position despite publicly celebrating killing Palestinian, Palestinian suffering, and the ethnic cleansing of Palestinians (e.g., "They will be freed from their bodies"). This disparate treatment reflects intentional discrimination, as Emory adopted external pressure from Reznichenko's StopAntisemitism.org and Canary Mission—which falsely labeled her posts "antisemitic"—while ignoring the context of her full posts, documented PTSD, and requests for medical leave.

244.    Emory further violated Title VI by fostering a hostile educational environment through deliberate indifference to anti-Palestinian, anti-Muslim, and anti-Arab hate and harassment. The University adopted the racist doctored and defamatory posts by Reznichenko's StopAntisemitism.org and Canary Mission to suppress Dr. AbouYabis's humanization of Palestinians on her private social media posts, thereby enforcing a dual system of discipline that privileged Zionist narratives over Palestinian human rights. Emory's failure to investigate Weiden's genocidal rhetoric or student complaints about his conduct—despite its obligation to address harassment—constitutes deliberate indifference under.

245.    Emory, a recipient of federal funds, fostered a hostile environment for Palestinian/Muslim employees, violating Title VI's prohibition on national origin discrimination.

## COUNT IX
### 29 U.S.C. § 2615
### (FMLA Interference)
Against Defendants Emory University, Emory Healthcare, Inc.,
Ravi Thadhani (official capacity), Joon Lee (official capacity),
and Carlos del Rio (official capacity)

246.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

247.    Dr. AbouYabis, an eligible employee under the FMLA with over 1,250 hours worked in the preceding 12 months, requested medical leave on October 19, 2023, to address severe PTSD caused by Israel's ongoing occupation, apartheid, and genocide in Palestine, which was exacerbated by the cyberstalking and doxing campaign by Reznichenko's StopAntisemitism.org and Canary Mission, and Emory's retaliatory harassment. Her psychiatrist documented the disability, emphasizing that the trauma of death threats and institutional betrayal rendered her unable to perform essential job functions. Despite her clear eligibility and proper notice, Emory executives Thadhani, Lee, and del Rio willfully interfered with her FMLA rights by instead placing her on involuntary administrative leave.

248.    Emory compounded this violation by terminating Dr. AbouYabis on November 8, 2023, just weeks after her leave request, while she was actively seeking treatment. Emory and Emory Health failed to provide the required FMLA eligibility notice or engage in the interactive process to accommodate her disability, instead weaponizing her PTSD as pretext for termination. This conduct violates the FMLA's core purpose of balancing workplace demands with employees' serious health needs. Emory's communications imply

that executives prioritized silencing her Palestinian advocacy over complying with federal leave mandates, stating the need to "resolve the situation swiftly" to appease Zionist pressure.

## COUNT X
### Title VII and ADA
### (Hostile Work Environment)
Against Defendants Emory University, Emory Healthcare, Inc.,
Ravi Thadhani (official capacity), Joon Lee (official capacity),
Carlos del Rio (official capacity), and Jason D. Weiden

249.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

250.    Dr. AbouYabis, a Palestinian Muslim physician and faculty member, endured a workplace at Emory University and Emory Healthcare that was permeated by discriminatory intimidation, ridicule, and insult on the basis of her national origin, race, religion, and disability. The hostile environment was not only created by the conduct of her co-workers—most notably Jason D. Weiden, who publicly celebrated the ethnic cleansing of Palestinians and led a public and Emory-wide campaign to have Dr. AbouYabis fired—but was also ratified and perpetuated by Emory's leadership, who failed to intervene, investigate, or discipline those responsible for the cyberstalking and harassment. Instead, Emory's executives Thadhani, Lee, and del Rio amplified the abuse by publicly condemning Dr. AbouYabis without any investigation or due process, placing her on administrative leave, and ultimately terminating her employment in direct response to her protected speech and identity.

