**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ABEER ABOUYABIS,

      *Plaintiff,*

vs.

EMORY UNIVERSITY ET AL,

      *Defendants.*

Case No. 1:25-cv-02438-ELR-CCB

**(Judge Christopher Bly)**

**ANN AND ROBERT FROMER CHARITABLE FOUNDATION INC.'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
SANCTIONS PURSUANT TO RULE 11**

This lawsuit was frivolous from the start. Plaintiff and her counsel's decisions not only to maintain it—despite repeated notice of its obvious and fatal flaws—but to double down by adding new, equally unconnected defendants demands the most serious sanctions. Plaintiff's claims are based on antisemitic conspiracy theories and do not pass the smell test. They are explicitly intended to harass and intimidate prominent Jewish individuals and organizations.

Plaintiff Abeer AbouYabis was fired from Emory University because of antisemitic social media posts that violated school policy. Among other things, she celebrated the Hamas terrorists who raped, murdered, and captured

1

innocent civilians on October 7, 2023. Rather than take responsibility or apologize for her actions, she and her attorney, Abdel-Rahman Hamed, have doubled down on antisemitism and filed an outrageous lawsuit blaming an imaginary Jewish conspiracy for the consequences of her actions.

AbouYabis's lawsuit is, at best, an employment dispute with Emory, though a weak one at that. But the claims against the Ann and Robert Fromer Charitable Foundation Inc. (the "Fromer Foundation") are patently frivolous. Neither Ann and Robert Fromer nor the Fromer Foundation have ever communicated with AbouYabis or made statements about her to anyone, including anyone at Emory. They have no connection with AbouYabis or Emory at all. Ann and Robert Fromer had never even heard of AbouYabis until she added claims against the Fromer Foundation in this third iteration of her complaint. Indeed, they have had no contact with AbouYabis or Emory. The Complaint contains *zero* facts supporting her claims that they conspired to deprive her of civil rights. The Fromer Foundation does not bear any moral or legal responsibility for the employment consequences of her actions. Nor are there any facts to establish personal jurisdiction over the Fromer Foundation, which has no contacts with Georgia, much less minimum contacts satisfying Due Process.

Plaintiff's *entire* theory of liability against the Fromer Foundation is based on the allegation that it indirectly donated an unspecified amount of

2

money, years ago, to a website called "Canary Mission" through *another* organization called the Central Fund of Israel. In turn, according to AbouYabis, those websites independently and accurately reposted her tweets—*i.e.*, engaged in protected speech. At some point, Emory University discovered AbouYabis's tweets and fired her. Plaintiff now drags the Fromer Foundation into Court, seeking millions of dollars in damages.

Plaintiff's claim against the Fromer Foundation is not only far-fetched, but is raised in bad faith. Even if the websites could be liable for reposting or commenting on her tweets (they cannot), the Fromer Foundation cannot be liable for the independent acts of separate entities. It is blackletter law that even owners and shareholders of a corporation are not liable for the corporation's acts, absent extraordinary circumstances that warrant veil-piercing. Plaintiff does not try to—and cannot—allege any bases for veil-piercing based on indirect funding.

Of greater concern is the motivation for this lawsuit against prominent Jewish individuals and organizations. Both AbouYabis and her counsel have publicly expressed animus against "Zionists." Mr. Hamed has stated that he wishes Zionists "never know sleep" and "burn and rot eternally—figuratively and literally—in this life and the next." **Exs**. **A**, **B**. This case—which is entirely a political diatribe against Zionism—is intended to harass individuals and organizations for their identity and alleged charitable activity, rather than

redress any actionable harm. Indeed, this is not the first lawsuit that Mr. Hamed has filed against Jewish charitable organizations like the Fromer Foundation based on the same outlandish theory. Mr. Hamed has been filing similar lawsuits in which he and his clients spew irrelevant, hate-filled invectives against Zionism and blame Jewish philanthropists and charitable organizations for things they have nothing to do with. This is a classic antisemitic conspiracy theory. But this Court need not address the intersection of antisemitism and anti-Zionism. While Plaintiff and her counsel will deny their conduct is grounded in Jew hatred, that is irrelevant. It does not matter that Plaintiff and her counsel claim they are targeting "Zionists" instead of Jews. It is still a flagrant abuse of the judicial system to identify members of a group—of any group—and sue them without basis.

This Court should put a stop to this misconduct immediately. It should dismiss with prejudice, award attorneys' fees, and impose other relief as it deems appropriate to deter future misuse of judicial proceedings.

