**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**ABEER ABOUYABIS,**

**Plaintiff,**

**v.**

**EMORY UNIVERSITY, et al.,**

**Defendants.**

**CIVIL ACTION NO.**
**1:25-CV-2438-ELR-CCB**

**ORDER AND NON-FINAL REPORT AND RECOMMENDATION**

Plaintiff Abeer AbouYabis brings this action against Defendants Emory University (EU), Emory Healthcare, Inc. (EHC), Carlos Del Rio, Joon Lee, and Ravi Thadhani (the Emory Defendants); Jason D. Weiden; StopAntisemitsm.org; Canary Mission; Liora L. Reznichenko; and, finally, a group of foundations that the Court will refer to, collectively, as the "Donor Defendants": the Ann and Robert Fromer Charitable Foundation Inc. (Fromer); Tuvia Milsztein, the Adam and Gila Milstein Family Foundation, Gila Milstein (the Milsteins); the Natan and Lidia Peisach Family Foundation (Peisach); the Merona Leadership Foundation (Merona); and the Koum Family Foundation (Koum).

Plaintiff asserts claims for discrimination and retaliation under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*; retaliation under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq.*; race discrimination under 42 U.S.C. § 1981; race and national-origin discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; interference under the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601 *et seq.*; a hostile work environment under Title VII and the ADA; a conspiracy to deprive her of her rights under 42 U.S.C. § 1985(3); and state-law claims for breach of contract, tortious interference with contractual relations, and false light invasion of privacy. (Doc. 31 at ¶¶ 241-492).

The matter is before the Court for consideration of the motions to dismiss Plaintiff's second amended complaint (SAC) filed by the Emory Defendants (Docs. 66, 69), Weiden (Doc. 40), and each of the Donor Defendants (Docs. 39, 67, 70, 98, 99); motions for sanctions filed by the Milsteins (Doc. 47), Fromer (Doc. 92), Koum, (Doc. 100), Merona (Doc. 98), and Weiden (Doc. 40); and four additional motions (Docs. 32, 56, 57, 104). I address all issues below with the exception of the requests for sanctions, which will be taken up separately at a later time.[1]

[1] Near the end of the time for briefing in this case, the U.S. District Court for

## I. BACKGROUND

The Court draws the following factual allegations from the second amended complaint, which are assumed to be true for the purpose of this discussion.[2]

Plaintiff was born in Lebanon into a family of Palestinian refugees. (Doc. 31 at ¶ 61). After completing medical school and residency, she was eventually hired in 2018 as a hematologist and assistant professor at Emory's school of medicine.

---

the District of Columbia issued a comprehensive opinion in *Johnson v. Georgetown Univ.*, 827 F. Supp. 3d 133 (D.D.C. 2026). That case was brought by the same counsel, arose from materially similar allegations concerning the fallout from pro-Palestinian speech following the October 7, 2023 attacks, asserted many of the same legal theories against a university, individual critics, and donor defendants, and included analogous motions for sanctions. District Judge Christopher R. Cooper dismissed all claims against the appearing defendants and granted Rule 11 sanctions as to certain donor-related claims while declining to impose monetary sanctions or to find that the action had been brought in bad faith. Of course, *Johnson* is not binding on this Court. Nevertheless, the Court finds Judge Cooper's careful analysis persuasive in several respects and, given the substantial factual and legal overlap between the two cases, cites *Johnson* throughout this R&R where appropriate.

[2] As I noted in a previous order, the SAC is unnecessarily long and "includes lengthy, editorial-style accounts of domestic and international events." (Doc. 30 at 2). It is also replete with tendentious and sometimes inflammatory language wholly inappropriate for a pleading in federal court. (*See generally* Doc. 31 (repeatedly referring to Israel only as "the Zionist Occupier" rather than by its name; referring to that nation's "*Apartheid* Ministry of Strategic Affairs," (*id.* at ¶¶ 113, 127, 128, 148, 157 (emphasis added)), among other choices)). Nonetheless, in this section I distill from the SAC those facts necessary for resolving what is, at bottom, a relatively straightforward employment dispute.

*Id.* at ¶¶ 61, 62, 65. On October 7, 2023, Hamas fighters from Gaza, using paragliders, launched an attack on Israel, killing about 1,200 people, including Israeli civilians, and taking about 250 hostages.[3] In the wake of this, Plaintiff made a number of posts on social media sharing her views on the attacks and on the broader conflict between Israel and Palestine. One such post included a photo of a paraglider paired with these lyrics: "They wander the forest, hands stretched like rainfall, knocking on my door, but no one answers." (Doc. 31 at ¶ 86). That post ended with Plaintiff's wish for "Palestine to wake up in a liberated homeland." *Id.* at ¶ 87. Another post, on October 9, 2023, featured this text, along with some contrasting images from incidents involving Israelis and Palestinians:

[3] Natan Odenheimer, "A Day of Somber Ceremony in Israel, with a Fragile Cease-Fire Holding," N.Y. Times (October 16, 2025). After the attack, "Israel immediately launched a retaliatory military campaign in the Gaza Strip that has, in the roughly two-and-a-half years since, killed tens of thousands of Palestinians and displaced many thousands more from their homes." *Johnson*, 827 F. Supp. 3d at 149. The SAC does not mention the October 7, 2023, attacks as such, but the Court takes judicial notice of them, as it is necessary for understanding the context of the events at issue.

> COLONIAL SETTLERS fleeing from a music festival they were enjoying on an ETHNICALLY CLEANSED STOLEN LAND where its indigenous PALESTINIANS have been besieged for more than 15 years, steps away, behind an ILLEGAL SEPARATION WALL, broke the hearts of the self proclaimed 'human' western world!
> BUT NOT that of INDIGENOUS PALESTINIANS, fleeing their camps that were raided by israeli apartheid regime 4 months ago,
> or the pictures of Palestinians expelled from their HOMELAND PALESTINE by zionist terror groups in 1948,
> Tells all you need to know about Justice, relative morality & humanity.
>
> To those who do not see Palestinians as equal humans, we see you.
> To those who support out killers, #wewillnotforget
> To the freedom fighters: we're praying for you 🙏
>
> #gaza #relativemorality #Palestine #unequallyhuman #humanitychallenge #StopApartheid #wearealsohumans
>
> Oct 09, 2023 12:32:08 am

*Id.* at ¶ 88.

On the same day, Plaintiff attended a student-organized protest near the Israeli consulate in Atlanta, after which she posted this text, accompanied by photos and videos from the event:

I needed to say it LOUD,
So I joined those brave, well organized, passionate students from different Atlanta colleges near the israeli embassy. Thanks to Emory students for Justice in Palestine and all the other student bodies who helped me hang onto the last thread of my faith in humanity and hope for justice… one day
One day!

They got walls we got gliders
Glory to all resistance fighters

Palestine is our demand
No peace on stolen land

Not another nickel not another dollar
We will pay For israel slaughter

Not another nickel not another dime
We will pay for israel crimes

#wearealsohumans #Gaza #palestine #nojusticenopeace #freedomfighter #endisraelapartheid #istandwithpalestine #istandwithpalestine🇵🇸

Oct 09, 2023 3:28:32 am

*Id.* at ¶ 91.

On October 10, 2023, Plaintiff attended a meeting of the Diversity, Equity and Inclusion (DEI) committee at the school of medicine. *Id.* at ¶ 94. At that meeting, she criticized the leadership of Emory for sending "two emails expressing solidarity with the Zionist Occupation," while remaining "silent" about a previous attack by Israel in Gaza. *Id*. More broadly, Plaintiff noted Emory's "selective empathy" in choosing not to issue statements about conflicts in non-European, non-Israeli regions. *Id.* Plaintiff then broke down in tears while sharing news of an Israeli airstrike in Gaza that had destroyed the home of a close friend. *Id.* at ¶ 95.

Dr. Sheryl Heron, then the Vice Chair of DEI at the school of medicine, called Plaintiff the next day to discuss both the meeting and Plaintiff's general response to the October 7 attack. *Id.* at ¶ 96. Heron asked whether Plaintiff wanted to take leave in light of the situation in Gaza, but Plaintiff "declined," given the busy workload for her department. *Id.* Heron and Plaintiff agreed that they would organize a "circle of healing" for the department. *Id.* at ¶ 97. Heron ended the call by advising Plaintiff to avoid social media posts that might "upset others," and to "be careful." *Id.* at ¶ 98.

Nevertheless, on October 15, 2023, Plaintiff shared a new post on Facebook, this one featuring dozens of provocative images, including suffering children in Gaza and concentration camps during World War II. *Id.* at ¶¶ 99-100. Included in the post was a picture of Adolf Hitler and a quote attributed to him ("Jews are not people; they are animals") along with a picture of an unnamed Israeli Defense Minister and a quote attributed to him ("We are fighting against human animals"). *Id.* at ¶ 100. That image collection ended with a piece of "graffiti art" depicting two children sitting across from each other, separated by a wired fence—one wearing a traditional Jewish head covering with a Star of David pattern, and the other, in a prison uniform, wearing a traditional Palestinian scarf. *Id.* at ¶¶ 100-101.