251.    The harassment Dr. AbouYabis suffered was both subjectively and objectively hostile. She was subjected to doxing, threats, and public vilification, including being labeled "antisemitic" and "hateful" by her own institution and Zionist colleagues. The conduct was unwelcome and so severe and pervasive that it fundamentally altered the conditions of

her employment, causing her to suffer PTSD and requiring her to seek medical leave. A reasonable person in Dr. AbouYabis's position—facing relentless intimidation, ostracism, and threats to her safety and career because of her Palestinian identity and opposition to Israel's occupation, apartheid, and genocide—would also find the environment abusive and intolerable. The hostile environment was further exacerbated by Emory's failure to address her disability-related needs, dismissing her requests for accommodation, and instead weaponizing her mental health struggles as a pretext for termination.

252.    The totality of the circumstances—frequency and severity of the harassment, the humiliation, and threats Dr. AbouYabis endured, and the direct interference with her ability to perform her job—meets and exceeds the legal threshold for a hostile work environment under both Title VII and the ADA. Emory's actions and omissions were not isolated or inadvertent; they were part of a deliberate pattern of discriminatory treatment and institutional indifference that left Dr. AbouYabis exposed to ongoing abuse, ultimately culminating in her constructive and actual discharge.

## COUNT XI
### 42 U.S.C. § 1985(3)
### (Conspiracy to Violate Civil Rights)
Against All Defendants

253.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

254.    The Defendants engaged in a coordinated conspiracy, both within and outside Emory University, to deprive Dr. AbouYabis of her civil rights, in violation of 42 U.S.C. § 1985(3). This statute, rooted in the Ku Klux Klan Act of 1871, provides a cause of action against two or more persons who conspire to deprive any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, and who

commit an act in furtherance of that conspiracy resulting in injury or deprivation. Section 1985(3) applies to both private and public conspiracies, provided the conspiracy is motivated by a class-based, invidiously discriminatory animus, and results in the deprivation of protected rights.

255.    Here, the conspiracy was motivated by anti-Palestinian, anti-Arab, and anti-Muslim animus—protected classes under § 1985(3). The conspiracy began when external Zionist actors, including Liora Reznichenko's StopAntisemitism.org, Canary Mission, the Milstein/Fromer/Peisach/Merona/Koum Foundations, and their agents Liora Reznichenko, Tuvia "Adam" Milsztein, and Gila Milstein, funded and launched a coordinated cyberstalking, doxing, and defamation campaign targeting Dr. AbouYabis for humanizing Palestinians and opposing Israel's occupation, apartheid, and genocide in Palestine. These entities widely disseminated false and inflammatory accusations, labeling Dr. AbouYabis as "antisemitic" and a "terror sympathizer"—after sharing decontextualized and doctored posts attributed to Dr. AbouYabis—and mobilized their Zionist networks of hate to pressure Emory University to take adverse action.

256.    Jason D. Weiden, acting in concert with these outside Zionist actors, amplified the campaign externally and internally. Emory's executives, Thadhani, Lee, and del Rio responded to this call to Zionist action and placed Dr. AbouYabis on administrative leave, denied her procedural protections, and ultimately terminated her employment—all in response to the orchestrated Zionist pressure and in furtherance of the conspiracy's objective to silence conscientious voices that humanize Palestinians, that oppose Israel's occupation, apartheid, and genocide, and punish Dr. AbouYabis for her race, national origin, religion, and protected speech.

257.    The Defendants' actions were not isolated or coincidental. Internal communications, public statements, and the rapidity and coordination of the response demonstrate a meeting of the minds and a shared purpose to deprive Dr. AbouYabis of her equal protection and privileges under the law.

258.    Each Defendant committed overt acts in furtherance of the conspiracy: external Defendants funded, launched, and amplified the racist and defamatory campaign of hate; Emory's agents leveraged institutional power to suspend, pretend to investigate, and terminate Dr. AbouYabis; and both groups collaborated to ensure her professional, reputational, and economic ruin. The result was Dr. AbouYabis's loss of employment, destruction of her professional reputation, severe emotional distress, and the chilling of conscientious voices humanizing Palestinians and opposing Israel's occupation, apartheid, and genocide in Palestine throughout the academic and healthcare communities.