## BACKGROUND

Plaintiff Abeer AbouYabis began her employment at Emory University in 2018 as an Assistant Professor and hematologist at Emory Hospital. Sec. Am. Compl. ("SAC") ¶ 64. Immediately after October 7, 2023, she began posting on social media in support of Hamas's mass murder, rape, and terrorism in Israel. *Id.* ¶¶ 86, 88, 90-91. For example, it was well known that

4

Hamas used paragliders to break into Israel and commit its atrocities, and AbouYabis specifically praised the use of paragliders. SAC ¶ 86 ("[O]n October 8, 2023, Dr. AbouYabis posted a photo of a paraglider" with lyrics from a poem). On October 9, AbouYabis posted a tweet that included the phrase "They got walls we got gliders / Glory to all resistance fighters," *i.e.*, Hamas. *Id.* ¶ 91. AbouYabis also used her social media platform to accuse Israel of genocide and apartheid, compared Israelis to Nazis and slaveowners, and retweeted an image of Adolf Hitler with the caption, "Jews are not people; they are animals." *Id.* ¶¶ 100.

Around that time, AbouYabis participated in a meeting at Emory University where she shared her views on the October 7 invasion of Israel. *Id.* ¶ 94. After the meeting, the Vice Chair of Diversity, Equity, Inclusion called AbouYabis to caution her about her social media activity and advised her not to make hateful posts. *Id.* ¶¶ 96–98. Despite this clear warning, AbouYabis persisted in posting inflammatory and vile commentary about the October 7 attack. *Id.* ¶¶ 99–102.

In October 2023, StopAntisemitism.org, a website dedicated to exposing antisemitism, compiled AbouYabis's social media posts and added them to its online database. *Id.* ¶ 159. StopAntisemitism.org commented that AbouYabis "endorse[d]" Hamas and asked, "Would you want your Jewish family member to be treated by this woman?" *Id.* ¶ 160. Canary Mission also reposted her

5

tweets and commented that AbouYabis "pray[ed] for the success of 'freedom fighters' of Hamas." SAC ¶ 165.

AbouYabis suggests that the posts contained defamatory statements, yet she does not identify any factual misstatement, falsehood, or distortion of her own Twitter (now "X") posts. *Id.* ¶ 160. Instead, she claims the posts were "contradicted by her decades of interfaith work and explicit condemnations of violence"—though she only cites an article that makes no such claim. *Id.*[1] AbouYabis alleges that one of her "contacts surreptitiously leaked her social media posts" to the websites. *Id.* ¶ 161.

On October 17, 2023, AbouYabis was contacted by the chair of her department, who informed her she was on administrative leave because of her social media activity, including her references to Hitler. *Id.* ¶ 162. Emory then condemned AbouYabis's abhorrent statements and announced her suspension. *Id.* ¶ 163. Following an investigation, the University determined that AbouYabis's actions were "rooted in bias and hate." *Id.* ¶ 177. As such, because of her online behavior, her employment was terminated upon conclusion of the investigation. *Id.* ¶ 178.

---

[1] (citing The National Desk, *Emory Professor Who Allegedly Cheered Hamas As 'Resistance Fighters' No Longer Employed by School*, FOX 11 NEWS (Nov. 15, 2023), https://fox11online.com/news/nation-world/emory-professor-who-allegedly-cheered-hamas-as-resistance-fighters-no-longer-employed-by-school-georgia-atlanta-antisemitism-university-campus-jews-israel-palestine-muslim-conflict-middle-east-gaza-hamas).

Rather than accept responsibility for the antisemitic tweets that led to her termination, AbouYabis has propounded a far-reaching and antisemitic conspiracy theory for employment discrimination. According to her latest complaint, several Jewish individuals and organizations—including many with no connection to her or to Emory—allegedly acted in concert to orchestrate her dismissal. She asserts that the Fromer Foundation is legally responsible for her termination, despite the absence of any allegation that it or the Fromers knew of her, interacted with her, spoke about her, or communicated in any capacity with Emory or any of the other supposed "co-conspirators."

AbouYabis tries to connect the Fromer Foundation to StopAntisemitism.org and Canary Mission through allegations that the Foundation donated funds that reached these websites after passing through two separate organizations, the Central Fund of Israel and Megamot Shalom. *See* SAC ¶¶ 28, 31, 110, 113, 130. But Plaintiff does not allege the Fromer Foundation authored, directed, or distributed, the posts that she now complains about. Plaintiff does not identify any instructions the Fromer Foundation gave to target AbouYabis, nor does she allege any communication with Emory concerning her employment, or any concrete decision by the Fromer Foundation directing the particular acts alleged to have caused her injury. Instead, the SAC relies on the unsupported inference that alleged (indirect) funding of Canary Mission rendered the Fromer Foundation

7

responsible for wholly independent actions taken by those entities. SAC ¶¶ 31, 110, 113, 130.

Beyond her scant and antisemitic allegations of a Jewish conspiracy to have her fired, AbouYabis's complaint is littered with vitriol about "Zionism" and Israel (which she refers to as the "Zionist Occupier"), and political diatribes about the Israel-Palestinian conflict, all completely unconnected to her employment dispute and to any claim she raises. *See generally id.* (referring to "Zionist" and "Zionism" over 200 times). AbouYabis demands $5,000,000 for alleged "cyberstalking or "doxxing" operations and $10,000,000 in punitive damages, and seeks to hold the Fromer Foundation jointly and severally liable. AbouYabis's attorney, Mr. Hamed, has filed a similar frivolous lawsuit in the District of Columbia. *Johnson v. Georgetown Univ.*, No. 1:25-cv-01540 (D.D.C.).