Defendant Canary Mission maintains an online database profiling individuals critical of Israel and publicizes information about those individuals with the stated objective of affecting future educational and employment opportunities. *Id.* at ¶¶ 109, 117, 131–38. According to the complaint, Canary Mission maintained such a profile on Plaintiff. *Id.* at ¶ 442. Similarly, Defendant StopAntisemitism.org publicizes the names of people it views as engaging in antisemitic conduct, encourages complaints to employers and other institutions, and is operated by Defendant Reznichenko. *Id.* at ¶¶ 140–45. And for their part, the Milsteins, Merona, Fromer, Peisac, and Koum provided financial support at various points, either directly or through intermediary organizations, to Canary Mission, StopAntisemitism.org, or both. *Id.* at ¶¶ 29–37, 110–13, 141.

Some of Plaintiff's posts went viral on October 16, 2023, when StopAntisemitism.org posted screenshots of them, along with identifying information about Plaintiff's position and employer. *Id.* at ¶ 159. One post asked: "Would you want YOUR Jewish family member to be treated by this woman?" *Id.* at ¶¶ 159-160. In response to one of StopAntiSemitism.org's posts about Plaintiff on X, a user named Jonathan Donenfeld asked, "Are there any Jewish doctors and professors that work at @EmoryUniversity? They should [know] about their

antisemitic colleague." *Id.* at ¶ 185. Defendant Dr. Jason Weiden, a radiologist at Emory, replied: "We will start working on the campaign to get her fired." *Id.* at ¶¶ 27, 186.

As a result of this publicity, complaints began pouring into Emory via email and phone, calling for Plaintiff's termination. *Id.* at ¶¶ 167-68. On the morning of October 17, 2023, Plaintiff participated in a conference call with Defendant del Rio, then the acting dean of the school of medicine, who shared concerns about a post "related to Hitler" and informed Plaintiff there would be an investigation. *Id.* at ¶ 162. Later that day, Emory posted a statement noting that it was "aware of the recent antisemitic comments made on a private social media account by one of our assistant professors," and, condemning those comments, noted that the school had "immediately placed this individual on administrative leave pending an internal investigation." *Id.* at ¶ 163. And, at 3:00 pm that day, Plaintiff received an email placing her on administrative leave. *Id.* at ¶ 171.

After consulting with her psychiatrist, on October 19, 2023, Plaintiff submitted a request to take medical leave under FMLA due to post-traumatic stress disorder, insomnia, and other mental heath conditions. *Id.* at ¶ 174. An Emory HR representative emailed her that night, requesting a meeting to discuss

the pending investigation. *Id.* That meeting occurred the next day over Zoom. *Id.* at ¶¶ 175-76. Plaintiff was terminated on November 8, 2023. *Id.* at ¶ 178.

## II. PERSONAL JURISDICTION

At the outset, the Court considers whether Plaintiff has alleged personal jurisdiction over the Defendants. Federal Rule of Civil Procedure 12 allows for dismissal of a complaint based on the defense that the court lacks personal jurisdiction over a defendant. Fed. R. Civ. P. 12(b)(2). Whether personal jurisdiction exists is a question of law, and "the plaintiff bears the ultimate burden of establishing that personal jurisdiction is present." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009). Every appearing Defendant except Weiden argues, for either service-related or substantive reasons, that Plaintiff has not done so. (*See* Docs. 39, 66, 67, 69, 70, 98, 99).

### a. Personal Jurisdiction over the Emory Defendants

The Emory Defendants move to dismiss for insufficient service of process under Rule 12(b)(5)—and, because a court cannot exercise personal jurisdiction without valid service, under Rule 12(b)(2) (allowing a party to move to dismiss for lack of personal jurisdiction) as well. (Doc. 66-1 at 8-10; Doc. 69-1 at 9-12). They argue that Plaintiff failed to timely serve EU, EHC, and the individual Emory Defendants. *Id.*

Rule 4(m) provides that a defendant must be served within 90 days after the complaint is filed. EU and EHC were named in the original complaint filed May 2, 2025, (*see* Doc. 1), making the service deadline July 31, 2025. Plaintiff served EU and EHC on January 27, 2026—nearly six months late. (Docs. 75, 76). For their part, del Rio, Lee, and Thadhani were named in the first amended complaint filed May 19, 2025, making the service deadline August 17, 2025. (Doc. 9). Plaintiff did not serve Lee until January 29, 2026. (Doc. 77). And the record regarding del Rio and Thadhani is, at best, muddled: Plaintiff relies on emails with defense counsel and counsel's purported later acceptance of service on March 19, 2026, subject to preserved objections. (Doc. 88-2). But in sum, the record does not show timely service, or anything close to it, for any of the Emory Defendants.[4]

Under Rule 4, if a plaintiff shows good cause for failing to effectuate service within the 90 days provided for by the Rules, "the court must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m). Good cause exists "only

[4] Contrary to Plaintiff's arguments, the filing of an amended complaint does not restart the Rule 4(m) clock as to that defendant. Accordingly, the relevant deadlines were not reset by the filing of the SAC. *See Endurance Am. Ins. Co. v. Bain Berkeley, Inc.*, No. 1:22-CV-1309-SEG, 2024 WL 6077907, at *8 (N.D. Ga. Mar. 14, 2024) (holding that the filing of an amended complaint did not extend the service period).

when some outside factor, such as reliance on faulty advice, rather than inadvertence or negligence, prevented service." *Lepone-Dempsey v. Carroll Cnty. Comm'rs*, 476 F.3d 1277, 1281 (11th Cir. 2007) (alteration and internal quotation marks omitted). Here, Plaintiff points to the "flurry of activity with certain named Defendants following the filing of the Complaint, as well as preparing the [first amended complaint]" as reason for having "neglected" to effect service. (Doc. 32 at 1). That is not good cause—that is simply litigation. Counsel's failure to calendar and comply with basic service deadlines is not an external impediment. Rule 4 is not optional, and the repeated failure to effect timely service reflects a lack of diligence that should not have occurred.

That said, even the absence of good cause does not end the inquiry. "Rule 4(m) grants discretion to the district court to extend the time for service of process even in the absence of a showing of good cause." *Horenkamp v. Van Winkle & Co., Inc.*, 402 F.3d 1129, 1132 (11th Cir. 2005). And here, although Plaintiff's showing is very thin, the Court concludes that a discretionary extension is warranted. First, dismissal without prejudice would apparently operate as a dismissal with prejudice as to at least some claims because of statutes of limitations issues. (Doc. 91 at 18-19). That factor is not dispositive, and it does not excuse

counsel's neglect, but it is a significant consideration. *See Lepone-Dempsey*, 476 F.3d at 1282 (holding that a district court must consider whether the statute of limitations would bar refiling before dismissing a case for untimely service). Second, the Emory Defendants have had actual notice of this action and have actively litigated the case through counsel, including by filing substantive motions to dismiss. Third, the Court is resolving the pending motions on the merits in this Report & Recommendation. Allowing service to stand promotes final resolution of the claims already fully briefed.

I therefore recommend that the Court exercise its discretion under Rule 4(m) to extend the service deadline. Service on EU, EHC, and Lee should be deemed timely. As to del Rio and Thadhani, the Court should likewise extend the deadline and treat defense counsel's March 19, 2026, acceptance of service, subject to preserved objections, as sufficient for purposes of resolving the pending motions. This recommendation should not be read as approving Plaintiff's counsel's conduct. It does not. It reflects only my determination that, under the circumstances of this case, the better course is to reach the merits rather than let service defects dictate the outcome of a case that has now been fully presented to

the Court across dozens of filings and hundreds of pages of allegations and argument.

As such, I **RECOMMEND** that the Emory Defendants' motions to dismiss, (Docs. 66, 69), be **DENIED** to the extent they request dismissal for insufficient service of process. Plaintiff's motion for an extension of time to serve, (Doc. 32), should be **GRANTED**.

**b. Personal Jurisdiction over the Donor Defendants**

Next, the Donor Defendants each move to dismiss on the grounds that the Court lacks personal jurisdiction over them under Georgia's long-arm statute and the requirements of due process. (Doc. 39 at 13-16; Doc. 67-1 at 9-12; Doc. 70-1 at 11-17; Doc. 98 at 10-13; Doc. 99 at 17-26).[5]

The Donor Defendants consist of several nonresident individuals and nonprofit entities that are alleged to have financially supported organizations such as Canary Mission and StopAntisemitism.org. Specifically, the challenged defendants are Fromer, the Milsteins, Peisach, Merona, and Koum. None is alleged to reside in Georgia, maintain its principal place of business in Georgia, or

[5] Several of the Donor Defendants make arguments regarding improper service too. But because I conclude that Plaintiff lacks personal jurisdiction over them under Georgia's long-arm statute, I do not reach that issue.

otherwise be subject to general jurisdiction here. The question, then, is whether Plaintiff can establish specific jurisdiction over them. (*See* Doc. 83 at 10-18 (arguing that specific jurisdiction exists)).