**COUNT XII**
**(Defamation)**
Against All Defendants

259.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

260.    Dr. AbouYabis was subjected to a coordinated and malicious defamation campaign orchestrated by both institutional and external Zionist actors. The campaign began with StopAntisemitism.org, led by Liora Reznichenko (aka Liora Rez) and substantially funded by the Milstein Family Foundation, the Koum Family Foundation, and the Merona Leadership Foundation, which published and widely disseminated false statements accusing Dr. AbouYabis of "atrocious endorsement of the Hamas terrorists," "antisemitism," and support for "terrorist" violence. These statements were not only false but were made with

knowledge of their falsity or reckless disregard for the truth. Dr. AbouYabis's social media posts, taken out of context and mischaracterized, were used as the basis for these accusations, which were then broadcast to millions through Reznichenko's StopAntisemitism and Canary Mission social media platforms, resulting in widespread public condemnation, doxing, and threats to her safety and livelihood.

261.    Canary Mission, whose Zionist platforms of hate is made possible in part by the and its funders, including the Adam and Gila Milstein Family Foundation, the Ann and Robert Fromer Charitable Foundation, and the Natan and Lidia Peisach Family Foundation, further amplified Reznichenko's defamatory statements on StopAntisemitism.org through its own platforms. Canary Mission published a tweet of decontextualized and mistranslated private social media posts from Dr. AbouYabis's private account to falsely frame Dr. AbouYabis as "pro-terrorist," "antisemitic," and "dangerous"—all for humanizing Palestinians and opposing Israel's genocide in Palestine. This aligns with Canary Mission and its funders' strategy of weaponizing antisemitism accusations to suppress Palestinian solidarity. These falsehoods were intended to and did inflict maximum reputational harm, targeting her professional standing and employability in the academic and medical fields.

262.    Within Emory, the defamatory campaign was ratified and echoed by Emory University, Emory Healthcare, Ravi Thadhani, Joon Lee, Carlos del Rio, and Jason D. Weiden. Emory's official statements, including those issued by its highest-ranking officials, publicly accused Dr. AbouYabis of making "comments rooted in bias and hate," and engaging in "language and behavior based in hatred, that incites violence, and is counter to the values that unite us as educators and health practitioners." These statements, made without any factual investigation or due process, were widely reported in the media and

further cemented framing Dr. AbouYabis with the false narrative of "antisemitism" and "terrorism." Jason D. Weiden, acting both as an agent of Emory and as a private individual, led and encouraged the internal campaign to "get her fired," further amplifying the defamatory accusations and ensuring their wide dissemination within professional and community circles.

263.    The defamatory statements were not mere opinions or protected commentary; they were specific factual allegations that Dr. AbouYabis endorsed terrorism, was antisemitic, and was unfit to practice medicine or serve as a faculty member. These statements were false, made with actual malice, and published to third parties with the intent and effect of causing Dr. AbouYabis severe reputational, professional, and emotional harm. The campaign resulted in her summary termination from Emory, loss of professional opportunities, and ongoing threats to her safety and wellbeing.

**COUNT XIII**
**(Breach of Contract)**
Against Defendants Emory University, Emory Healthcare, Inc.,
Ravi Thadhani (official capacity), Joon Lee (official capacity),
and Carlos del Rio (official capacity)

264.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

265.    Dr. AbouYabis's employment relationship with Emory University and Emory Healthcare was governed by a binding contractual framework comprising her appointment letter, Emory's Faculty Handbook, and the Statement of Principles Governing Faculty Relationships ("Gray Book"). These documents collectively guaranteed her due process rights during disciplinary proceedings, including advance notice, a fair investigation, and the right to respond to allegations before termination. The Gray Book explicitly states that faculty

on "continuous appointments" may only be terminated for "adequate cause" after a formal hearing, with written notice specifying the grounds for dismissal.