The Fromer Foundation served a Rule 11 letter and motion regarding Plaintiff's Second Amended Complaint. Plaintiff refused to drop her claims against it and indeed, doubled down in her response.

## LEGAL STANDARD

Rule 11 requires a court to impose sanctions when a party presents a pleading, motion, or other paper that lacks evidentiary support or is submitted for an improper purpose. *See* Fed. R. Civ. P. 11. The Rule requires every attorney to certify that, to the best of their knowledge, information, and belief formed after an inquiry reasonable under the circumstances: (1) the filing is

not being presented for any improper purpose, such as to harass; (2) the claims are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; and (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Fed. R. Civ. P. 11(b); *Massengale v. Ray,* 267 F.3d 1298, 1301 (11th Cir. 2001)

The purpose of Rule 11 is to reduce frivolous claims, defenses, or motions, and to deter costly, meritless maneuvers. *See Rhodes v. MacDonald*, 670 F. Supp. 2d 1363, 1378 (M.D. Ga. 2009), *aff'd*, 368 F. App'x 949 (11th Cir. 2010) ("The absolute absence of any legitimate legal argument, combined with the political diatribe in her motions, demonstrates that Ms. Taitz's purpose is to advance a political agenda and not to pursue a legitimate legal cause of action."); *see also Massengale*, 267 F.3d at 1302; *Saltany v. Reagan*, 886 F.2d 438, 440 (D.C. Cir. 1989) (per curiam) ("We do not conceive it a proper function of a federal court to serve as a forum for 'protests,' to the detriment of parties with serious disputes waiting to be heard."). The sanction must be sufficient to deter future misconduct. *See Homecare CRM, LLC v. Adam Grp., Inc.*, 952 F. Supp. 2d 1373, 1385(N.D. Ga. 2013).

## ARGUMENT

### I. THERE IS NO OBJECTIVELY REASONABLE BASIS TO ASSERT PERSONAL JURISDICTION OVER FROMER FOUNDATION IN GEORGIA

AbouYabis and her attorney are trying to drag prominent Jewish individuals and entities like the Fromer Foundation into this Court for improper purposes. But the attempt is frivolous in part because there is no objectively reasonable basis to establish personal jurisdiction. The Fromer Foundation has *zero* contacts with Georgia to satisfy the long-arm statute, much less "minimum contacts" to satisfy due process. *See* O.C.G.A. § 9-10-91; *see also World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

At the outset, there is no jurisdiction even over the *websites* that engaged in the protected speech AbouYabis complains about and that the Fromer Foundation allegedly indirectly supported. Personal jurisdiction cannot be established based on the mere existence of a passive website that is accessible nationwide. Courts have held that the operation of a website which merely makes information available to interested persons is insufficient to create jurisdiction. *See Intercont'l Servs. of Del., LLC v. Kent*, 807 S.E.2d 485, 491 (Ga. Ct. App. 2017) ("A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction."); *see also Jordan Outdoor Enters., Ltd. v. That 70's Store, LLC,* 819 F. Supp. 2d 1338, 1343 (M.D. Ga. 2011) (same). As a district court in this circuit recently emphasized, liability and jurisdiction must

10

be grounded in the defendant's own conduct. *See* Tr. Mot. Dismiss Hr'g. at 12–13, *Khorashi v. Beer*, No. 25-cv-23202 (S.D. Fla. Nov. 19, 2025). AbouYabis's allegations fall well short of these requirements. The SAC does not allege that the websites are based in Georgia, maintain contacts within the state, conduct business here, or target a Georgia audience. *See* SAC ¶¶ 28, 33.

Worse still, AbouYabis has not alleged that her supposed injury relates to or arises from any contacts between *the Fromer Foundation and Georgia* that could support jurisdiction. *See* O.C.G.A. § 9-10-91. Plaintiff does not allege that the Fromer Foundation has any connection to the State, does business here, or committed any tortious acts in the state. As AbouYabis alleges, they reside in Florida. *See* SAC ¶ 31. The notion that the Fromer Foundation's alleged indirect donations to out-of-state websites, through out-of-state entities, somehow subjects them to jurisdiction in Georgia is frivolous and sanctionable. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

## II.    THE ALLEGED CONSPIRACY, BLAMING THE FROMER FOUNDATION FOR PLAINTIFF'S ACTIONS, IS MALICIOUS AND FRIVOLOUS

At best, this is an employment dispute with Emory, not a reasonable lawsuit against the Fromer Foundation, which has no connection to AbouYabis. Still, out of the gate, the claims against the Fromer Foundation because her claims against Emory University (the primary defendant) and against Canary Mission and StopAntisemitism.org (the secondary defendants)

11

fail. Without primary liability or secondary liability, there cannot be tertiary liability for the Fromer Foundation, which has no connection to this dispute.