The Donor Defendants argue that the SAC alleges, at most, that they provided financial support to third-party organizations located outside Georgia and that such allegations are insufficient to establish specific jurisdiction under Georgia's long-arm statute. (Doc. 39 at 13-16; Doc. 67-1 at 9-12; Doc. 70-1 at 11-17; Doc. 98 at 10-13; Doc. 99 at 17-26). Plaintiff responds that jurisdiction exists because the Donor Defendants allegedly funded organizations that targeted her employment at Emory University in Georgia, because the effects of the alleged campaign were felt in Georgia, and because Georgia recognizes a theory of conspiracy jurisdiction permitting the acts of in-state co-conspirators to be imputed to nonresident defendants. (Doc. 49 at 9-13; Doc. 83 at 10-18; Doc. 106 at 7-10; Doc. 113 at 10-13).

A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of sufficiently alleging facts in the complaint to establish jurisdiction. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir.

2009). A federal court sitting in diversity[6] undertakes a two-part analysis to determine whether personal jurisdiction exists: "the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Id*. District courts in Georgia cannot conflate these two inquiries because Georgia's long-arm statute "imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1259 (11th Cir. 2010). Federal district courts must interpret and apply Georgia's long-arm statute literally. *Id*. Accordingly, the Court must first determine whether Plaintiff has established jurisdiction under O.C.G.A. § 9-10-91

---

[6] Although this case arises under federal-question jurisdiction, the analysis is the same, as the statute under which Plaintiff brings her only claim against the Donor Defendants—42 U.S.C. § 1985—does not provide for nationwide service of process. *See Lockard v. Equifax, Inc.*, 163 F.3d 1259, 1265 (11th Cir. 1998) ("Rule 4(e) of the Federal Rules of Civil Procedure limits the jurisdiction of federal courts to service over nonresident defendants in the manner authorized by the forum state's law, absent Congress's grant of nationwide jurisdiction [in a federal statute]."); *see also Iraheta v. Linebarger Goggan Blair & Sampson LLP*, No. 5:14-CV-413 (CAR), 2015 WL 4653211, at *3 (M.D. Ga. Aug. 5, 2015) (noting that § 1985 does "not have a nationwide service-of-process provision").

before considering constitutional minimum contacts. If the statute is not satisfied, the inquiry ends.

Plaintiff principally relies on subsection (1), which authorizes jurisdiction over a nonresident who "[t]ransacts any business within this state." O.C.G.A. § 9-10-91(1). (Doc. 83 at 12). That provision requires the nonresident defendant to have "purposefully done some act or consummated some transaction" in Georgia. *Aero Toy Store, LLC v. Grieves*, 631 S.E.2d 734, 737 (Ga. Ct. App. 2006) (quotation omitted). But the SAC contains no nonconclusory allegation that any Donor Defendant did any such thing. The pleading does not allege that any Donor Defendant negotiated, executed, performed, or solicited any transaction in Georgia. Nor does it allege that any Donor Defendant communicated with Emory, communicated with Plaintiff, directed any publication into Georgia, or otherwise engaged in conduct within Georgia giving rise to Plaintiff's claims. Instead, the SAC alleges that certain Donor Defendants provided funding—sometimes through intermediaries—to Canary Mission, StopAntisemitism.org, or related organizations. (Doc. 31 at ¶¶ 29–37, 110–13, 141, 389).

Even accepting those allegations as true, the alleged donations occurred outside Georgia, were made by nonresident actors, and were directed to

nonresident organizations. Plaintiff attempts to bridge this gap by focusing on the alleged conduct of Canary Mission and StopAntisemitism.org. She argues that those organizations identified her Georgia employer, published information concerning her employment at Emory, and sought to generate adverse consequences for her in Georgia.[7] (*See, e.g.*, Doc. 83 at 13). That does not establish jurisdiction over the Donor Defendants. Personal jurisdiction must be assessed defendant by defendant. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984). The relevant inquiry is whether the Donor Defendants themselves engaged in conduct falling within Georgia's long-arm statute. The SAC does not come anywhere close to alleging that they did.

Take, for instance, the Milsteins. In her response in opposition to the Milsteins' motion to dismiss, Plaintiff asserts that they "engaged in individualized targeting of [Plaintiff], explicitly identified her Georgia employer, coordinated with Georgia-based co-conspirators, monitored Georgia-specific results, and

[7] At least, that is Plaintiff's claim as to StopAntiSemitism.org. The claim as to Canary Mission appears to be that it "maintained a defamatory profile of [Plaintiff] on its cyberstalking social media platforms, targeting her based on her Palestinian national origin and advocacy for Palestinian human rights," (Doc. 31 at ¶ 442), and that "[t]he timing and messaging coordination with StopAntisemitism.org's October 16, 2023 campaign demonstrates Canary Mission's participation in a unified improper scheme." *Id.*

celebrated her termination from Georgia employment." (Doc. 49 at 12). But absolutely nothing in the SAC suggests that the Milsteins, or any of the Donor Defendants, did anything of the sort. The SAC quotes a video by Adam Milstein in which he warned of the need to "investigate" and "expose" what Plaintiff calls "opponents of Zionist occupation." (Doc. 31 at ¶ 119). Plaintiff asserts that the quote "reflect[s] an explicit intent to violate the civil and constitutional rights of a protected class, including Dr. AbouYabis, by deploying racist tropes that conflate Palestinian identity and solidarity with terrorism and hostility towards the United States." *Id.* That may well be, or it may well not be. But neither that assertion nor the quotes from the video come close to alleging that the Milsteins even knew who Plaintiff was prior to this lawsuit, let alone that they "targeted" her specifically. And the same is true for all of the Donor Defendants.

Plaintiff next attempts to invoke conspiracy jurisdiction. Georgia recognizes a limited form of conspiracy-based jurisdiction under which the in-state acts of a resident co-conspirator may, in appropriate circumstances, be imputed to a nonresident conspirator. *Hyperdynamics Corp. v. Southridge Cap. Mgmt., LLC*, 699 S.E.2d 456, 456, 466 (Ga. Ct. App. 2010). That doctrine does not relieve a plaintiff of the obligation to plead specific facts demonstrating the existence of an actual

conspiracy and the defendant's knowing participation in it. Conclusory allegations of coordinated conduct are insufficient. *Rudo v. Stubbs*, 472 S.E.2d 515, 517-18 (Ga. Ct. App. 1996). Here, Plaintiff alleges a sweeping conspiracy involving Emory, multiple university officials, several nonprofit organizations, various donors, and numerous unrelated entities. (Doc. 31 at ¶¶ 375-407).

The allegations concerning the Donor Defendants are materially the same. The Milsteins are alleged to have provided "sustained annual funding" to Canary Mission and StopAntisemitism.org. *Id.* at ¶ 389. The Fromer and Peisach Foundations are alleged to have donated, at some unspecified point, to Canary Mission through an intermediary. *Id*. Merona is alleged to have funded StopAntisemitism.org by paying its executive director, Defendant Reznichenko, certain sums of money in 2022 and 2023. *Id*. And Koum Foundation is alleged to have funded StopAntisemitism.org through Merona in 2023. *Id*. But the SAC contains no factual allegations plausibly connecting any of those donations to an agreement to violate Plaintiff's rights or to procure her termination from Emory. It identifies no communications, agreements, meetings, instructions, directives, or other facts plausibly showing that any Donor Defendant entered into an agreement with Emory, with university officials, or with any other alleged

conspirator to terminate Plaintiff's employment. Instead, Plaintiff asks the Court to infer a conspiracy from the fact of funding alone. That inference is too attenuated. Financial support for an organization—even one alleged to engage in wrongful conduct—does not by itself establish that the donor agreed with, directed, controlled, or participated in every action undertaken by the recipient organization. Nor does it establish the type of defendant-specific forum contact required by Georgia's long-arm statute.[8]

Judge Cooper came to a similar conclusion in *Johnson*. In that case, a student at Georgetown University had conducted an internet search of Johnson, a newly-hired administrator. *Johnson*, 827 F. Supp. 3d at 149. Upon doing so, the student discovered Canary Mission's profile of Johnson, which included old social media posts in which Johnson had been highly critical of Israel. *Id.* at 149-150. After the