266.    Emory breached these contractual obligations in three ways. First, by failing to provide advance notice. Dr. AbouYabis received less than 24 hours' notice of the October 20, 2023 investigatory interview, violating the Gray Book's requirement for "written notice" and time to prepare a defense. Second, by denying procedural safeguards. The investigatory committee, led by Cliff Teague and Zainab Harvey, refused her legal representation, ignored her PTSD-related medical leave request, and failed to consider exculpatory evidence, contravening the Faculty Handbook's mandate for "impartial fact-finding." Finally, by terminating without adequate cause. Emory's November 8, 2023 termination letter cited vague allegations of "behavior harmful to Emory's reputation," but provided no evidence that Dr. AbouYabis's private social media posts disrupted university operations—a requirement under the Gray Book for "adequate cause."

267.    Emory further violated its contractual duty of good faith and fair dealing in at least two ways. First, by retroactively applying its Social Media Policy to punish Dr. AbouYabis's protected speech, despite her posts predating the policy's enactment. The Faculty Handbook explicitly prohibits such retroactive discipline unless the policy is "expressly incorporated" into the employment contract, which it was not. Second, by punishing Dr. AbouYabis's protected speech, even though her posts were made on a private account, were not associated with Emory, and were protected by the university's paramount Respect for Open Expression Policy. The Committee for Open Expression found that Emory's actions likely violated Dr. AbouYabis's rights to open expression and that the Social Media Policy is overly restrictive and inconsistent with the university's stated commitments.

## COUNT XIV
**(Tortious Interference with Contract)**
Against Defendants Ravi Thadhani (individual capacity), Joon Lee (individual capacity),
Carlos del Rio (individual capacity), and Jason D. Weiden,
Canary Mission, StopAntisemitism.org, Tuvia Milsztein (aka Adam Milstein),
Adam and Gila Milstein Family Foundation, Ann and Robert Fromer Charitable
Foundation Inc., Natan and Lidia Peisach Family Foundation,
Liora Reznichenko (aka Liora Rez), Gila Milstein,
Merona Leadership Foundation, and Koum Family Foundation

268.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

269.    Dr. AbouYabis's employment with Emory University and Emory Healthcare was governed by a valid, enforceable contract that guaranteed due process protections, academic freedom, and termination only for "adequate cause" under the Faculty Handbook. External Defendants, including Canary Mission, Reznichenko's StopAntisemitism.org, and their funders (Milstein, Fromer, Peisach, Merona, and Koum Foundations), orchestrated a coordinated campaign to destroy Dr. AbouYabis's contractual relationship with Emory. These Defendants—led by Liora Reznichenko, Tuvia (Adam) Milstein, and Gila Milstein—published false accusations of "antisemitism" and "support for terrorism" across social media and press outlets, deliberately misrepresenting Dr. AbouYabis's humanization of Palestinians and opposition to Israel's occupation, apartheid, and genocide in Palestine as grounds for termination.

270.    The external Defendants' actions were not merely criticism but targeted interference: they contacted Emory donors, trustees, administrators, employees, and students threatening financial repercussions unless Dr. AbouYabis was fired. Emory executives Thadhani, Lee, and del Rio, acting outside their authority as agents of the University, capitulated to this pressure. They bypassed contractual due process safeguards, ignored

exculpatory evidence, and terminated her employment on November 8, 2023, citing pretextual "reputational harm" unrelated to her job performance. Jason Weiden, an Emory faculty member, exacerbated the interference by campaigning within Emory to "get her fired," further poisoning her professional standing.

271.    Defendants' actions were improper, malicious, and without privilege, as they involved deliberate lies, threats, and abuse of institutional influence to sabotage Dr. AbouYabis's employment.