### A. There Are Several Bars to Liability that Any Lawyer Would Recognize After Basic Research and Investigation

*First*, AbouYabis posted deeply offensive, antisemitic tweets after October 7, 2023, which is a fireable offense. Because Emory clearly fired her properly for cause, there can be no secondary, much less tertiary, liability.

Although AbouYabis refers to Emory's Open Expression Policy 8.14 to support her claim against Emory, that Policy does not give her carte blanche to engage in hate-filled vitriol against Jews and to invoke Hitler to make political statements. *See Policy 8.14 Open Expression Policy*, EMORY UNIVERSITY, https://www.thefire.org/colleges/emory-university/policy-814-open-expression-policy (last accessed Dec. 19, 2025). The Policy provides that Emory is "not bound by the First Amendment" and that its policy "embodies a reasonable balance between the free speech interests . . . and the significant interests of the university." *Id*. Those interests include "activities central to the university mission, teaching, research, healthcare, housing, dining services, and providing safety on the Emory campuses." *Id*. Under the Policy, an employee's "freedoms are limited to the extent necessary to protect significant university." *Id*. Moreover, as relevant here, Emory *does not* permit "harassing speech or behavior that is subjectively and objectively offensive and is so severe or pervasive that it unreasonably limits or effectively denies a person's ability

to participate in or benefit from the educational program or activity," and "speech directed at inciting or producing (and that is likely to produce) lawless action." *Id.*; *see also* SAC. ¶ 183 (referring to Policy 1.3, preventing discriminatory harassment, and Policy 4.62, prohibiting conduct that is "harmful to Emory's reputation").

In short, Emory was well within its rights to find that AbouYabis violated school policies and that she should be fired for undermining the school's interests and reputation. No liability can flow to Emory or, in turn, to others from this clearly lawful termination.

***Second***, assuming for argument that the claims against Emory are viable, the claims against the websites are absurd. Websites cannot be liable for protected speech regarding matters of public interest in which they did nothing more than accurately and truthfully report the AbouYabis's past tweets. *See* SAC ¶¶ 159–60. Falsity is a necessary element of defamation and truth is an absolute defense. *See, e.g.*, *Cottrell v. Smith*, 788 S.E.2d 772, 781 (Ga. 2016) ("[A] defamation action will lie only for a statement of fact"); *Lucas v. Cranshaw*, 659 S.E.2d 612, 615 (Ga. Ct. App. 2008). No falsity is alleged.

Without any false or defamatory statements to point to, AbouYabis can only suggest that the alleged defamation arises from the websites' statement that she "endorsed" Hamas. SAC ¶ 160. But that is precisely what she did in celebrating Hamas's use of "gliders" to attack Israel and praising "[g]lory to

13

the resistance fighters"—*i.e.*, Hamas. *Id.* ¶¶ 86, 91. Rather than allege how that claim is *factually* false given her own tweet, she instead argues that the statements are "contradicted by her decades of interfaith work and explicit condemnation of violence." *Id.* ¶ 160. That is a non-sequitur. Whatever AbouYabis did in the past is entirely irrelevant. She did, in fact, endorse Hamas in her tweets, and the websites were free to point that out. *Cf. Lucas*, 659 S.E.2d at 615 ("As long as facts are not misstated, distorted or arranged so as to convey a false and defamatory meaning, there is no liability for a somewhat less than complete report of the truth, even if the newspaper ... conveys ... its own editorial opinions."). The websites have no obligation to discuss her supposed past conduct that she wants reported. That is not how the First Amendment works.

AbouYabis also complains about StopAntisemitism.org's tweet, "Would you want YOUR Jewish family member to be treated by this woman?" SAC ¶ 160. But there is no factual assertion there, much less a false one, and any insinuation that Jewish patients should not see AbouYabis is protected opinion because it does not imply any disprovable facts. *See, e.g.*, *Chaney v. Harrison & Lynam, LLC*, 708 S.E.2d 672, 676 (Ga. Ct. App. 2011) (holding that a sign inviting passersby to ask defendants for their opinion and implying it was a negative one was not defamatory because "nothing in the sign connotes

14

anything that is 'sufficiently factual to be susceptible of being proved true or false'").

Courts have long held that value-laden characterizations drawn from disclosed speech, including moral or political condemnation, are protected opinion and therefore nonactionable as a matter of law. The First Amendment does not permit liability for speech that reflects a speaker's interpretation of another person's publicly expressed views, particularly where the audience can evaluate the same underlying material. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964).