[8] The Court reaches the same conclusion regarding Plaintiff's request for jurisdictional discovery. (*See, e.g.,* Doc. 83 at 18). The request here rests largely on speculation that donor communications, grant records, or internal documents may reveal facts establishing jurisdiction. But a plaintiff must first make a colorable showing of jurisdiction before obtaining discovery. *See Butler v. Sukhoi Co.,* 579 F.3d 1307, 1314 (11th Cir. 2009) (finding that a district court abused its discretion in allowing jurisdictional discovery "inasmuch as the complaint was insufficient as a matter of law to establish a *prima facie* case that the district court had jurisdiction"). Plaintiff has not made that showing. Her theory depends upon assumptions regarding the donors' knowledge, intent, and involvement that are not supported by any factual allegations in the SAC.

student publicized some of the posts, causing them to go "viral," Georgetown put Johnson on administrative leave and, ultimately, terminated her. *Id.* at 150-152. And, as in this case, Johnson sued the university and some of its employees, along with Canary Mission and some of its donors. *Id.* The Court found that Johnson had not adequately alleged personal jurisdiction over the donor defendants, either under D.C.'s long-arm statute or conspiracy jurisdiction. Judge Cooper explained:

> Johnson's jurisdictional theory seems to rest on the assumption that the Court can automatically impute Canary Mission's in-District conduct to its donors. But personal jurisdiction cannot be exercised by the wave of a hand: "The contacts necessary for the Court to exercise personal jurisdiction must be assessed individually for each defendant." *Mouzon v. Radiancy, Inc.*, 85 F. Supp. 3d 361, 371 (D.D.C. 2015) (citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). This is not to say that organizational donors can never expect to be sued in D.C. courts pursuant to [the District's long-arm statute]. But without more—perhaps, for instance, some factual allegation demonstrating that the donor directed its funds to the organization with the objective or specific knowledge that the money would be used to engage in conduct in the District—the connection between this forum and an out-of-state donor with no other D.C. ties would appear fortuitous, and the exercise of personal jurisdiction under section 13-423(a)(4) unsupported. . . . To hold otherwise would subject anyone who contributes to an organization that engages continuously in the District to being haled into court here on the mere basis of that association. Such a rule would be at odds with bedrock principles of personal jurisdiction.

*Id.* at 155–56.[9]

The same is true here. At bottom, the harm Plaintiff suffered—termination from employment—was inflicted by her employer, not by the Donor Defendants. Those Defendants' connection to that harm runs through at least two sets of independent decisionmakers: Canary Mission (which kept a profile on her) and StopAntiSemitism.org (which chose to publicize her posts) on the one hand; and Emory (which chose to terminate her) on the other. None of the Donor Defendants can "fairly be said to have literally transacted business in Georgia." *Websters Chalk Paint Powder, LLC v. Annie Sloan Interiors, Ltd.*, No. 1:13-CV-2040-WSD, 2014 WL 4093669, at *4 (N.D. Ga. Aug. 18, 2014) (internal quotation marks omitted). And the conspiracy theory requires specific overt acts in Georgia and a viable underlying conspiracy, neither of which is present here.

Accordingly, Plaintiff has failed to establish that any Donor Defendant is subject to this Court's jurisdiction under Georgia law. And because the long-arm statute is not satisfied, the Court need not reach the constitutional due-process

---

[9] *Johnson* applied D.C.'s long-arm statute, but its reasoning applies with equal force here because Georgia law likewise requires the Court to assess each defendant's own forum-directed conduct. *Compare* D.C. Code § 13-423 *with* O.C.G.A. § 9-10-91.

analysis. *Cold Smoke Cap., LLC v. Gross,* No. 1:11-CV-3558-WSD, 2012 WL 3612626, at *7 (N.D. Ga. Aug. 21, 2012). As such, I **RECOMMEND** that the motions to dismiss for lack of personal jurisdiction filed by the Milsteins, (Doc. 39), the Fromer Family Foundation, (Doc. 67), the Natan and Lidia Peisach Family Foundation, (Doc. 70), the Merona Leadership Foundation, (Doc. 98), and the Jan Koum Family Foundation, (Doc. 99), be **GRANTED**.

## III. ADMINISTRATIVE EXHAUSTION

Next, the Emory Defendants argue that Plaintiff's Title VII and ADA claims mostly fail for lack of administrative exhaustion and should be dismissed on that basis. (Doc. 66-1 at 11-13). Below, I analyze the exhaustion issue with respect to each claim.

### a. Title VII Disparate Treatment (Count I)

Count I alleges discrimination based on race, religion, and national origin under Title VII as to the Emory Defendants. (Doc. 31 at ¶¶ 241-255). Before an employee may litigate a claim under Title VII or the ADA, "she must first exhaust her administrative remedies," which begins with "filing a timely charge of discrimination with the EEOC." *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (citing 42 U.S.C. § 2000e-5(b)). "Because Georgia is a non-deferral state, [a plaintiff is] required to file a Charge of Discrimination [with the EEOC]

within 180 days of the alleged unlawful employment action." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003). "Pursuant to that requirement, any claim based on a discrete act of discrimination prior to the 180-day period is not actionable." *Woodson v. Corning*, No. 1:18-CV-1048-LMM-JSA, 2018 WL 11486929, at *5 (N.D. Ga. Nov. 30, 2018), *adopted by* 2019 WL 13273271 (N.D. Ga. Jan. 9, 2019); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("The charge . . . must be filed within the 180-[day] time period after the discrete discriminatory act occurred."). Discrete acts are "separate actionable unlawful employment practice[s]," such as "termination, failure to promote, denial of transfer, or refusal to hire." *Morgan*, 536 U.S. at 114 (internal quotation marks omitted).

Here, Plaintiff filed her EEOC Charge on May 2, 2024. (Doc. 66-2). Accordingly, absent a basis for tolling, only discrete acts occurring on or after November 4, 2023, fall within the 180-day filing period. The parties agree that Plaintiff's termination occurred on November 8, 2023. (Doc. 31 at ¶ 178; Doc. 66-1 at 6). As such, the termination itself falls within the filing period and was timely presented to the EEOC. And Count I challenging Plaintiff's termination as discriminatory is administratively exhausted.

The same is not true, however, for Plaintiff's placement on administrative leave on October 17, 2023, or for the ensuing investigation that preceded her termination. (Doc. 31 at ¶ 245). Placement on administrative leave and the initiation of an investigation are discrete employment actions, each of which occurs on a particular day and is independently verifiable. Because those actions occurred before November 4, 2023, they fall outside the 180-day charge period and cannot themselves serve as independently actionable bases for relief under Title VII or the ADA. Nor does the continuing-violation doctrine save those claims. That doctrine "allows the plaintiff to sue on otherwise time-barred claims if the defendant's actions violate a plaintiff's rights on a repeated or ongoing basis." *Jimenez v. U.S. Att'y Gen.*, 146 F.4th 972, 992 (11th Cir. 2025) (internal quotation marks omitted). It does not apply to discrete acts such as suspensions, investigations, or terminations. *Id.* (observing that "[t]he continuing violation doctrine cannot convert related discrete acts into a single unlawful practice for the purposes of timely filing") (internal quotation marks omitted). Plaintiff therefore cannot render the October 17 administrative leave or subsequent investigative actions timely merely because her termination occurred within the limitations period. *See Lewis v. Mercedes-Benz USA, LLC*, No. 1:22-CV-4804-SEG-JKL, 2025 WL

2058826, at *10 (N.D. Ga. Feb. 6, 2025) (holding that a plaintiff's termination "was a discrete act that cannot be saved by invocation of the continuing violations doctrine" and that the plaintiff could not "reset or extend the limitations period on her separation claim by pointing to some other subsequent discrete act of alleged discrimination or retaliation"), *adopted by* 2025 WL 2058824 (N.D. Ga. June 23, 2025), *appeal dismissed*, No. 25-12468-CC, 2025 WL 4062690 (11th Cir. Dec. 10, 2025).

For these reasons, Plaintiff's Title VII disparate treatment claim (Count I) is exhausted only insofar as it is based on Plaintiff's November 8, 2023, termination. Any Title VII discrimination claim seeking relief for the October 17 administrative leave, the investigation itself, or other pre-November 4, 2023, discrete acts is barred for failure to timely exhaust administrative remedies.

**b. Title VII and ADA Retaliation, and Hostile Work Environment (Counts II, III, and VII)**

The Court addresses a different question with respect to Counts II, III, and VII: whether those claims fall within the scope of the EEOC Charge. Counts II and III allege, respectively, Title VII retaliation and ADA retaliation against the institutional Emory Defendants. (Doc. 31 at ¶¶ 256-273, 274-292). Count VII alleges a hostile work environment under both statutes as to the same Defendants. *Id.* at ¶¶ 353-373.