## COUNT XV
### (False Light Invasion of Privacy)
Against Defendants Jason D. Weiden, Canary Mission, StopAntisemitism.org,
Tuvia Milsztein (aka Adam Milstein), Adam and Gila Milstein Family Foundation,
Ann and Robert Fromer Charitable Foundation Inc., Natan and Lidia Peisach Family
Foundation, Liora Reznichenko (aka Liora Rez), Gila Milstein,
Merona Leadership Foundation, and Koum Family Foundation

272.    Dr. AbouYabis realleges and incorporates by reference the allegations contained in Paragraphs 1 through 211 above.

273.    False light invasion of privacy occurs when publicity about a false statement places the plaintiff in a false light that would be highly offensive to a reasonable person. Unlike defamation, this tort redresses mental distress from being thrust into public view under misleading circumstances.

274.    Between October 2023 and November 2023, the external Defendants engaged in a coordinated campaign to place Dr. AbouYabis in a false light by distorting her protected speech and advocacy for Palestinian rights. Canary Mission, Reznichenko's StopAntisemitism.org, and their affiliated funders (Milstein, Fromer, Peisach, Merona, Koum Foundations) published doctored screenshots of her social media posts alongside inflammatory captions falsely claiming she is antisemitic and endorsed violence.

These statements were not merely defamatory but were crafted to portray Dr. AbouYabis as a threat to public safety and a bigot—a narrative wholly divorced from her actual words, which focused on Israel's ongoing genocide in Gaza.

275.    Liora Reznichenko (aka Liora Rez), Tuvia Milsztein (Adam Milstein), and Gila Milstein orchestrated the campaign of hate, leveraging their cyberstalking platforms to broadcast these falsehoods to millions of followers. For example, StopAntisemitism.org's October 16, 2023 tweet, which reached over 3.1 million users, juxtaposed Dr. AbouYabis's professional headshot with a decontextualized and distorted quote framing it as her "atrocious endorsement of the Hamas terrorists that murdered 1300 Israelis," a statement she never made. Similarly, Canary Mission's tweets, funded by the Milstein Family Foundation, falsely accused her of inciting violence, despite her posts explicitly condemning Israel's genocide.

276.    These actions resulted in social media accounts and pressured media outlets to publish stories framing Dr. AbouYabis as an antisemite and a security threat. These actions ensured widespread dissemination of the false narrative, subjecting Dr. AbouYabis to public hatred, contempt, and ridicule. Defendants acted with reckless disregard for the truth, as evidenced by their refusal to retract statements even after Dr. AbouYabis provided evidence disproving their claims.

277.    The false light created by these Defendants was highly offensive to a reasonable person, damaging Dr. AbouYabis's reputation as a physician and academic, inciting death threats, and causing severe emotional distress—that publicity unreasonably placed Dr. AbouYabis in a false position.

## VII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Dr. Abeer AbouYabis respectfully requests that this Court enter judgment in her favor and against all Defendants, and:

(a)  Compensatory Damages

- Back Pay: Award full back pay from November 8, 2023 (date of termination), including salary, clinical incentives, retirement contributions (403(b)/401(a)), and benefits under 42 U.S.C. § 2000e-5(g) (Title VII), 29 U.S.C. § 2617 (FMLA), and 42 U.S.C. § 1981, adjusted for projected raises and promotions as a tenured faculty physician at Emory's Winship Cancer Institute.

- Front Pay: Front pay for 10+ years reflecting Dr. AbouYabis's career trajectory as a hematologist/oncologist and academic leader, calculated using:
  - AAMC (Association of American Medical Colleges) median salaries for full professors in oncology ($450,000+ annually).
  - NIH Grant Funding: Lost opportunity damages for her research portfolio, including R01 grants averaging $500,000/year.

- Contractual Damages: Compensation for breach of Emory's Faculty Handbook and Gray Book under Georgia common law, including lost tenure-track benefits and professional development funds.

- Emotional Distress: $10,000,000 for severe emotional distress, PTSD, reputational destruction, and professional ostracization under 42 U.S.C. § 1981, § 1985(3), and Georgia tort law (defamation, false light).