That rule squarely governs statements labeling conduct or speech as antisemitic. Federal courts consistently hold that such labels constitute protected opinion rather than verifiable statements of fact. *See, e.g., Florio v. Gallaudet Univ.*, 119 F.4th 67, 77 (D.C. Cir. 2024); *Farrakhan v. Anti-Defamation League*, No. 23CV9110 (DLC), 2024 WL 1484449, at \*7 (S.D.N.Y. Apr. 5, 2024), *aff'd*, 2025 WL 24066 (2d Cir. Jan. 3, 2025). In the copycat case in D.C., also brought by AbouYabis's counsel, the plaintiff's own declarant acknowledged as much. *See Johnson v. Georgetown Univ. et al.*, No. 1:25-cv-01540 (D.D.C.), Dkt. No. 62-3 ("In a line of cases beginning in the 1940's, but continuing to the present, falsely calling someone an antisemite has been held to be a mere statement of opinion, and therefore not defamatory."). Plaintiff and her counsel cannot claim to be unaware of this longstanding precedent.

The Supreme Court has likewise confirmed that social media commentary, including the republication or criticism of another's speech, lies at the core of First Amendment protection. *See Packingham v. North Carolina*, 582 U.S. 98, 108 (2017) (explaining that social media posts constitute the "legitimate exercise of First Amendment rights"); *Moody v. NetChoice, LLC*, 603 U.S. 707, 728–33 (2024); *Flannery v. Eckenwiler*, 2024 U.S. Dist. LEXIS 176663, at *19 (D.D.C. Sep. 30, 2024) ("[A]ctivities like posting on social media . . . on a topic of public concern lie at [the First Amendment's] core."). Indeed, AbouYabis and her counsel hypocritically claim that *her* First Amendment rights are under attack. *See* SAC ¶¶ 384(b), 402. But plaintiff cannot claim constitutional protection for her own speech while denying that same protection to those who criticize or republish it. She is the one launching a frivolous lawsuit based on protected speech, not the other way around.

For these very reasons, a federal court recently dismissed a similar lawsuit against StopAntisemitism.org, in which a university professor complained about a profile in which his tweets were reposted with "interspersed commentary." *Tannous v. Cabrini University, et al.*, 2:23-cv-01115-GAM (E.D. Pa.), Dkt. No. 35. The court specifically rejected the plaintiff's argument that the tweets were selectively chosen to make him seem antisemitic because it was merely opinion without any implied, undisclosed facts. *Id.* ("Even if Defendant selectively republished the tweets to create a

16

false impression that Plaintiff is antisemitic – which could satisfy the "falsity" prong of a false light claim – it nonetheless remains merely an opinion about Plaintiff, even if it is promoted through selectively reprinted material. . . . Nor did the republished tweets imply the presence of undisclosed facts about Plaintiff of a defamatory nature.").

To try to circumvent the First Amendment as a clear bar to this lawsuit, Plaintiff repeatedly employs sensational rhetoric to make the claims sound viable (*e.g.*, "cyberstalking," "harassment," "defamation," "collaboration," "weaponized," "smear campaign," "distort[ion]," "doxing"), but she does not actually allege that the websites did anything other than to accurately repost and comment on her tweets with protected opinion.

In short, the websites engaged in protected speech on matters of "public concern"—a debate into which AbouYabis freely injected herself. SAC ¶ 402. AbouYabis may not like the consequences of having her antisemitism exposed, but that was a risk she assumed by posting in celebration of October 7, comparing Israel to Nazis, and invoking Adolf Hitler.

***Third,*** while the claims against the websites are frivolous, the claims against the Fromer Foundation are even more absurd. AbouYabis does not try to (because she cannot) connect the Fromer Foundation to her, to her employment, or to Emory University—no knowledge, no communications, no interactions, no meetings, no collaboration, no conspiracy, no false or

17

defamatory statements. Nothing. Yet she claims the Fromer Foundation was part of a shadowy Jewish conspiracy, without any of the basic factual elements, only attempting to connect the Fromer Foundation to websites through alleged highly indirect *"financial contributions." See* SAC ¶¶ 31, 110, 130.

This theory of tertiary liability is frivolous. It is well-established that corporate entities are legally distinct from their owners and shareholders. *See, e.g.*, O.C.G.A. § 14-2-622(b) (shareholder not liable for acts of corporation); *EnduraCare Therapy Mgmt., Inc. v. Drake*, 681 S.E.2d 168, 171 (Ga. Ct. App. 2009) (owner not liable for acts of corporation). Accordingly, owners and shareholders cannot be held liable for acts of the corporation, except for in rare instances where the corporation is insolvent and there are exceptional circumstances that warrant piercing the corporate veil. *Perry v. Unum Life Ins. Co. of Am.*, 353 F. Supp. 2d 1237, 1240 (N.D. Ga. 2005). This high hurdle applies for non-profits as well. *See United States v. Funds Held in the Name or for the Benefit of Wetterer,* 210 F.3d 96, 106 (2d Cir. 2000). Notwithstanding these basic principles of corporate law, Plaintiff does not allege *any* of the facts necessary to pierce the corporate veil. At most, AbouYabis alleges that the Fromer Foundation supported third parties who *independently* engaged in online speech, untethered to AbouYabis specifically. SAC ¶¶ 86–94. But she does not—and cannot—allege that (1) the Fromer Foundation disregarded the corporate entity to "make it a mere instrumentality for the transaction of their