"[A] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Patterson v. Georgia Pacific, LLC*, 38 F.4th 1336, 1345 (11th Cir. 2022) (internal quotation marks omitted). "Judicial claims are proper if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint, but allegations of new acts of discrimination are inappropriate." *Thomas v. Miami Dade Pub. Health Tr.*, 369 F. App'x 19, 22 (11th Cir. 2010) (internal quotation marks and alteration omitted). The Eleventh Circuit has "noted that the scope of an EEOC complaint should not be strictly interpreted." *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (internal quotation marks omitted); *see also Patterson*, 38 F.4th at 1345 ("We do not strictly construe EEOC charges, and we are reluctant to allow procedural technicalities to bar Title VII claims.").

I begin with Count II, Plaintiff's Title VII retaliation claim. On the EEOC charge, Plaintiff checked boxes for religion discrimination, national-origin discrimination, and disability discrimination. (Doc. 66-2 at 1). She did not check the retaliation box. *Id.* Although failure to check a particular box is not dispositive, having reviewed the charge, the Court concludes that a Title VII retaliation claim would not reasonably have grown out of the allegations presented to the EEOC.

The charge alleges that Plaintiff was subjected to disparate treatment because she is Palestinian and Muslim, and that she was wrongly terminated because of her disability. *Id.* at 2-4. It does not allege that she engaged in protected activity under Title VII, such as opposing discrimination prohibited by Title VII or participating in a Title VII proceeding. Nor does it allege facts that would naturally prompt the EEOC to investigate whether Defendants retaliated against her for engaging in such protected conduct. Plaintiff argues that the charge referenced her comments at the October 10 DEI meeting, and that those comments constituted protected opposition activity. (Doc. 91 at 25). But the charge referenced that meeting in the context of describing Plaintiff's emotional distress and subsequent mental-health symptoms, not as an instance of opposition to unlawful employment discrimination. (*See* Doc. 66-2 at 2). An EEOC investigation into whether Plaintiff was discriminated against because of her religion or national origin would not reasonably encompass an inquiry into whether she was retaliated against for engaging in protected Title VII activity when the charge nowhere identifies such activity. As such, Count II exceeds the scope of the EEOC charge and is due to be dismissed for failure to exhaust. *See Ramon v. AT & T Broadband*, 195 F. App'x 860, 866 (11th Cir. 2006) (unpublished) (finding a retaliation claim unexhausted where

the plaintiff "did not check the retaliation box on the EEOC charge form" and "failed to illustrate in the charge her claim later made in the complaint" that the adverse employment action was a result of her protected activity); *Sprinkle v. City of Douglas*, 621 F. Supp. 2d 1327, 1350 (S.D. Ga. 2008) (finding a failure to exhaust where "not only did Plaintiff not mention retaliation anywhere in his EEOC charge, but there was absolutely no factual basis in the charge" for retaliation).

The Court reaches the same conclusion as to Count III, Plaintiff's ADA retaliation claim. The charge alleges that Plaintiff suffered from PTSD and related conditions, requested FMLA leave, and was subsequently terminated. (Doc. 66-2 at 2). But the charge does not allege that Plaintiff requested an ADA accommodation, that any accommodation request was denied, or that Defendants retaliated against her for seeking such accommodation. Plaintiff's response in opposition to the motion to dismiss characterizes the charge as describing an "FMLA/ADA accommodation request," (Doc. 91 at 24), but for exhaustion purposes, the Court must look to the charge itself. The charge's reference to an approved FMLA leave request does not reasonably place the EEOC on notice of an ADA retaliation theory. An investigation into whether Plaintiff was terminated because of her disability is not the same as an investigation into whether she was

terminated for requesting an accommodation. Because the factual allegations in the charge would not reasonably have led the EEOC to investigate ADA retaliation, Count III is unexhausted. *See Booth v. City of Roswell*, 754 F. App'x 834, 837 (11th Cir. 2018) (unpublished) (finding a reasonable-accommodation claim unexhausted where the plaintiff's EEOC charge "only said that he was terminated and that he believed he had been discriminated against because of his disability," and did not "mention an accommodation request" or "a failure to accommodate").

Count VII, alleging a hostile work environment under Title VII and the ADA, fares no better. The charge alleges discriminatory treatment culminating in Plaintiff's termination. (Doc. 66-2 at 2-4). It does not allege a hostile work environment, describe severe or pervasive harassment, or recount a pattern of intimidation, ridicule, insult, or other workplace conduct of the type typically associated with a hostile-work-environment claim. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245–47 (11th Cir. 1999) (en banc). Nor would an EEOC investigation into whether Plaintiff was discriminatorily terminated reasonably be expected to expand into a hostile-work-environment inquiry based on the allegations presented. The charge did not present a hostile-work-environment theory or facts that would reasonably trigger such an investigation. Indeed, Plaintiff expressly

described her theories in the charge---wrongful termination and disparate treatment. (Doc. 66-2 at 1). Accordingly, Count VII falls outside the scope of the administrative charge and should be dismissed. *See Johnson*, 827 F.Supp. 3d at 167 (dismissing plaintiff's Title VII retaliation and hostile work environment claims as unexhausted because her EEOC charge "reads like a textbook example of" disparate treatment, and the charge did not "reference the hallmarks of a hostile work environment claim, such as harassment from coworkers or insulting or disparaging comments" (internal quotation marks omitted)).

* * *

In sum, the Court concludes that Plaintiff exhausted administrative remedies only as to her Count I discrimination claims arising from her November 8, 2023, termination. Any discrimination claim predicated on earlier discrete acts is time-barred. Additionally, Counts II and III (retaliation) and Count VII (hostile work environment) exceed the scope of the EEOC charge and are therefore due to be dismissed for failure to exhaust administrative remedies.

## IV. MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

I now turn to Defendants' various motions to dismiss on the merits what remains of Plaintiff's case: her Title VI and FMLA interference claims against the

Emory Defendants (Title VI only as to the institutional Emory Defendants); her claim of a conspiracy to deprive her of her rights under 42 U.S.C. § 1985(3) against all Defendants (but now only against the Emory Defendants and Weiden, because I have recommended that the Donor Defendants be dismissed for lack of personal jurisdiction); and her state-law claims of tortious interference (against Weiden and the individual Emory Defendants) and false light invasion of privacy (against Weiden). I address each claim below.[10]

**a. Standard on a Motion to Dismiss**

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While a plaintiff need not include "detailed factual allegations" in the complaint, the requirement to demonstrate the grounds for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In other words, Rule 8 requires "more than an unadorned, the-defendant-

[10] The Emory Defendants have not moved to dismiss Plaintiff's claim of race discrimination under 42 U.S.C. § 1981 (Count IV), or her breach-of-contract claim (Count IX). Additionally, the Court does not address the tortious-interference claim as to Defendants Canary Mission, StopAntisemitism.org, or Liora Reznichenko, who have not appeared.

unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

These standards suggest a two-pronged approach for courts evaluating a motion to dismiss a complaint. *See id.* at 678–79; *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010). First, "eliminate any allegations in the complaint that are merely legal conclusions." *Am. Dental Ass'n*, 605 F.3d at 1290. While a court must accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff, *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011), it need not consider "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678. Nor should it consider "a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Second, "where there are well-pleaded factual allegations, assume their veracity and then determine

whether they plausibly give rise to an entitlement to relief." *Am. Dental Ass'n*, 605 F.3d at 1290 (internal quotation marks omitted).

**b. Title VI (Count V)**

Plaintiff raises a claim against the institutional Emory Defendants under Title VI, which prohibits any person from being excluded from participation in, denied the benefits of, or subjected to discrimination under "any program or activity receiving Federal financial assistance" on the basis of race, color, or national origin. 42 U.S.C. § 2000d. Importantly, however, "it was not intended that Title VI would impinge on Title VII," *Johnson v. Transp. Agency, Santa Clara Cnty.*, 480 U.S. 616, 627 n. 6 (1987) (internal quotation marks and alterations omitted), and it is Title VII, not Title VI, that "comprehensively regulates [employment] discrimination." *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 632 n. 13 (1984). As such, Title VI is limited to situations where providing employment is itself a primary purpose of the federal funding at issue. A Title VI plaintiff, then, must show that the program receives federal funding "for purposes of providing employment." *Jones v. Metro. Atlanta Rapid Transit Auth.*, 681 F.2d 1376, 1378 (11th Cir. 1982); *see also Glover v. Dist. of Trs. of Palm Beach State Coll.*, No. 9:19-CV-80968-ROSENBERG/REINHART, 2020 WL 3118469, at *1 (S.D. Fla. Jan. 23, 2020) ("Title

VI prohibits discrimination by an employer only if the employer receives federal financial assistance for the primary purpose of providing employment.”). The issue of “whether an employer receives federal funds for the primary purpose of providing employment is a threshold requirement for a litigant to raise a Title VI claim against an employer.” *Russell v. Pub. Health Tr. of Miami-Dade Cnty.*, No. 08-23442-CIV, 2009 WL 936662, at *6 (S.D. Fla. Apr. 6, 2009).