(b)  Punitive Damages

- Against Emory University and Emory Healthcare, Inc.:
  - $300,000 statutory cap under 42 U.S.C. § 1981a(b)(3) (Title VII/ADA) for institutional discrimination and retaliation.
  - Uncapped punitive damages under 42 U.S.C. § 1981 (racial discrimination) and § 1985(3)(civil rights conspiracy), reflecting Emory's systemic anti-Palestinian animus and collaboration with external hate groups.

- Against Individual Emory Defendants (Thadhani, Lee, del Rio, Weiden):
  - $1,000,000+ per defendant under § 1981 and § 1985(3) for direct participation in discriminatory acts, including weaponizing disciplinary policies to suppress Palestinian voices and amplifying defamatory campaigns by Reznichenko's StopAntisemitism.org and Canary Mission.

- Against External Defendants:
  - $5,000,000 against Canary Mission, Liora Reznichenko, StopAntisemitism.org, Tuvia Milsztein (Adam Milstein), and the Milstein/Fromer/Peisach/Merona/Koum Foundations under § 1985(3) and Georgia tort law (defamation, false light) for funding and coordinating cyberstalking/doxing operations and knowingly publishing false allegations of terrorism support with actual malice.
  - $250,000 statutory cap per defendant under Georgia Code § 51-12-5.1(g) for state tort claims (defamation, false light), except where federal claims (uncapped) apply.
- Award $10,000,000 jointly/severally from Adam Milstein, the Adam and Gila Milstein Family Foundation, Canary Mission, Rachel Jessica Wolff, and Ilya Shapiro under 42 U.S.C. § 1985(3) and common law torts.

(c)    Equitable Relief

- Injunctive Relief Against Emory University and Emory Healthcare, Inc.:
  - Permanently enjoin Emory to revise its Social Media Policy 4.62 and Faculty Handbook to prohibit disparate enforcement against Palestinian, Arab, and Muslim employees, including explicit protections for advocacy on Palestinian human rights.
  - Require Emory to adopt a neutral, viewpoint-neutral policy for investigating faculty speech, barring disciplinary action for political expression absent imminent workplace disruption.
  - Order Emory to permanently remove all defamatory statements, disciplinary records, and retaliatory justifications related to Dr. AbouYabis's termination from internal databases, personnel files, and public communications.
- Injunctive Relief Against External Defendants:
  - Issue a permanent injunction requiring Canary Mission, Reznichenko, StopAntisemitism.org, and affiliated foundations to delete all profiles, posts, and dossiers referencing Dr. AbouYabis and cease disseminating defamatory content about her under Georgia Uniform Deceptive Trade Practices Act (O.C.G.A. § 10-1-370) and 42 U.S.C. § 1985(3).
  - Appoint a Special Master to audit and enforce compliance with deletion orders, with penalties of $10,000/day for violations.
- Institutional Accountability Measures:
  - Order Emory's Board of Trustees, executives (Thadhani, Lee, del Rio), and faculty (including Weiden, Winer, and Seidel) to complete annual anti-discrimination training by a court-approved provider, focusing on Palestinian rights, Islamophobia, and Title VII/ADA compliance.

- ▪ Require Emory to retain an independent auditor to review all disciplinary actions from 2020–2025 for racial/national origin bias, with public reporting of findings.

- • Restorative Measures:

  - ▪ Order Emory to issue a public apology to Dr. AbouYabis on its website and in *The Emory Wheel*, acknowledging its role in enabling anti-Palestinian discrimination.

  - ▪ Restore Dr. AbouYabis's research grants, committee appointments, and leadership roles at Winship Cancer Institute.

(d)  Statutory Penalties

- • Award $500,000 penalty against Canary Mission, Reznichenko, StopAntisemitism.org, and the Milstein/Fromer/Peisach/Merona/Koum Foundations under Georgia Code § 45-19-44(a)(3) for aiding and abetting discrimination by funding and coordinating the defamatory campaign against Dr. AbouYabis.