18

own affairs"; (2) that there is "such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist"; or (3) that to "adhere to the doctrine of corporate entity would promote injustice or protect fraud." *Dearth v. Collins*, 441 F.3d 931, 934 (11th Cir. 2006) (quoting *McLean v. Cont'l Wingate Co.*, 442 S.E.2d 276, 279 (Ga. 1994)). Nor does she allege any sort of agency relationship, in which the Fromer Foundation exercised any control or discretion over the websites and their use of funds that could support any vicarious liability. In short, there is no legal or factual basis to hold the Fromer Foundation liable for the acts of the websites, which are separate and distinct legal entities. The claims are frivolous and raised in bad faith.

## B. There Is No Possibility the Fromer Foundation "Conspired" to Deprive Plaintiff of Her Civil Rights (Count VIII)

AbouYabis's § 1985(3) claim fails as a matter of law and is sanctionable under Rule 11, first, because it advances the same theory the Supreme Court rejected in *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366 (1979). As in *Novotny*, AbouYabis attempts to transform an employment dispute into a civil rights conspiracy by invoking equal protection and equal privileges and immunities language untethered to any independently enforceable constitutional right. That attempt is foreclosed by controlling precedent.

In *Novotny*, the Supreme Court held that § 1985(3) creates no substantive rights and may not be used to repackage employment

19

discrimination claims governed by Title VII's comprehensive statutory scheme. *Id.* at 372–78. Allowing plaintiffs to pursue those claims through § 1985(3) would permit evasion of Title VII's procedural safeguards and disrupt the balance Congress deliberately struck between administrative resolution and judicial review. *Id.* at 375–76. For that reason, the Court held that rights created by Title VII may not be asserted within the remedial framework of § 1985(3). *Id.* at 378.

That principle governs here. The SAC alleges harm arising from AbouYabis's employment and termination and attributes that outcome to an alleged conspiracy to deny her equal protection and equal privileges and immunities. *See* SAC ¶¶ 102–18. But the SAC does not identify any independently protected constitutional right that was the object of a private conspiracy. Instead, it seeks to relabel her employment grievance, using a theory and language that the Supreme Court has expressly held cannot do that work. Plaintiff neither acknowledges *Novotny* nor offers any nonfrivolous argument for distinguishing or revisiting it.

Even apart from *Novotny*, longstanding Supreme Court precedent makes clear that § 1985(3) reaches purely private conspiracies only in narrow circumstances. A plaintiff must allege a conspiracy aimed at depriving a right constitutionally protected against private impairment, not merely opposition to conduct or speech followed by adverse employment consequences imposed

20

by an independent actor. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274 (1993); *Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1379 (11th Cir. 1997). Only a limited category of rights qualifies, and employment-related rights do not. *Bray*, 506 U.S. at 278; *Novotny*, 442 U.S. at 378; *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010).

Additionally, it should be clear to any reasonable lawyer that there is no "conspiracy" that can be alleged here, when Plaintiff does not and cannot even point to *communications* amongst co-conspirators, much less communications about Plaintiff. Again, the Fromer Foundation did not know about Plaintiff until this lawsuit. Further, Plaintiff does not allege any communications between the Fromer Foundation or other co-conspirators and *Emory*, which had sole authority to terminate her employment. How can conspirators intend to harm Plaintiff when, as Plaintiff must concede, they do not even know she existed? These are basic requirements of a conspiracy. *See, e.g.*, *Dickerson v. Alachua County Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000).

Measured against this settled authority and elementary legal principles, Plaintiff's § 1985(3) claim lacks any reasonable legal foundation. Advancing a theory squarely foreclosed by binding Supreme Court precedent and lacking supporting allegations as to any of the elementary requirements of the claim violates Rule 11. Plaintiff has been on notice of these defects yet has failed to properly dismiss her Complaint.

21

### III.    RULE 11 SANCTIONS ARE WARRANTED BECAUSE THE COMPLAINT IS FRIVOLOUS AND PART OF A PATTERN OF IMPROPER LAWFARE AGAINST JEWS AND ZIONISTS

This lawsuit is not only devoid of factual or legal merit, it is explicitly intended to harass and intimidate the Fromer Foundation because of their Jewish identity and support for Israel, and to make their religious activity "cost-prohibitive," according to Mr. Hamed. Such conduct warrants the strongest sanctions available under Rule 11.