Plaintiff’s Title VI claim fails at this threshold step. To be sure, the complaint alleges that Emory University and Emory Healthcare receive “substantial federal financial assistance” through research grants, educational programs, student financial aid, healthcare funding, Medicare, Medicaid, infrastructure grants, federal contracts, and institutional support. (Doc. 31 at ¶ 315). And it further alleges that Plaintiff’s employment was “part of” Emory’s federally funded academic medical center program and that her position “involved participation in federally funded research activities, medical education programs, and healthcare delivery services.” *Id.* at ¶ 318. But that is not enough. Research funding, educational funding, healthcare-program funding, student financial aid, Medicare, Medicaid, grants, contracts, and institutional support may involve employees or require personnel to administer, but the complaint does not plead

facts showing that their primary purpose was employment. *See Scirotto v. City of Fort Lauderdale*, No. 23-60424-CIV, 2023 WL 11814856, at *11 (S.D. Fla. Sept. 22, 2023) (dismissing a Title VI claim where the plaintiff failed to show that the defendant "was provided federal funds for the purpose of creating jobs").

Nor do Plaintiff's allegations that her faculty and physician role was "integral to" federally funded programs cure the defect. (Doc. 31 at ¶ 326). Those allegations may suggest that Plaintiff worked in programs that received or benefited from federal funds, but not that Emory received federal assistance for the purpose of providing employment. The amended complaint's repeated assertion that Plaintiff was excluded from "federally funded programs" by virtue of her termination, *see id.* at ¶¶ 317–20, merely repackages an employment-discrimination theory. It does not plausibly allege the statutory prerequisite that the federal funds themselves were provided primarily to create or support employment. *See Russell*, 2009 WL 936662, at *6 (dismissing a Title VI claim where plaintiff had only alleged that defendant was "a public hospital and medical center which, upon information and belief, is supported both by local, state and federal tax and/or grant moneys").

As such, Plaintiff has not pleaded that Emory received federal financial assistance for the primary purpose of providing employment. Count V therefore fails to state a Title VI claim, and I **RECOMMEND** that it be **DISMISSED**.

**c. FMLA Interference (Count VI)**

The FMLA grants eligible employees the right to take up to twelve workweeks of unpaid leave during any twelve-month period for any one or more of several reasons, including that the employee has a serious health condition. 29 U.S.C. § 2612(a)(1)(D); *see also Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006). An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided for under the FMLA, nor may an employer "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. §§ 2615(a)(1), (2).

An employee may assert two types of claims under the FMLA: "interference claims, in which an employee asserts that [her] employer denied or otherwise interfered with [her] substantive rights under the Act, and retaliation claims, in which an employee asserts that [her] employer discriminated against [her] because [s]he engaged in activity protected by the Act." *Strickland v. Water Works and Sewer*

*Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001) (internal citations omitted). Both interference and retaliation claims require the plaintiff to establish that she qualified for FMLA leave. *Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003). To plausibly state a claim of FMLA interference, a plaintiff must allege facts showing that she was entitled to a right under the FMLA but was denied that right. *Strickland*, 239 F.3d at 1206–07; *see also Pereda v. Brookdale Senior Living Cmtys., Inc.*, 666 F.3d 1269, 1274 (11th Cir. 2012) (applying this standard in the motion to dismiss context).

Here, Plaintiff alleges three forms of interference: (1) Defendants continued their investigation after Plaintiff requested and was approved for FMLA leave; (2) Defendants required Plaintiff to participate in an investigatory interview on October 20, 2023, shortly after she submitted her FMLA documentation; and (3) Defendants terminated Plaintiff's employment on November 8, 2023, while she remained on approved leave. (Doc. 31 at ¶ 339).

These allegations do not plausibly state an FMLA interference claim. As an initial matter, the FMLA "does not create an absolute right to be left alone." *Simmons v. Indian Rivers Mental Health Ctr.*, 652 F. App'x 809, 819 (11th Cir. 2016). In other words, it does not entitle an employee to be entirely relieved of all contact

with her employer during a period of leave. Accordingly, Plaintiff's allegations that Defendants continued an already-initiated investigation and required her participation in a scheduled investigatory interview do not, standing alone, plausibly establish the denial of any substantive FMLA entitlement. The SAC does not allege that Defendants revoked Plaintiff's approved leave, denied leave benefits, refused to process her leave request, required her to return to work, or otherwise prevented her from taking leave. Rather, Plaintiff alleges that Defendants proceeded with an investigation that had already started before her leave request was submitted. (Doc. 31 at ¶ 339). And while the FMLA generally entitles an employee returning from leave to reinstatement, an employer may terminate an employee who would have been terminated regardless of her request for leave. *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010) (noting that "if an employer can show that it refused to reinstate an employee for a reason unrelated to FMLA leave, the employer is not liable for failing to reinstate the employee after the employee has taken FMLA leave").

The chronology alleged in the SAC defeats any plausible inference that Plaintiff's termination deprived her of a substantive FMLA entitlement. According to Plaintiff's own allegations, the events precipitating the investigation occurred

between October 7 and October 15, 2023. (Doc. 31 at ¶¶ 85–103). Defendants placed her on administrative leave, and informed her that an investigation would occur, on October 17, 2023. *Id.* at ¶¶ 162, 171. Only after that did Plaintiff obtain psychiatric documentation and submit her FMLA request, on October 19, 2023. *Id.* at ¶ 174. Thus, by Plaintiff's own allegations, the challenged disciplinary process was already underway before she requested leave.

To be sure, Plaintiff alleges that Defendants ultimately reached the wrong conclusion and terminated her for improper reasons. But even if that were true, it does not plausibly show that Plaintiff lost any FMLA right because she requested leave. The complaint itself alleges that the investigation, administrative leave, and contemplated disciplinary proceedings predated the FMLA request. Under those circumstances, Plaintiff has not plausibly alleged that Defendants denied her leave benefits or interfered with her exercise of FMLA rights. *See Bolden v. DeKalb Cnty. Sch. Dist.*, No. 1:20-CV-2725-MLB-CMS, 2021 WL 6936652, at *9 n. 8 (N.D. Ga. Nov. 30, 2021) (noting that there is "persuasive case law showing that even if [the plaintiff] had been asked to participate in [his employer's] investigation of misconduct, it would not have constituted impermissible interference with his

FMLA leave"), *adopted by* 2022 WL 1690537 (N.D. Ga. Feb. 18, 2022). As such, her FMLA interference claim (Count VI) is due to be dismissed.

**d. § 1985(3) Conspiracy (Count VIII)**

Plaintiff next brings a claim of conspiracy to violate her civil rights under § 1985(3) against all Defendants. The Eleventh Circuit has articulated the elements of such a claim:

> The elements of a cause of action under section 1985(3) are (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 627–28 (11th Cir. 1992) (internal quotation marks omitted).

"The only rights the Supreme Court has expressly declared enforceable against private conspirators under § 1985(3) are the right to interstate travel and the right against involuntary servitude." *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010). By contrast, speech rights, and rights protected by Title VII, may not form the basis of § 1985(3) claims against private actors. *See Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 274, 278 (1993); *Great Am. Fed. Sav.*

*& Loan Ass'n v. Novotny*, 442 U.S. 366, 378 (1979). Additionally, "a § 1985(3) conspiracy must be motivated by a racial or otherwise class-based, invidiously discriminatory animus." *Cooksey v. Waters*, 435 F. App'x 881, 883 (11th Cir. 2011).

Here, Plaintiff alleges that Defendants conspired to deprive her of rights protected by Title VII, § 1981, the First Amendment, the Fourteenth Amendment, Georgia law, and more generalized rights to professional access and freedom from retaliation. (Doc. 31 at ¶ 384). However, to begin with, none of those are rights that have been found to state a claim against a private actor, and some of them have been squarely found *not* to state such a claim. Her reliance on § 1981 is foreclosed by *Jimenez*, which held that § 1981 rights do not support a § 1985(3) claim against private conspirators. 596 F.3d at 1312. Her reliance on Title VII is foreclosed by *Novotny*. 442 U.S. at 378. And her invocation of the First and Fourteenth Amendments is likewise insufficient under binding law. The First Amendment does not provide a basis for a § 1985(3) claim against purely private actors, and the Fourteenth Amendment reaches state action, not the private conduct alleged here. *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 830 (1983); *Terry Props., Inc. v. Standard Oil Co. (Ind.)*, 799 F.2d 1523, 1533-34 (11th Cir. 1986).

But even if that were not the case, Plaintiff's conspiracy claim would fail at the first step: alleging the conspiracy. The "linchpin for conspiracy is agreement, which presupposes communication." *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty.*, 956 F.2d 1112, 1122 (11th Cir. 1992). It is not enough to allege that various actors took actions that occurred in temporal sequence or that one actor's conduct influenced another actor's later decision. Without "a meeting of the minds, the independent acts of two or more wrongdoers do not amount to a conspiracy." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005) (internal quotation marks and citation omitted). Thus, a complaint must plead facts permitting a reasonable inference that the alleged conspirators reached an understanding to accomplish an unlawful objective. And here, the SAC does not do so.