- • $1,000,000 penalty against Emory University under 42 U.S.C. § 2000e-6 (Title VII) for institutional participation in a pattern of anti-Palestinian discrimination, as evidenced by its collaboration with external actors to suppress protected speech.

(e)  Attorneys' Fees and Costs

- • Award reasonable attorneys' fees under 42 U.S.C. § 1988 for successful claims under 42 U.S.C. § 1981 (racial discrimination), § 1983 (constitutional violations), § 1985(3) (conspiracy), and Title VII/ADA (employment discrimination).

- • Award expert witness fees, litigation costs, and expenses under 42 U.S.C. § 1988(c) and Georgia Code § 9-15-14 for defending against frivolous counterclaims and prosecuting complex civil rights violations.

- • Award fees under Georgia Fair Employment Practices Act (FEPA) (O.C.G.A. § 34-5-4) for state-law claims, including defamation and tortious interference.

(f)  Declaratory Judgment

- • Declare that Emory University and Emory Healthcare, Inc.'s reliance on defamatory profiles and content from hateful Zionist sources like Liora Reznichenko, StopAntisemitism.org, and Canary Mission constitutes a *per se* violation of Title VII (42 U.S.C. § 2000e) and the Georgia Fair Employment Practices Act (FEPA) (O.C.G.A. § 34-5-1 et seq.), as their use of these materials institutionalized discrimination against Dr. AbouYabis based on her Palestinian national origin, Arab ancestry, and Muslim religion.

- Declare that Canary Mission, StopAntisemitism.org, the Milstein/Fromer/Peisach/Merona/Koum Foundations, and Liora Reznichenko's creation, maintenance, and weaponization of defamatory profiles and social media campaigns against Dr. AbouYabis constitutes false light invasion of privacy under Georgia common law, as their deliberate distortions of her advocacy placed her in a false, offensive public light.

- Declare that the coordinated actions of Emory University, Canary Mission, Liora Reznichenko's StopAntisemitism.org, and affiliated funders constitute an unlawful conspiracy to deprive Dr. AbouYabis of her rights under 42 U.S.C. § 1981 and § 1985(3), in violation of the First and Fourteenth Amendments.

(g)    Joint and Several Liability

- Hold Defendants Emory University ("Emory" or "University"), Emory Healthcare, Inc. ("Emory Health"), Ravi Thadhani, Joon Lee, and Carlos del Rio, Jason D. Weiden, Canary Mission, Tuvia Milsztein (aka Adam Milstein), Adam and Gila Milstein Family Foundation, Ann and Robert Fromer Charitable Foundation Inc., Natan and Lidia Peisach Family Foundation, StopAntiSemitism.org, Liora Reznichenko (aka Liora Rez), Gila Milstein, Merona Leadership Foundation, Koum Family Foundation, and John Does 1–10 jointly and severally liable for all damages under 42 U.S.C. § 1985(3) for conspiracy to violate civil rights.

(h)    Grant such other relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all triable claims.

Respectfully submitted,

| _/s/Abdel-Rahman Hamed_ | _/s/ Ravi Rayasam_ |
|---|---|
| ABDEL-RAHMAN HAMED, ESQ. | RAVI RAYASAM, ESQ. |
| DC Bar No. 1632130* | Ga Bar No. 596769 |
| **_Lead Counsel_** | **_Local Counsel_** |
| **Hamed Law** | GHANAYEM AND RAYASAM, LLC |
| P.O. Box 25085 | 1936B North Druid Hills Road, N.E. |
| Washington, D.C. 20027 | Atlanta, GA 30319 |
| (202) 888-8846 | (404) 561-0202 |
| Advocates@HamedLaw.com | ravi@gratlantalaw.com |

*Attorneys for Plaintiff Abeer N. AbouYabis*
*\* Admitted Pro Hac Vice*