At the outset, the complaint is replete with inflammatory and utterly irrelevant attacks against Israel and "Zionists," *i.e.*, Jews who—in accordance with their religion—support the one Jewish state and land where Jews are indigenous. *See, e.g.*, SAC ¶ 54 (accusing "Zionist occupation" of "domination" and "systematic[] oppress[ion] [of] indigenous Palestinians" via "laws that enshrine 'Jewish settlement' as a national value, military orders conducted under what the Zionist occupation declares as a 'Jewish army,' forced displacement conducted in the name of maintaining 'Jewish'"). AbouYabis uses the word "Zionism" or "Zionist" over *200* times and replaces legal names with highly inflammatory claims, such as referring to cities in Israel as being in "occupied Palestine," and making irrelevant claims about genocide and apartheid that have nothing to do with this case.[2]

---

[2] The Court has correctly observed that the SAC's "lengthy, editorial-style accounts of domestic and international events" hinder resolution of the case

Accordingly, the SAC is nothing more than an improper political diatribe, for no other purpose than to spew anti-Jewish hatred and air grievances about Israel. That is sanctionable. *See* Fed. R. Civ. P. 11(b); *see also Rhodes*, 670 F. Supp. 2d at 1378 ("The absolute absence of any legitimate legal argument, combined with the political diatribe in her motions, demonstrates that Ms. Taitz's purpose is to advance a political agenda and not to pursue a legitimate legal cause of action."); *Massengale*, 267 F.3d at 1302; *Saltany v. Reagan*, 886 F.2d 438, 440 (D.C. Cir. 1989) (per curiam) ("We do not conceive it a proper function of a federal court to serve as a forum for 'protests,' to the detriment of parties with serious disputes waiting to be heard."). These incendiary allegations, *which have nothing to do with the claims*, are improperly motivated by AbouYabis and her attorney's desire to harass Jews and promote ludicrous and bigoted conspiracy theories.

AbouYabis has already, admittedly, expressed her distain for Zionists and her celebration of the attempted invasion of their homeland. Among her public statements was the assertion, "They got walls we got gliders / Glory to all resistance fighters," SAC ¶ 91, which referenced Hamas's use of hang gliders during the attack and commended acts of so-called "resistance" that included rape, murder, and butchery. AbouYabis also used her platform to

___

and that the SAC "is the antithesis of a 'short and plain statement' of anything." (*See* Dec. 5, 2025 Order at 2, Dkt. No. 30.)

accuse Israel of genocide and apartheid, compare Israelis to Nazis and American slaveowners, and retweeted an image of Adolf Hitler with the caption, "Jews are not people; they are animals." *Id.* ¶ 100. It is no surprise that, rather than take responsibility for her own hateful conduct and professional consequences, she has instead tried to blame some shadowy Jewish conspiracy, comprised of individuals and organizations who do not even know her and have nothing to do with her.

More troubling are Mr. Hamed's public statements. Last November, he posted on LinkedIn that Zionists are a "curse onto humanity" and should "never know sleep." **Ex. A.** He explicitly called for violence against Jewish supporters of Israel, asking them to "burn and rot eternally—figuratively and literally—in this life and the next." **Ex. B.** He called Israelis "Zionist White Supremacists from Europe," who "stole the name of the Jewish homeland 'Israel' to legitimize occupation, apartheid, and genocide." **Ex. C.** In another example, he calls Zionists a "curse onto humanity" and states that they "*must and will be eradicated.*" **Ex. D** (emphasis added). Given that he and his client identify the Fromer Foundation as "Zionist," he has therefore expressed his view that it and/or the Fromers should be "eradicated." That he wants Zionists to be "eradicated" is deeply troubling; that he then named several random "Zionists" in two separate lawsuits is an abuse of the judicial system. Claiming that several Jewish Zionists—who do not know one another—engaged in a

24

shadowy conspiracy to harm Plaintiff is the textbook definition of antisemitism.[3]

To be sure, to order sanctions, this Court does not need to find that Mr. Hamed and AbouYabis are antisemitic—though they clearly are. It is enough that they have identified a *group* that they hate and thereafter targeted members of that group with lawsuits absent any grounding in law or fact. Plaintiff and her counsel's campaign would be equally sanctionable if they brought frivolous suits targeting Democrats, Jets fans, or redheads.

The plain and obvious purpose of this lawsuit is not to redress any actionable harm, but to weaponize the courts to air political grievances and exact reputational retribution against Jewish (or Zionist) individuals and organizations. That is a blatant abuse of judicial process and a violation of Rule 11. This Court should not tolerate such conduct. It should impose the most severe sanctions under Rule 11, including attorney's fees, to compensate the Fromer Foundation for this waste of time and to deter AbouYabis and her counsel from further abuses of the judicial process.

---

[3]*Antisemitism*, International Holocaust Remembrance Alliance, *Working Definitions & Charters*, https://holocaustremembrance.com/resources/working-definition-antisemitism (last visited Nov. 18, 2025) ("Antisemitism frequently charges Jews with conspiring to harm humanity, and it is often used to blame Jews for 'why things go wrong,'" and it includes "the myth about a world Jewish conspiracy").

RESPECTFULLY SUBMITTED this 26th day of March 2026.