Plaintiff alleges that StopAntisemitism.org posted about her on October 16, 2023; that Weiden responded online that "we will start working on the campaign to get her fired"; that Emory officials contacted Plaintiff and placed her on administrative leave the next day; and that Emory later terminated her employment. (Doc. 31 at ¶¶ 159, 162, 186, 397). But a sequence of events is not an agreement. The SAC does not allege that Weiden communicated with Emory decisionmakers about Plaintiff's termination, that Emory or the individual Emory

Defendants communicated with StopAntisemitism.org, Canary Mission, or any other outside actor, or that any remaining defendant reached an understanding with any other defendant to violate Plaintiff's rights.[11]

Specifically as to Weiden, Plaintiff mostly relies on his alleged statement that "we will start working on the campaign to get her fired." (Doc. 31 at ¶ 186). But the SAC does not identify who "we" refers to, what agreement had been reached, when it was reached, or with whom. Nor does it allege any subsequent act by Weiden showing coordination with Emory. A vague pronoun in a social-media comment cannot substitute for factual allegations of a conspiratorial agreement. And the allegations against the Emory Defendants are similarly deficient. Plaintiff alleges that Emory acted quickly after public criticism of her posts and that outside actors later celebrated Emory's actions. But the SAC pleads no facts showing that Emory, Thadhani, Lee, or del Rio agreed with Weiden or any outside organization to accomplish an unlawful objective. At most, Plaintiff alleges that Emory

[11] Plaintiff rightly observes that conspiracies are often (indeed, almost always) established through circumstantial facts rather than direct evidence, and that such facts can be enough at the pleading stage. (Doc. 49 at 14). The problem here is that the circumstances do not reasonably support the inference of an agreement among Defendants.

responded to public controversy and made an employment decision she believes was discriminatory and unjustified. That may describe an employment dispute, but it does not plausibly plead a § 1985(3) conspiracy.

Plaintiff's theory ultimately depends on speculation: because outside actors criticized her, because Weiden posted about a "campaign," because Emory acted soon afterward, and because outside actors later praised the result, the defendants *must* have been acting pursuant to a shared agreement. But a complaint requires more than allegations that are "merely consistent with" liability. *Twombly*, 550 U.S. at 557.[12] The complaint does not "hint at any events, conversations, or documents that might reveal an agreement," and its "patchwork of allegations cannot form a quilt of conspiracy without being stitched together by substantial strands of speculation." *Johnson*, 827 F.Supp. 3d at 172. Accordingly, even if Plaintiff had identified a right actionable under § 1985(3), the claim would still fail because the SAC does not plausibly allege an agreement among the Defendants to deprive

---

[12] Indeed, the Supreme Court in *Twombly* itself rejected a conspiracy claim (albeit under the Sherman Act) because the complaint pleaded conduct that was "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy," and therefore did not "nudge[]" the claim "across the line from conceivable to plausible." 550 U.S. at 554, 570.

Plaintiff of that right. *See Mickens v. Tenth Jud. Cir.*, 181 F. App'x 865, 876 (11th Cir. 2006) (affirming the dismissal of a § 1985(3) claim because plaintiff had "failed to allege with specificity an agreement between the defendants to deprive the [plaintiffs] of their rights").

As such, Count VIII (conspiracy) is due to be dismissed.[13]

**e. Tortious Interference with an Employment Contract (Count X)**

Plaintiff brings a claim for tortious interference with contract against the individual Emory Defendants and Weiden along with several Defendants who have not yet appeared. (Doc. 31 at ¶¶ 434-466). In order to state a claim for tortious interference with employment under Georgia law, "a plaintiff must allege: (1) the existence of an employment relationship; (2) interference by one who is a 'stranger' to the relationship; and (3) resulting damage to the employment relationship." *Lee*

[13] The Milsteins and Weiden additionally move to strike Plaintiff's response to their motion to dismiss. (Doc. 56). Plaintiff's response was filed four days after the extended deadline and exceeded the page limit that would ordinarily have applied to a single response. The Court fully agrees with the Milsteins that Plaintiff's counsel should have complied with the Court's scheduling order and the Local Rules, or should have sought leave to deviate from them. Plaintiff's counsel routinely ignores the rules. But the Court finds no meaningful prejudice resulting from the delay or the consolidated briefing. Because of this, and because the motions to dismiss have been fully briefed and addressed, the Milsteins' motion to strike, (Doc. 56), is **DENIED**.

*v. Caterpillar, Inc.*, 496 F. App'x 914, 915 (11th Cir. 2012). "In addition, it must be shown that the alleged intermeddler acted maliciously and without privilege." *Harper v. DSI Enters., Inc.*, No. 3:08-CV-00085-JTC-RGV, 2009 WL 10665765, at *4 (N.D. Ga. June 26, 2009) (internal quotation marks omitted). And "*an independent wrongful act* is required as well as an injury." *Singleton v. Itson*, 383 S.E.2d 598, 599 (Ga. Ct. App. 1989) (emphasis in original) (internal quotation marks omitted).

The Eleventh Circuit has found that "the term 'stranger' has been interpreted broadly by Georgia courts" in tortious interference cases, noting that:

> "One is not a stranger to the contract just because one is not a party to the contract." *Mabra v. SF, Inc.,* 316 Ga.App. 62, 728 S.E.2d 737, 740 (2012) (quotation omitted). "Those who have a direct economic interest in or would benefit from a contract with which they are alleged to have interfered (even though not intended third-party beneficiaries of the contract) are not strangers to the contract and cannot have tortiously interfered." *Id.* Moreover, "all parties to an interwoven contractual arrangement are [not strangers and therefore] not liable for tortious interference with any of the contracts or business relationships." *Id.* (quotation omitted).

*Id*. at 915–16 (alteration in original). And the Supreme Court of Georgia has explained the evolution of the tort in these terms:

> The intended third-party beneficiary of a contract, legally authorized to enforce the contract, cannot be held liable for tortious interference since he is not a stranger to the contract. The exclusion of third-party beneficiaries from the "stranger doctrine" has been expanded to cover those who benefit from the contract of others, without regard to

> whether the beneficiary was intended by the contracting parties to be a third-party beneficiary. . . . We endorse the Court of Appeals' line of cases which, in effect, reduce the number of entities against which a claim of tortious interference with contract may be maintained. We reiterate that, in order to be liable for tortious interference, one must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract. In other words, all partys to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships.

*Atlanta Mkt. Ctr. Mgmt., Co. v. McLane*, 503 S.E.2d 278, 283–84 (Ga. 1998).

In *Lee*, the Eleventh Circuit held that "it is clear" that the defendant was not a stranger to the employment contract where the plaintiff's employer employed the plaintiff to provide services to the defendant and the defendant "therefore benefitted from [the plaintiff's] employment contract with [his employer]." 496 F. App'x at 916.

Applying those principles, Plaintiff's tortious-interference claim fails as to Defendants Thadhani, Lee, del Rio, and Weiden. Plaintiff alleges that Thadhani, Lee, and del Rio interfered with her employment contract by placing her on administrative leave, issuing or approving institutional communications concerning her conduct, participating in the investigation, and ultimately terminating her employment. (Doc. 31 at ¶¶ 447-52). But the SAC's own allegations establish that these Defendants were not strangers to Plaintiff's

employment relationship with Emory. Thadhani was Emory University's Executive Vice President for Health Affairs, Lee was the CEO of Emory Healthcare, and del Rio was the Interim Dean of Emory School of Medicine. *Id.* at ¶¶ 24-26. The conduct attributed to them—administrative leave, institutional communications, investigation-related actions, and termination—falls squarely within Emory's internal employment and institutional governance functions. Under Georgia law, "in order to be liable for tortious interference, one must be a stranger to both the contract at issue and the *business relationship* giving rise to and underpinning the contract." *Atlanta Mkt. Ctr.*, 503 S.E.2d at 283 (emphasis added). That does not describe Thadhani, Lee, or del Rio.

Plaintiff attempts to avoid this rule by alleging that Thadhani, Lee, and del Rio acted outside the scope of their authority because they acted with discriminatory animus, relied on false pretenses, and coordinated with external actors. (Doc. 31 at ¶ 437). But those assertions are conclusory. The SAC does not plead facts plausibly showing that these Defendants stepped outside their institutional roles or acted as strangers to Plaintiff's employment relationship. To the contrary, the facts pleaded show that they acted, if at all, as senior Emory officials addressing employee conduct they believed implicated Emory's policies,

reputation, and operations. That Plaintiff disputes the legality, fairness, or motivation of those actions does not transform Emory officials into third-party intermeddlers with Emory's own employment contract.