/s/ *Mark Pinkert*

Mark Pinkert, Esq. (*admitted pro hac vice*)
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
2333 Ponce de Leon Blvd., Suite 600
Coral Gables, FL 33134
203-415-6665
mpinkert@holtzmanvogel.com

Jason Torchinsky, Esq. (*admitted pro hac vice*)
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643
Washington, DC 20037
202-737-8808
jtorchinsky@holtzmanvogel.com

Bryan P. Tyson
CLARK HILL PLC
Georgia Bar No. 515411
3630 Peachtree Road, NE
Suite 550
Atlanta, Georgia 30326
678-370-4377
btyson@clarkhill.com

/s/ Bryan P. Tyson
Bryan P. Tyson, Esq**.**

26

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D and 5.1(B), I hereby certify that this Motion for Rule 11 Sanctions has been prepared using Century Schoolbook 13-point font and otherwise complies with the formatting requirements of the Local Rules of this Court.

/s/ Mark Pinkert
Mark Pinkert, Esq.
Counsel for the Fromer Foundation

## CERTIFICATE OF SERVICE

I certify that on March 26, 2026, a copy of the foregoing was filed with the Clerk of the Court using the Court's electronic filing system, which will send a copy to all counsel of record.

*/s/ Mark Pinkert*
Mark Pinkert, Esq.
Counsel for Fromer Foundation

27

# EXHIBIT A



**Abdel-Rahman H.** ✓ · 3rd+                    **+ Follow**   ···
African Semite ( 🤎 | Civil Rights Attorney | Concerned with Fun...
3w · 🌐

Zionists are neither Israelites, nor are they of the Holy Land of Palestine. Zionists are a EuroAmerican White Supremacist antisemitic curse onto humanity—a malignancy that will be eradicated.

May the eyes of Zionist never know sleep.

#EducateToElevate #EngageJustice #WakeUp #SpeakUp #EndZionism #StopAntiSemitism #ZionistWarCrimes #EndZionistImpunity #JusticeForPalestine #BlackLivesMatter #TogetherWeRise #PalestineWillBeFree

# EXHIBIT B



**Abdel-Rahman H.** ✅ • 3rd+                                    4mo  •••
African Semite | ✊🏾 | Civil Rights Attorney | Concerned with Fundamental F...

May they both burn and rot eternally—figuratively and literally—in this life
and the next, along with every Zionist White Supremacist anti-Semite that
supported the EuroAmerican occupation and genocide of Palestinians in any
way, shape, or form.

Like | Reply

# EXHIBIT C



**Abdel-Rahman H.** ✓ · 3rd+                                    1mo   •••
African Semite ⟮ ✊ ⟯ | Civil Rights Attorney | Concerned with Fundamental F...

Zionist White Supremacists from Europe stole the name of the Jewish homeland "Israel" to legitimize occupation, apartheid, and genocide.

Zionist White Supremacists in the US are attacking, abducting, and persecuting students who acknowledge the humanity of Palestinians in the name of "protecting Jewish students." Some of the students authorities are attacking are Jewish themselves.

Nothing is more antisemitic than engaging is such atrocities and violence in the name of Judaism and claiming that it's for the benefit of Jewish people.

Like | Reply

# EXHIBIT D



**Abdel-Rahman H.** • 3rd+                    • • •

African Semite | 🛡 | Civil Rights Attorney | Concerned with...

Reposted from Asif Khan • 1mo • 🌐



Would you rather perish in a gas chamber or get beaten into submission for a raging animal to repeatedly rape you?

Zionists are neither Israelites, nor are they of the Holy Land of Palestine. Zionists are a EuroAmerican White Supremacist antisemitic curse onto humanity—a malignancy that must and will be eradicated.

#EducateToElevate #EngageJustice #WakeUp #SpeakUp #EndZionism #StopAntiSemitism #JusticeForPalestine #BlackLivesMatter #TogetherWeRise #PalestineWillBeFree



**Abdel-Rahman H.** • 3rd+                    • • •

African Semite | 🛡 | Civil Rights Attorney | Concerned with...

Reposted from Mervisa Halilović • 3w • 🌐



Zionists are neither Israelites, nor are they of the Holy Land of Palestine. Zionists are a EuroAmerican White Supremacist antisemitic curse onto humanity—a malignancy that will be eradicated.

May the eyes of Zionist never know sleep.

#EducateToElevate #EngageJustice #WakeUp #SpeakUp #EndZionism #StopAntiSemitism #ZionistWarCrimes #EndZionistImpunity #JusticeForPalestine #BlackLivesMatter #TogetherWeRise #PalestineWillBeFree



**Abdel-Rahman H.** · 3rd+

African Semite ¡ 🛡 | Civil Rights Attorney | Concerned with...

Reposted from Reem 🌸 A. · 2w · 🌐

Zionists are neither Israelites, nor are they of the Holy Land of Palestine. Zionists are a EuroAmerican White Supremacist antisemitic curse onto humanity—a malignancy that will be eradicated.

#EducateToElevate #EngageJustice #WakeUp #SpeakUp #EndZionism #StopAntiSemitism #JusticeForPalestine #BlackLivesMatter #TogetherWeRise #PalestineWillBeFree



2,580 views

01:17