The claim against Weiden also fails, for a different reason. Plaintiff alleges that Weiden was an Emory radiologist who publicly criticized Plaintiff, endorsed characterizations of her posts as antisemitic or supportive of Hamas, and stated that "we will start working on the campaign to get her fired." (Doc. 31 at ¶¶ 186, 444–46). Unlike the individual Emory Defendants, Weiden is not alleged to have had supervisory authority over Plaintiff. But even assuming Plaintiff has shown that Weiden was a stranger to the contract, and that he acted maliciously and without privilege (all of which Weiden contests) she has not adequately alleged an independent wrongful act. Such an act "generally involves predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." *Culpepper v. Thompson*, 562 S.E.2d 837, 840 (Ga. Ct. App. 2002). Nothing like that is alleged here.

Nor, for that matter, has Plaintiff adequately pled causation. "[I]f a plaintiff cannot show that damage to his rights or obligations under a contract proximately

resulted from the third party's alleged interference, his claim for tortious interference fails as a matter of law." *Duke Galish, LLC v. Manton*, 662 S.E.2d 880, 884 (Ga. Ct. App. 2008). And "any damage claimed to have been suffered by a plaintiff does not proximately result from the defendants' alleged misconduct, if the damage would have occurred notwithstanding their misconduct." *Id.* Here, even construing the facts in her favor, Plaintiff has not shown that Weiden's alleged interference played *any* role in Emory's decision to terminate her, much less the decisive one. Plaintiff baldly asserts that Weiden "led a coordinated campaign" within Emory, (*see* Doc. 31 at ¶¶ 27, 444), but she does not plead specific facts showing what Weiden did to induce Emory's decision, what communications he made to decisionmakers, or how those communications caused Emory to suspend or terminate Plaintiff. The allegation that Weiden publicly criticized Plaintiff and expressed a desire that she be fired is not enough, without factual allegations connecting his conduct to Emory's decision.

Accordingly, Count X is due to be dismissed as to Defendants Thadhani, Lee, del Rio, and Weiden.

**f. False Light (Count XI)**

Finally, Plaintiff pursues a claim, against Weiden, of false light invasion of privacy under Georgia law. (Doc. 31 at ¶¶ 467-492).

"To support a claim for false light invasion of privacy, a plaintiff must show that the defendant knowingly or recklessly published falsehoods about him … and, as a result, placed him … in a false light which would be highly offensive to a reasonable person." *Phillips v. Ocwen Loan Servicing, LLC*, 92 F. Supp. 3d 1255, 1267 (N.D. Ga. 2015). Additionally, "the publicity [must be] false; to wit, it depicts the plaintiff as something or someone which he is not." *Zarach v. Atlanta Claims Ass'n*, 500 S.E. 2d 1, 6 (Ga. Ct. App. 1998) (internal quotation marks omitted). "Whatever innuendos people may draw from such facts is a matter of individual thought processes, and cannot support a claim for false light." *Monge v. Madison Cty. Record, Inc.*, 802 F. Supp. 2d 1327, 1337 (N.D. Ga. 2011) (internal quotation marks and alterations omitted).

Plaintiff's false-light claim against Weiden is based on two categories of conduct: first, that Weiden publicly endorsed statements portraying Plaintiff as a "Hamas supporter" and "antisemite"; and second, that Weiden stated, "We will start working on the campaign to get her fired." (Doc. 31 at ¶¶ 27, 185–86, 472).

Plaintiff contends that these statements falsely portrayed her as a supporter of terrorism, as antisemitic, and as professionally unfit to remain employed at Emory.

However, to begin with, the claim is time-barred. Georgia applies a one-year statute of limitations to false-light invasion-of-privacy claims. O.C.G.A. § 9-3-33 (providing that "actions for injuries to the person shall be brought within two years after the right of action accrues, *except for injuries to the reputation, which shall be brought within one year after the right of action accrues*.") (emphasis added); *see also Marques v. JP Morgan Chase N.A.*, No. 1:16-CV-1215-LMM-AJB, 2019 WL 2714504, at *7 (N.D. Ga. Jan. 3, 2019), *adopted by* 2019 WL 2714503 (N.D. Ga. Feb. 26, 2019) (applying a one-year statute of limitations to a false light invasion of privacy claim). The alleged statements necessarily occurred no later than November 8, 2023, when Plaintiff was terminated, and the SAC specifically ties Weiden's alleged conduct to events in October 2023. Plaintiff did not file this action until May 2, 2025, well over one year later. Plaintiff, citing an out-of-district case, argues that the statute of limitations was tolled while her EEOC charge was pending. (Doc. 49 at 41). That is incorrect. A false-light claim is an independent state-law tort, and it "is well-established that the statute of limitations for a plaintiff's state law claims is not tolled while the plaintiff is pursuing administrative remedies

with the EEOC." *Simmons v. Mobile Infirmary Med. Ctr.*, 391 F. Supp. 2d 1124, 1131 (S.D. Ala. 2005); *see also Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 466 (1975) (holding that a § 1981 claim is not tolled during an EEOC investigation of a Title VII claim for the same conduct). Plaintiff was not prevented from filing her false-light claim within the limitations period against Weiden, who is, in any event, an individual party, not an employer or even one of Plaintiff's supervisors. Accordingly, the false-light claim is untimely.

But it would also fail on the merits. The SAC does not identify with sufficient specificity any false statement of fact made by Weiden. It alleges that he "endorsed" characterizations of Plaintiff as a "Hamas supporter" and "antisemite," but it does not quote the alleged statement, identify the platform, specify the date, describe the audience, or explain whether Weiden authored, reposted, liked, commented on, or otherwise adopted the statement. The only specific statement attributed to Weiden is, "We will start working on the campaign to get her fired." (Doc. 31 at ¶ 186). That statement is not a false factual depiction of Plaintiff, but rather a statement of intent or advocacy regarding future action. It may be critical or even hostile, but it is not capable of being proven true or false and therefore cannot support a false-light claim. And labels such as "antisemite"

or "Hamas supporter," particularly in the context of heated public debate over political speech and international conflict, are not pleaded here as verifiable false statements of fact by Weiden. At most, the SAC alleges that Weiden expressed or endorsed a harsh or uncharitable interpretation of Plaintiff's own public posts. That is insufficient.

Because Plaintiff's false-light claim against Weiden is untimely and, in any event, fails to plausibly allege actionable false publicity by him, the claim is due to be dismissed.

## V. CONCLUSION

For the reasons set forth above, I **RECOMMEND** that Plaintiff's motion for service, (Doc. 32), be **GRANTED**, and that the Emory Defendants' motions to dismiss, (Docs. 66, 69), be **GRANTED IN PART**. Specifically, I **RECOMMEND** that Counts II, III, and VII be **DISMISSED WITHOUT PREJUDICE** for failure to exhaust administrative remedies,[14] and that Count I be **DISMISSED WITHOUT PREJUDICE** for the same reason, except to the extent that Count I relies on

[14] *See Grier v. Sec'y of Army*, 799 F.2d 721, 724-25 (11th Cir. 1986) (holding that an unexhausted Title VII claim is properly dismissed without prejudice to be first raised to the EEOC and that, even if filing an EEOC charge would be untimely, a plaintiff may be able to argue tolling before the EEOC).

Plaintiff's termination. I further **RECOMMEND** that Count V; Count VI; Count VIII; Count X as to Thadhani, Lee, del Rio, and Weiden; and Count XI as to Weiden be **DISMISSED** for failure to state a claim.

Additionally, I **RECOMMEND** that the motions to dismiss for lack of personal jurisdiction filed by the Milsteins, (Doc. 39), the Fromer Family Foundation, (Doc. 67), the Natan and Lidia Peisach Family Foundation, (Doc. 70), the Merona Leadership Foundation, (Doc. 98), and the Jan Koum Family Foundation, (Doc. 99), be **GRANTED**, and that the claims against each of these Defendants be **DISMISSED**. The Milsteins' motion to strike, (Doc. 56), is **DENIED**.

Finally, Defendant Liora L. Reznichenko has filed a motion for leave to file matters under seal, (Doc. 57), and Koum has filed a motion to substitute the second declaration of Jasmine Rodgers in place of Ms. Rodgers' original declaration, (Doc. 104). Plaintiff has not responded to either motion, rendering them unopposed. *See* LR 7.1(B), NDGa. ("Failure to file a response shall indicate that there is no opposition to the motion."). For this reason, and because they are otherwise supported by good cause, both motions, (Docs. 57, 104), are **GRANTED**. The Clerk

is **DIRECTED** to seal Docs. 33, 35, 78, and 86, and their attachments.[15]

**IT IS SO ORDERED and RECOMMENDED,** this 30th day of July, 2026.

CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE

[15] Reznichenko initially requested the sealing of only Docs. 33 and 35, but she has since contacted the Court requesting the additional sealing of Docs. 78 and 86, which contain the same sensitive information. The Court has provisionally sealed all four docket entries pending the resolution of the motion.